# EXHIBIT 2

**EFiled:  Jun 14 2019 05:31PM EDT**
**Transaction ID 63366543**
**Case No. K19C-06-022 JJC**

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| **CITY OF DOVER, a municipal corporation of the State of Delaware, CITY OF SEAFORD, a municipal corporation of the State of Delaware, and KENT COUNTY, a political subdivision of the State of Delaware,** | |
| **Plaintiffs,** | **C.A. No. _____** |
| **vs.** | |
| **PURDUE PHARMA L.P.; PURDUE PHARMA INC.; THE PURDUE FREDERICK COMPANY, INC.; RHODES PHARMACEUTICALS, L.P.; ABBOTT LABORATORIES; ABBOTT LABORATORIES, INC.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC N/K/A JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. N/K/A JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC F/K/A ACTAVIS PLC; ACTAVIS, INC. F/K/A WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.;** | **TRIAL BY JURY OF TWELVE DEMANDED** |

1

| | |
|---|---|
| **ACTAVIS LLC; ACTAVIS PHARMA, INC. F/K/A WATSON PHARMA, INC.; MALLINCKRODT PLC; MALLINCKRODT LLC; INSYS THERAPEUTICS, INC.; MYLAN PHARMACEUTICALS, INC.; ASSERTIO THERAPEUTICS, INC., F/K/A DEPOMED, INC.; MCKESSON CORPORATION; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN CORPORATION;  ANDA PHARMACEUTICALS, INC.; H.D. SMITH, LLC; CVS HEALTH CORPORATION; RITE AID CORPORATION; WALGREENS BOOTS ALLIANCE, INC.; RICHARD SACKLER; THERESA SACKLER; KATHE SACKLER; JONATHAN SACKLER; MORTIMER D.A. SACKLER; BEVERLY SACKLER; DAVID SACKLER; ILENE SACKLER LEFCOURT;** | |
| **Defendants.** | |

## **COMPLAINT**

Plaintiffs, The City of Dover, The City of Seaford, and Kent County, Delaware (collectively referred to as "Plaintiffs"), by and through the undersigned attorneys, upon personal knowledge as to its own acts and beliefs, and upon information and belief as to all matters based upon the investigation of counsel, for

its Complaint against Defendants Purdue Pharma L.P.; Purdue Pharma Inc.; The Purdue Frederick Company; Inc.; Rhodes Pharmaceuticals, L.P.; Abbott Laboratories; Abbott Laboratories, Inc.;    Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals Inc.; Janssen Pharmaceutica, Inc. n/k/a/ Janssen Pharmaceuticals; Endo Health Solutions, Inc.; Endo Pharmaceuticals, Inc.; Allergan PLC f/k/a Actavis plc; Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.; Watson Laboratories, Inc.; Actavis LLC; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Mallinckrodt PLC; Mallinckrodt LLC; Insys Therapeutics; Mylan Pharmaceuticals, Inc.; Assertio Therapeutics, Inc. f/k/a Depomed, Inc. (collectively "Manufacturer Defendants"); McKesson Corporation; Cardinal Health, Inc.; AmerisourceBergen Corporation; Anda Pharmaceuticals, Inc.; H.D. Smith, LLC; CVS Health Corporation; Rite Aid Corporation; and Walgreens Boots Alliance, Inc. (collectively, "Distributor Defendants"); Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; and Ilene Sackler Lefcourt (collectively "the Sackler Family"); all collectively referred to as "Defendants", allege as follows:

## I.   INTRODUCTION

1.      There is an opioid epidemic ravaging the United States, touching virtually every community in the county including the City of Dover, City of Seaford, and Kent County, Delaware.  In 2017, more than 47,000 people died in this country from an opioid overdose.  In Delaware, a person dies nearly every day from an opioid overdose and thousands more suffer from addiction.

2.      The opioid epidemic is a manmade crisis recognized as a national public health emergency.[1]  The individuals and entities named as Defendants in the Complaint have created this epidemic.  Through false and deceptive marketing, intentional mislabeling, aggressive sales tactics that promoted over-prescription, disregard of legal and regulatory obligations, and coordinated relationships that targeted and enabled inappropriate access to prescription opioids, the Defendants collectively flooded communities across the country with these highly addictive drugs.  As a result, in 2016, more than 2 million Americans were addicted to prescription or illicit opioids.  Plaintiffs, their residents, and communities' have suffered as a result.

3.      Dover is the second largest city in Delaware and the state capital, with a population of approximately 37,500 residents.  Seaford is a city in southwestern Sussex County, with a population of approximately 6,900 residents.  Kent County is one of three counties in Delaware with a population of approximately 176,824

---

[1] https://www.whitehouse.gov/opioids/.

residents, and includes the City of Dover.  The City of Dover, City of Seaford, and Kent County are collectively referred to herein as "Plaintiffs."

4.      Plaintiffs spends substantial sums of money each year to provide or pay for the health care, pharmaceutical care, and other necessary services and programs on behalf of their employees, indigents and otherwise eligible residents, including payments for prescription opium-like painkillers ("opioids"), which are manufactured, marketed, promoted, sold, and/or distributed by the Defendants.

5.      Plaintiffs also provide a wide range of other governmental services to and on behalf of its residents, including services for families and children, public assistance, law enforcement, fire prevention and emergency management. Plaintiffs depend on the health and productivity of its residents and workforce to generate tax revenue to support these services.

6.      Opioids include brand-name drugs like OxyContin and Percocet and generics like oxycodone and hydrocodone. These drugs are derived from or possess properties similar to opium and heroin, and, as such, they are highly addictive and dangerous and, therefore, are regulated by the United States Food and Drug Administration ("FDA") as controlled substances.

7.      Opioids can provide effective treatment for short-term post-surgical and trauma-related pain, and for palliative end-of-life care. Opioids are approved by the FDA for use in the management of moderate to severe pain and their use is

typically appropriate for a few days or more. For example, doctors traditionally used opioids to treat acute pain arising from severe bodily trauma (e.g. – gunshot wounds, post-surgical pain, etc.). Patients experiencing traumatic levels of pain from cancer have also received opioids for palliative care to make the end of their life as pain free as possible.

8.      Defendants, however, have manufactured, promoted, marketed, dispensed, distributed and enabled access to opioids for the long-term management of chronic pain by misleading consumers and medical providers through misrepresentations or material omissions regarding the appropriate uses, risks, and safety of opioids.

9.      Addiction is a spectrum of substance use disorders that range from misuse and abuse of drugs to addiction.[2] Throughout this Complaint, "addiction" refers to the entire range of substance abuse disorders. Individuals suffer negative consequences wherever they fall on the substance use disorder continuum.

10.     Defendants knew that, barring exceptional circumstances, opioids are too addictive and too debilitating for long-term use for chronic non-cancer pain lasting three months or longer ("chronic pain").

11.     Defendants knew that, with prolonged use, the effectiveness of opioids wanes over time, requiring increases in doses to achieve pain relief and

---

[2] Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM-V").

markedly increasing the risk of significant side effects and addiction.[3]

12.     Defendants knew that controlled studies of the safety and efficacy of opioids were limited to short-term use (*i.e.,* not longer than 90 days) in managed settings (*e.g.*, hospitals) where the risk of addiction and other adverse outcomes was significantly minimized.

13.     To date, there have been no long-term studies demonstrating the safety and efficacy of opioids for long-term use.

14.     Despite the foregoing knowledge, to expand the market for opioids, and realize massive profits, Defendants sought to create a false perception of the safety and efficacy of opioids in the minds of medical professionals, regulators, and members of the public that would encourage the use of opioids for longer periods of time and to treat a wider range of problems, including such common aches and pains as lower back pain, arthritis, and headaches.

15.     Manufacturer Defendants and the Sackler Family accomplished this false perception through a coordinated, sophisticated, and highly deceptive marketing campaign that began in the late 1990s, became more aggressive in or about 2006, and continues to the present.

16.     Distributor Defendants accomplished this false perception by neglecting and misrepresenting their compliance with regulatory and legal

---

[3] *See, e.g.*, Russell K. Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, 1 Progress in Pain Res. & Mgmt., 247-287 (H.L. Fields and J.C. Liebeskind eds., 1994).

obligations imposed for the protection of the public.

17.     Manufacturer Defendants' and the Sackler Family's deceptive marketing campaign convinced doctors, patients, and others that the benefits of using opioids to treat chronic pain outweighed the risks, and that opioids could be safely used by most patients.

18.     Defendants, individually and collectively, knowing that long-term opioid use causes addiction, misrepresented the dangers of long-term opioid use to physicians, pharmacists, and patients by engaging in a campaign to minimize the risks of, and to encourage, long-term opioid use.

19.     This marketing campaign has been extremely successful in expanding opioid use. Since 1999, the amount of prescription opioids sold in the U.S. nearly quadrupled.[4] In 2010, 254 million prescriptions for opioids were filled in the U.S. – enough to medicate every adult in America around the clock for a month. In that year, 20% of all doctors' visits resulted in the prescription of an opioid (nearly double the rate in 2000).[5] While Americans represent only 4.6% of the world's population, they consume 80% of the opioids supplied around the world and 99% of the global hydrocodone supply.[6] By 2014, nearly two million Americans either

---

[4]  CDC, Injury Prevention & Control: Opioid Overdose, Understanding the Epidemic. Available at: http://www.cdc.gov/drugoverdose/epidemic/index.html (accessed September 19, 2017) (internal footnotes omitted).
[5] M. Daubresse, et al., Ambulatory Diagnosis and Treatment of Nonmalignant Pain in the United States, 2000-2010, 51(10) Med. Care 870-78 (2013).
[6] L. Manchikanti, et al., Therapeutic Use, Abuse, and Nonmedical Use of Opioids:  A Ten- Year Perspective, 13 Pain Physician 401-435 (2010).

abused or were dependent on opioids.[7]

20.     The dramatically increased prescription and use of opioids caused by the Defendants has also been extremely profitable for all of the Defendants. The Defendants have reaped millions, if not billions, of dollars from the sale and distribution of prescription opioids.  In 2012 alone, opioids generated $8 billion in revenue for drug manufacturers.[8]  Of that amount, approximately $3.1 billion went to Purdue for its OxyContin sales.[9]  By virtue of their ownership and control of Purdue, the Sackler Family has become billionaires.

21.     The Defendant conduct in marketing and distributing opioids has been extremely harmful to Americans, including the residents of Plaintiffs' communities.  Overdoses from prescription pain relievers are a driving factor in a 15-year increase in opioid overdose deaths. Deaths from prescription opioids have quadrupled since 1999. From 2000 to 2014, nearly half a million people died from such overdoses. Seventy-eight Americans die every day from an opioid overdose.[10]

22.     In 2012, an estimated 2.1 million people in the United States suffered from substance use disorders related to prescription opioid pain relievers.[11] Between 30% and 40% of long-term users of opioids experience problems with

---

[7]   CDC, Injury Prevention & Control: Opioid Overdose, Prescription Opioids. Available at: http://www.cdc.gov/drugoverdose/opioids/prescribed.html (accessed September 19, 2017).
[8]   B. Meier & B. Marsh, *The Soaring Cost of the Opioid Economy*, N.Y. Times (June 22, 2013).
[9]   K. Eban, *Purdue Pharma's Painful Medicine*, Fortune Magazine (Nov. 9, 2011).
[10]  CDC, Injury Prevention & Control: Opioid Overdose, Understanding the Epidemic, *supra*.
[11]  Substance Abuse and Mental Health Services Administration, *Results from the 2012 National Survey on Drug Use and Health: Summary of National Findings*, NSDUH Series H- 46, HHS Publication No. (SMA) 13-4795. Rockville, MD: Substance Abuse and Mental Health Services Administration, 2013.

opioid use disorders.[12]

23.     Opioid addiction and overdoses have reached epidemic levels over the past decade. On March 22, 2016, the FDA recognized opioid abuse as a "public health crisis" that has a "profound impact on individuals, families and communities across our country."[13]

24.     In 2016, approximately 64,000 people died from drug overdoses in the United States, more than the peak yearly death tolls from car crashes, HIV deaths, or gun deaths.[14] Sixty six percent (66%) of the drug overdose deaths in 2016 involved opioids, with the total deaths involving opioids taking more lives than breast cancer.[15]  The total overdose deaths in 2016 were 10,000 more than in 2015. The graph below shows the trend relating to overdose deaths since 2000:[16]

---

[12] J. Boscarino et al., Risk factors for drug dependence among out-patients on opioid therapy in a large US health-care system, 105(10) Addiction 1776 (2010); J. Boscarino et al., Prevalence of Prescription Opioid-Use Disorder Among Chronic Pain Patients: Comparison of the DSM-5 vs. DSM-4 Diagnostic Criteria, 30(3) Journal of Addictive Diseases 185 (2011).

[13] FDA announces enhanced warnings for immediate-release opioid pain medications related to risks of misuse, abuse, addiction, overdose and death. Available at:
http://www.fda.gov/newsevents/newsroom/pressannouncements/ucm491739.htm (accessed September 19, 2017).

[14] Katz, Josh, *The First Count of Fentanyl Deaths in 2016: Up 540% in Three Years*,
https://www.nytimes.com/interactive/2017/09/02/upshot/fentanyl-drug-overdose-deaths.html (published September 2, 2017, accessed October 27, 2017).

[15] Kounang, Nadia, *Opioids now kill more people than breast cancer*, http://www.cnn.com/2017/12/21/health/drug-overdoses-2016-final-numbers/index.html (accessed December 29, 2017).

[16] Katz, Josh, *The First County of Fentanyl Deaths in 2016: Up 540% in Three Years*, *Supra*.



25.     Despite the record profits being generated from their efforts, Defendants' campaign to expand the use of opioids has failed to achieve any material health care benefits. Since 1999, there has been no overall change in the amount of pain that Americans report.[17]

26.     The National Institutes of Health ("NIH") not only recognizes the opioid abuse problem, but also identifies "aggressive marketing" as a major cause: "Several factors are likely to have contributed to the severity of the current prescription drug abuse problem. They include drastic increases in the number of prescriptions written and dispensed, greater social acceptability for using medications for different purposes, and *aggressive marketing by pharmaceutical*

---

[17] CDC, Injury Prevention & Control: Opioid Overdose, Understanding the Epidemic, *supra*.

*companies.*"[18] As shown below, the "drastic increases in the number of prescriptions written and dispensed" and the "greater social acceptability for using medications for different purposes" are not really independent causative factors but are in fact the direct result of "the aggressive marketing by pharmaceutical companies."

27.    The rising numbers of persons addicted to opioids have led to significant increased health care costs as well as a dramatic increase of social problems, including drug abuse, diversion,[19] and the commission of criminal acts to obtain opioids throughout the United States, including within Plaintiffs' communities. Consequently, public health and safety throughout the United States, has been significantly and negatively impacted due to the misrepresentations and omissions of the Defendants, ultimately leading to widespread inappropriate use of the drug.

28.    Opioid abuse is widespread across the state of Delaware.  Delaware is ranked #1 in the country for rate of high dose opioid pain reliever prescriptions, with 8.8 prescriptions per 100 persons. Delaware is ranked #2 for rate of long-acting/extended release opioid pain relievers, with 217 prescriptions per 100 persons, and is ranked #17 for rate of all opioid pain relievers, with 90.8

---

[18] America's Addiction to Opioids: Heroin and Prescription Drug Abuse. Available at: https://www.drugabuse.gov/about-nida/legislative-activities/testimony-to-congress/2016/americas-addiction-to-opioids-heroin-prescription-drug-abuse (accessed September 19, 2017) (emphasis added).
[19] According to the CDC, when prescription medicines are obtained or used illegally, it is called "drug diversion."

prescriptions per 100 persons.[20]

29.     Delaware has seen annual distributions exceeding 50 pills per resident and 440 pills per opioid user in the past few years.[21] Opioid related overdose deaths in Delaware have jumped more than 300 percent in the last 15 years, increasing most in the last five years.

30.     In 2014, Delaware ranked 9th nationwide for rate of opioid-related overdose deaths, with an overdose rate of 20.9 deaths per 100,000 people.[22]  From 2007 to 2016, 694 prescription opioid-related deaths occurred in Delaware. In 2016 alone, there were 112 prescription opioid-related deaths in Delaware.[23]

31.     Aside from deaths, addiction and misuse in Delaware have resulted in increased emergency room visits, increased emergency responses, and increased administration of naloxone – the antidote to opioid overdose. In Delaware, administrations of naloxone (or Narcan) rose approximately 12 percent from 2014 to 2015 (1,236 doses in 2014 to 1,389 doses in 2015).[24]

32.     The abuse of opioids has caused additional medical conditions that

---

[20] http://dhss.delaware.gov/dhcc/files/opiodpresentation_03022017.pdf
[21] (Drug Enf't Admin., ARCOS Report, Retail Drug Distribution By Zip Code Within State by Grams Weight, https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/2013/2013_rpt1.pdf; https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/2014/2014_rpt1.pdf; https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/2015/2015_rpt1.pdf; https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/report_yr_2016.pdf.)
[22] https://www.insurancejournal.com/news/national/2017/12/11/473653.htm. (Accessed January 29, 2018).
[23] CDC, Wide-ranging Online Data for Epidemiologic Research (WONDER), Multiple Cause of Death Data, 1999–2016, https://wonder.cdc.gov/mcd.html
[24] Delaware Office of Emergency Medical Services, Emergency Medical Services and Preparedness Section, "DEA Intelligence Report, The Drug Situation in Delaware" May 2016. https://www.dea.gov/divisions/phi/2016/phi051816_attach.pdf . (Accessed 1/29/2018.)

harm Delaware residents - including residents of Plaintiffs' communities - and require care paid for by tax payers. In 2016 alone, Delaware spent at least $4.5 million on opioid addiction recovery and treatment facilities.[25]

33.     The abuse and misuse of opioids has also harmed children and infants in Delaware, including children and infants within Plaintiffs' communities. Neonatal Abstinence Syndrome ("NAS") is a condition where babies are born addicted to drugs. The National Institute on Drug Abuse, a federal government research institute, determined that the average hospital cost for a newborn with NAS is $66,700, compared to $3,500 for the typical newborn.[26] After birth, children born into families struggling with opioid addiction or who fall into opioid addiction frequently end up in the foster care system.

34.     Plaintiffs have experienced the suffering caused by the opioid epidemic. As Anthony Smith of the Dover Police Department reports, opiates have spread throughout Dover; in his experience: "It's an epidemic.  It's everywhere. You can just see it all day."  Alex Cooper, the Site Director for Connections CSP's Dover Clinic, which provides methadone and drug counseling, reports that the city is seeing an increasing need for opioid addiction treatment: "400 people come in each morning to get medication-assisted

---

[25] http://www.dhss.delaware.gov/dhss/pressreleases/2015/addictionepidemic-081915.html. (Accessed January 29, 2018.)

[26] National Institute on Drug Abuse, *Dramatic Increases in Maternal Opioid Use and Neonatal Abstinence Syndrome*, https://www.drugabuse.gov/related-topics/trends-statistics/infographics/dramatic-increases-in-maternal-opioid-use-neonatal-abstinence-syndrome, (accessed October 25, 2017).

treatment."[27]

35.     The opioid epidemic in Delaware has also led to increased heroin use and heroin overdoses. Dover Police Chief Paul Bernat reports that several years ago, heroin was not a primary concern for the department, while now it is a common occurrence.[28]   In 2015, 125 people died from heroin overdoses in Delaware, a 7 percent increase from 2014; 83 were due solely to heroin and 42 were tied to fentanyl.[29]

36.     The increase in opioid related drug use has led to crime and criminal activity in the City of Dover, City of Seaford, and Kent County, causing financial strain on the Plaintiffs' social service, public safety, and emergency response systems.

37.     As a direct and foreseeable consequence of Defendants' conduct, Plaintiffs have been required to spend substantial public resources to combat the public nuisance created by opioid abuse, misuse and diversion.  Plaintiffs have incurred, and will continue to incur in the future, significant costs related to opioid addiction and abuse including, but not limited to, health care costs, public safety and victimization costs, social costs, and lost productivity costs. Defendants' misrepresentations regarding the safety and efficacy of long-term opioid use

---

[27] http://delawarepublic.org/post/dovers-angel-initiative-steers-opioid-users-treatment-instead-jail  - (Accessed January 29, 2018.)
[28] Brittany Horn, The News Journal. "Dover Police start angel program to combat Heroin" Published June 29, 2016, updated June 30, 2016, https://www.delawareonline.com/story/news/local/heroindelaware/2016/06/29/dover-police-start-angel-program-combat-heroin/86428350/. (Accessed January 29, 2018.)
[29] Id.

proximately caused injury to Plaintiffs and their residents.

38.     Plaintiffs directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has created a public nuisance and ongoing financial burden for which the Plaintiff seeks relief. Categories of past and continuing sustained damages include, *inter alia*,: (1) costs for providing medical care, additional therapeutic, and prescription drug purchases, and other treatments for employees and residents suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs associated with law enforcement and public safety relating to the opioid epidemic; (5) and costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation. These damages have been suffered, and continue to be suffered directly, by the Plaintiffs.  By this Complaint, Plaintiffs seek to retrieve the costs needed to mitigate and remediate the disastrous epidemic caused by Defendants, which has impacted nearly every aspect of civic life, and the cost required to repair the damage moving forward.

39.     Plaintiff also seeks the means to abate the public nuisance created by the Defendants' wrongful and/or unlawful conduct and public health crisis which has resulted therefrom.

## II.    JURISDICTION

40.    This Court has jurisdiction over this action pursuant to Delaware State Constitution Article IV, §7 and 10 *Del. C.* §541.

41.    Plaintiffs have standing to bring this action pursuant to common law, Title 9 and Title 22 of the Delaware Code, and/or applicable provisions of the Charter of the City of Dover, the Charter of the City of Seaford, and the Code of Kent County.

42.    This Court has personal jurisdiction over Defendants because they conduct or conducted business in Delaware, including with Plaintiffs' communities; purposefully direct or directed their injurious actions toward Plaintiffs' communities ; consensually submitted to the jurisdiction of Delaware through their organization under the laws of Delaware, or when obtaining a manufacturer or distributor license; have headquartered in Delaware; have taken actions within Plaintiffs' jurisdictional boundaries that have foreseeably caused injury to Plaintiffs; and have the requisite minimum contacts with Delaware and Plaintiffs' communities necessary to constitutionally permit the Court to exercise jurisdiction for adequate Due Process to Defendants.

43.    Plaintiffs hereby declare, *inter alia*, that opioid abuse, addiction, morbidity and mortality has created a serious public health and safety crisis, and is a public nuisance, and that the diversion of legally produced controlled substances

into the illicit market causes or contributes to this public nuisance in their respective jurisdictions.

44.     This action is non-removable because there is incomplete diversity of residents and no substantial federal question is presented.

### III.   PARTIES

#### A.   Plaintiffs

45.     Plaintiff, City of Dover (individually referred to as "Dover"), is a municipal corporation of the State of Delaware located in Kent County, Delaware. Dover is governed by an elected Mayor and 8 member City Council.

46.     Plaintiff, City of Seaford (individually referred to as "Seaford") is a municipal corporation of the State of Delaware located in Sussex County, Delaware.  Seaford is governed by a Mayor and 5 member City Council.

47.     Plaintiff, Kent County (individually referred to as "Kent County") is a political subdivision of the State of Delaware.  Kent County's boundaries are established as set forth in 9 *Del. C.* §903 and its governing body consists of a six member Levy Court.

48.     Plaintiffs provide a wide range of services to its residents, including services for families and children, public health, public assistance, law enforcement, and emergency care. Plaintiffs also provide health and worker's compensation insurance benefits to their employees.

49.     Plaintiffs bring this action on their own behalf and also as subrogee of their employees and residents and, as such, Plaintiffs stand in the shoes of their subrogors, and are entitled to all the rights of the subrogors. In making the payments they have made on behalf of their employees and residents, Plaintiffs did not act as a volunteer but rather acted under compulsion, for the protection of its interests, or as *parens patriae.*

## B.   Manufacturer Defendants

50.     Defendant, Purdue Pharma L.P. ("PPL"), is a limited partnership organized under the laws of the State of Delaware with its principal place of business at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut 06901.

51.     Defendant, Purdue Pharma Inc. ("PPI"), is a New York corporation with its headquarters its principal place of business at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut 06901.

52.     Defendant, The Purdue Frederick Company, Inc. ("PFC"), is a New York corporation with its principal place of business at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut 06901.

53.     PPL, PPI, and PFC (collectively, "Purdue") are engaged in the manufacture, promotion, distribution, and sale of opioids nationally and within Plaintiffs' communities, including OxyContin (Oxycodone hydrochloride extended

release), MS Contin (Morphine sulfate extended release), Dilaudid (Hydromorphone hydrochloride), Dilaudid-HP (Hydromorphone hydrochloride), Butrans (Byrenorpine), Hysingla ER (Hyrdrocodone bitrate), and Targiniq ER (Oxycdone hydrocholoride and Naloxone hydrochloride), all of which except Butrans are classified as Schedule II drugs.[30] Purdue is owned or controlled by the Sackler Family.

54.   OxyContin is Purdue's largest-selling opioid. Since 2009, Purdue's national annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (*i.e.*, painkillers).

55.   In 2007, Purdue and three of its top executives pled guilty to felony crimes and Purdue agreed to pay $635 million to settle criminal and civil investigations brought by the United States Department of Justice associated with

56.   Defendant, Rhodes Pharmaceuticals, L.P. ("Rhodes"), is a Delaware limited partnership with its principal place of business in Coventry, Rhode Island. Rhodes is owned or controlled by the Sackler Family, the same family that owns or

---

[30] Since passage of the Controlled Substances Act ("CSA") in 1970, opioids have been regulated as controlled substances. As controlled substances, they are categorized in five schedules, ranked in order of their potential for abuse, with Schedule I being the most dangerous. The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety. Opioids generally had been categorized as Schedule II or Schedule III drugs. Schedule II drugs have a high potential for abuse, have a currently accepted medical use, and may lead to severe psychological or physical dependence. Schedule III drugs are deemed to have a lower potential for abuse, but their abuse still may lead to moderate or low physical dependence or high psychological dependence. Of the Purdue drugs listed above, Butrans is the only Schedule III drug.

controls Purdue.  Rhodes was created four months after Purdue entered its felony guilty plea to misbranding OxyContin.

57.    Rhodes is one of the largest producers of generic opioids in the United States has engaged in the manufacture, promotion, distribution, and sale of opioids nationally and within Plaintiffs' communities.   In 2016, Purdue and Rhodes collectively accounted for approximately 6% of the U.S. market for opioids.

58.    Defendant, Abbott Laboratories, is an Illinois corporation with a principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064-3500.

59.     Defendant, Abbott Laboratories, Inc., is an Illinois corporation principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064-3500.

60.    Abbott Laboratories and Abbott Laboratories, Inc. (collectively "Abbott") engaged in promotion and distribution of opioids nationally and within Plaintiffs' communities through a co-promotional agreement with Purdue. Pursuant to this agreement, between 1996 and 2006, Abbott actively promoted, marketed, and distributed opioids manufactured by Purdue.

61.    Through its co-promotional agreement with Purdue, Abbott helped make OxyContin the largest selling opioid in the United States.   Under the agreement, the more sales Abbott generated, the more Abbott received in

compensation.  Specifically, Abbott received approximately 25% to 30% of the net sales for prescriptions for Purdue's opioids written by the doctors Abbott's sales force called upon.  The co-promotional agreement between Purdue and Abbott was effective from approximately 1996 to 2002, and Abbott continued to receive residual payments of 6% of net sales up through at least 2006.

62.   With Abbott's help, sales of Purdue's Oxycontin rose from $49 million in its first year on the market to 1.6 billion in 2002.  Abbott's efforts on behalf of Purdue earned Abbott nearly $500 million in payments from Purdue over the life of the co-promotional agreement.

63.   Defendant, Teva Pharmaceuticals USA, Inc. ("Teva USA"), is a Delaware corporation with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454.

64.   Teva USA is a wholly owned subsidiary of Teva Pharmaceutical Industries, Ltd. ("Teva Ltd."), an Israeli corporation with its principal place of business in the United States at 1090 Horsham Road, North Wales, Pennsylvania 19454.

65.   Defendant, Cephalon, Inc., is a Delaware corporation with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454. In 2011, Teva Ltd. acquired Cephalon, Inc.

66.   Teva USA and Cephalon, Inc. (collectively, "Cephalon") work

together to manufacture, promote, distribute and sell both brand name and generic versions of opioids nationally and within Plaintiffs' communities, including Actiq (Fentanyl citrate) and Fentora (Fentanyl citrate tablet), both Schedule II drugs.

67.    Teva USA was in the business of selling generic opioids, including a generic form of OxyContin from 2005 to 2009 nationally and within Plaintiffs' communities.

68.    Defendant, Johnson & Johnson ("J&J"), is a New Jersey corporation with its principal place of business at 1 Johnson & Johnson Plaza, New Brunswick, New Jersey, 08933.

69.    Defendant, Janssen Pharmaceuticals, Inc. ("Janssen Pharmaceuticals"), is a Pennsylvania corporation with its principal place of business at 1125 Bear Harbor Road, Titusville, New Jersey, 08560.

70.    Jansen Pharmaceuticals is wholly owned subsidiary of J&J that was formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which in turn was formerly known as Janssen Pharmaceutica, Inc.

71.    Defendant, Ortho-McNeil-Janssen Pharmaceuticals, Inc. ("OMP"), now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business at 1125 Bear Harbor Road, Titusville, New Jersey, 08560.

72.    Defendant, Janssen Pharmaceutica, Inc. ("Janssen Pharmaceutica"),

now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business at 1125 Bear Harbor Road, Titusville, New Jersey, 08560.

73.     J&J is the only company that owns more than 10% of Janssen Pharmaceuticals stock. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals drugs and Janssen Pharmaceuticals profits inure to J&J's benefit.

74.     J&J, Janssen Pharmaceuticals, OMP, and Janssen Pharmaceutica (collectively, "Janssen") are or have been engaged in the manufacture, promotion, distribution, and sale of opioids nationally and within Plaintiffs' communities, including Duragesic (Fentanyl), Nucynta (Tapentadol), and Nucynta ER (Tapentadol extended release), all of which are Schedule 2 drugs.[31]

75.     Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014. Prior to 2009, Duragesic accounted for at least $1 billion in annual sales.

76.     Defendant, Endo Health Solutions Inc. ("EHS"), is a Delaware corporation with its principal place of business at 1400 Atwater Drive, Malvern, Pennsylvania 19355.

77.     Defendant, Endo Pharmaceuticals, Inc. ("EPI"), is a wholly owned

---

[31] Depomed, Inc. acquired the rights to Nucynta and Nucynta ER from Janssen in 2015.

subsidiary of EHS and is a Delaware corporation with its principal place of business at 1400 Atwater Drive, Malvern, Pennsylvania.

78.     EHS and EPI (collectively, "Endo") manufacture, promote, distribute and sell opioids nationally and within Plaintiffs' communities, including Opana ER (Oxymorphone hydrochloride extended release), Opana (Oxymorphone hydrochloride), Percodan (Oxymorphone hydrochloride and aspirin), and Percocet (Oxymorphone hydrochloride and acetaminophen).

79.     Opioid sales accounted for roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded revenue of $1.15 billion from 2010 to 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids, both directly and through its subsidiary, Qualitest Pharmaceuticals, Inc., including generic oxycodone, oxymorphone, hydromorphone, and hydrocodone products.

80.     Defendant, Allergan PLC, is a public limited liability company incorporated in Ireland with its principal place of business at Clonshaugh Business & Technology Park, Coolock, Dublin 17. Actavis PLC acquired Allergan PLC in March, 2015, and name of the combined company became Allergan PLC.

81.     Defendant, Watson Pharmaceuticals, Inc. acquired Actavis, Inc. in October 2012; the combined company changed its name to Actavis, Inc. in January, 2013. Actavis, Inc.'s headquarters are located at Morris Corporate Center

III, 400 Interpace Parkway, Parsippany, NJ 07054.

82.     Defendant, Watson Laboratories, Inc. is a Nevada corporation with its headquarters at 132 Business Center Drive, Corona, California, and is a wholly owned subsidiary of Allergan PLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.).

83.     Defendant, Actavis LLC, is a Delaware limited liability company with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey.

84.     Defendant, Actavis Pharma, Inc. f/k/a Actavis, Inc. is a Delaware corporation with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054, and was formerly known as Watson Pharma, Inc.

85.     Each of the defendants named in ¶¶   are owned by Allergan PLC, which uses them to market and sell its drugs in the United States. Upon information and belief, Allergan PLC exercises control over these marketing and sales efforts; profits from the sale of Allergan/Actavis products; and ultimately benefits from them (Allergan PLC, Actavis PLC, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc.)(collectively e referred to as "Actavis.").

86.     Actavis manufactures, promotes, distributes, and sells the branded

opioids Kadian (morphine sulfate extended release) and Norco nationally and within Plaintiffs' communities.  Kadian is a Schedule II drug. Actavis also sells a generic version of Kadian, Duragesic, and Opana. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc., on December 30, 2008, and began marketing Kadian in 2009.

87.    Defendant, Mallinckrodt PLC, is an Irish public limited liability company with its headquarters at 3 Lotus Park, The Causeway, Staines-Upon-Thames, Surrey, TW18 3 AG, United Kingdom.

88.    Defendant, Mallinckrodt LLC, a wholly owned subsidiary of Mallinckrodt PLC, is a Delaware limited liability company with its headquarters at 675 McDonnell Blvd, St. Louis, Missouri, 63042.

89.    Mallinckrodt PLC and Mallinckrodt LLC (collectively "Mallinckrodt") manufacture, promote, distribute and sell opioids nationally and within Plaintiffs' communities, including the branded opioid Roxicodone (Oxycodone hydrochloride), and Mallinckrodt is one of the largest manufacturers of generic oxycodone.  In 2016, Mallinckrodt had annual sales of approximately $3.6 billion and net profits of nearly $500 million.

90.    Defendant, Insys Therapeutics, Inc. ("Insys"), is a Delaware corporation with its headquarters at 1333 S. Spectrum Blvd, Suite 100, Chandler, Arizona   85286. Insys manufactures, promotes, distributes and sells opioids

nationally and within Plaintiffs' communities, including the opioid Subsys (fentanyl sublingual spray).  In 2015, Insys' net revenue exceeded $330 million, almost exclusively from sales of Subsys, earning the company more than $58 million in net income.

91.     Defendant, Mylan Pharmaceuticals, Inc. ("Mylan"), is a West Virginia corporation with its principal place of business in Canonsburg, Pennsylvania. Mylan manufactures, promotes, distributes and sells opioids nationally and within Plaintiffs' communities, including fentanyl, methadone, oxycodone, hydrocodone, morphine and tramadol.  Mylan produces approximately 1% of the nation's opioid painkillers.  In 2016, Mylan reported total revenues of more than $11 billion.

92.     Assertio Therapeutics, Inc., is a Delaware corporation formerly known as Depomed, Inc. (referred to herein as "Depomed"), headquartered in Lake Forest, Illinois.  Depomed manufactures, markets, distribution or promotes opioid products nationally and within Plaintiffs' communities, including Nucynta (Tapentadol), and Nucynta ER (Tapentadol extended release), the license and rights to which is acquired from Jansen in 2015 for $1.05 billion.  In 2017, Depomed had net revenues of nearly $400 million.

93.     The Defendants named in Paragraphs 50 through 92 of this Complaint are collectively referred to as "Manufacturer Defendants".

### C.    <u>Distributor Defendants</u>

94.    Defendant, McKesson Corporation ("McKesson"), is a Delaware corporation with its headquarters at One Post Street, San Francisco, California, 94104.

95.    McKesson promotes, distributes, and sells opioids manufactured by Manufacturer Defendants nationally and in Delaware, including within Plaintiffs' communities, to pharmacies and institutional providers.  In 2015, McKesson had net income more than $1.5 billion.

96.    Defendant, Cardinal Health Inc. ("Cardinal"), is an Ohio Corporation with its headquarters at 7000 Cardinal Place, Dublin, Ohio, 43017.

97.    Cardinal promotes, distributes, and sells opioids manufactured by Manufacturer Defendants nationally and in Delaware, including within Plaintiffs' communities, to pharmacies and institutional providers.

98.    Defendant, AmerisourceBergen Drug Corporation ("Amerisource"), is a Delaware Corporation with its headquarters at 1300 Morris Drive, Chesterbrook, Pennsylvania, 19087.

99.    Amerisource promotes, distributes, and sells opioids manufactured by Manufacturer Defendants nationally and in Delaware, including within Plaintiffs' communities, to pharmacies and institutional providers.

100.    Defendant, Anda Pharmaceuticals, Inc. ("Anda"), is a corporation

organized and existing under the laws of the State of Florida with its principal place of business located at 2915 Weston Road, Weston, FL 33331.

101.    Anda promotes, distributes, and sells opioids manufactured by Manufacturer Defendants nationally and in Delaware, including within Plaintiffs' communities, to pharmacies and institutional providers.

102.    Defendant, H. D. Smith, LLC ("H. D. Smith"), is a Delaware limited liability company with its principal place of business located at 3606 Fiat Avenue, Springfield, IL 62703.

103.    H. D. Smith promotes, distributes, and sells opioids manufactured by Manufacturer Defendants nationally and in Delaware, including within Plaintiffs' communities, to pharmacies and institutional providers.

104.    Defendant, CVS Health Corporation ("CVS"), is a Delaware with its principal place of business located at One CVS Drive, Woonsocket, RI 02895.

105.    CVS promotes, distributes, and sells opioids manufactured by Manufacturer Defendants nationally and in Delaware, including within Plaintiffs' communities, to pharmacies and institutional providers.

106.    Defendant, Rite Aid Corporation ("Rite Aid"), is a Delaware corporation with its principal place of business located at 30 Hunter Lane, Camp Hill, PA 17011.

107.    Rite Aid promotes, distributes, and sells opioids manufactured by Manufacturer Defendants nationally and in Delaware, including within Plaintiffs' communities, to pharmacies and institutional providers.

108.    Defendant, Walgreens Boots Alliance, Inc., f/k/a Walgreen Co. ("Walgreens"), is a Delaware corporation with its principal place of business located at 108 Wilmot Road, Deerfield, IL 60015.

109.    Walgreens promotes, distributes, and sells opioids manufactured by Manufacturer Defendants nationally and in Delaware, including within Plaintiffs' communities, to pharmacies and institutional providers.

110.    The distributors and dispensers of opioids named as Defendants in Paragraphs 94 through 109 of this Complaint are collectively referred to herein as "Distributor Defendants".

**D.    <u>Individual Defendants</u>**

111.    Defendant, Richard Sackler, is resident of Florida and a former Co-Chairman of the Board of Directors and President of Purdue.

112.    Defendant, Theresa Sackler, is a resident of the United Kingdom and a present or former member of the Board of Directors of Purdue.

113.    Defendant, Kathe Sackler, is a resident of Connecticut and a present or former member of the Board of Directors of Purdue.

114.    Defendant, Jonathan Sackler, is a resident of Connecticut and a present or former member of the Board of Directors of Purdue.

115.    Defendant Mortimer D.A. Sackler, is a resident of New York and a present or former member of the Board of Directors of Purdue.

116.    Defendant, Beverly Sackler, is a resident of Connecticut and a present or former member of the Board of Directors of Purdue.

117.    Defendant, David Sackler, is a resident of New York and a present or former member of the Board of Directors of Purdue.

118.    Defendant, Ilene Sackler Lefcourt is a resident of New York and a present or former member of the Board of Directors of Purdue.

119.    The individual members of the Sackler family named as Defendants in Paragraph 111 through 119 of this Complaint are collectively referred to as the "Sackler Family."

120.    At times relevant to this Complaint, the Sackler Family directly or beneficially owned Purdue, controlled the majority of seats of Purdue's Board of Directors, directed the sales and marketing actions of Purdue, and financially benefitted from Purdue's and Rhodes' business profits.

## IV.        **GENERAL FACTUAL ALLEGATIONS**

### A. **The Pain-Relieving and Addictive Properties of Opioids**

121.    The pain-relieving properties of opium have been recognized for millennia. Likewise, the magnitude of opium's potential for abuse and addiction has been well-known for ages and has led to its strict regulation world-wide. Opioids, similar to the illegal drugs opium and heroin, are substances that act on opioid receptors to produce morphine-like effects.

122.    During the Civil War, opioids, then known as "tinctures of laudanum," gained popularity among doctors and pharmacists for their ability to reduce anxiety and relieve pain – particularly on the battlefield – and they were popularly used in a wide variety of commercial products ranging from pain elixirs to cough suppressants to beverages.  By 1900, an estimated 300,000 people were addicted to opioids in the United States,[32] and many doctors prescribed opioids solely to avoid patients' withdrawal. Both the numbers of opioid addicts and the difficulty in weaning patients from opioids made clear their highly addictive nature.

123.    Due to concerns about their addictive properties, opioids have been regulated at the federal level as controlled substances by the U.S. Drug Enforcement Administration ("DEA") since 1970. The labels for scheduled opioid drugs carry black box warnings of potential addiction and "[s]erious, life-threatening, or fatal respiratory depression," as the result of an excessive dose.

124.    Studies and articles from the 1970s and 1980s also made clear the

---

[32] Substance Abuse and Mental Health Services Administration, Medication-Assisted Treatment for Opioid Addiction in Opioid Treatment Programs, Treatment Improvement Protocol (TIP Services), No. 43 (2005).

reasons to avoid opioids: Scientists observed negative outcomes from long-term opioid therapy in pain management programs; opioids' mixed record in reducing pain long-term and failure to improve patients' function; greater pain complaints as most patients developed a tolerance to opioids; opioid patients' diminished ability to perform basic tasks; their inability to make use of complementary treatments like physical therapy due to the side effects of opioids; and addiction. Leading authorities discouraged, or even prohibited, the use of opioid therapy for chronic pain.

125.    In 1986, Dr. Russel Portenoy, M.D., who later became Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, while at the same time serving as a top spokesperson for drug companies, published an article reporting that "[f]ew substantial gains in employment or social function could be attributed to the institution of opioid therapy."[33]

126.    Writing in 1994, Dr. Russel Portenoy, described the prevailing attitudes regarding the dangers of long-term use of opioids:

> **The traditional approach to chronic non-malignant pain does not accept the long-term administration of opioid drugs**. **This perspective has been justified by the perceived likelihood of tolerance, which would attenuate any beneficial effects over time, and the**

---

[33] R. Portenoy & K. Foley, Chronic Use of Opioid Analgesics in Non-Malignant Pain: Report of 38 cases, 25(2) Pain 171 (1986).

**potential for side effects, worsening disability, and addiction. According to conventional thinking, the initial response to an opioid drug may appear favorable, with partial analgesia and salutary mood changes, but adverse effects inevitably occur thereafter. It is assumed that the motivation to improve function will cease as mental clouding occurs and the belief takes hold that the drug can, by itself, return the patient to a normal life.** *Serious management problems are anticipated, including difficulty in discontinuing a problematic therapy and the development of drug seeking behavior induced by the desire to maintain analgesic effects, avoid withdrawal, and perpetuate reinforcing psychic effects. There is an implicit assumption that little separates these outcomes from the highly aberrant behaviors associated with addiction.*[34]

127.    According to Dr. Russel Portenoy, the foregoing problems could constitute "compelling reasons to reject long-term opioid administration as a therapeutic strategy in all but the most desperate cases of chronic nonmalignant pain."[35]

128.    For all the reasons outlined by Dr. Russel Portenoy, and in the words of one researcher from the University of Washington in 2012, and quoted by a Harvard researcher the same year, "it did not enter [doctors'] minds that there could be a significant number of chronic pain patients who were successfully managed with opioids, because if there were any, we almost never saw them."[36]

---

[34] R. Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, 1 Progress in Pain Res. & Mgmt., 247-287 (H.L. Fields and J.C. Liebeskind eds., 1994) (emphasis added).
[35] *Id.*
[36] J. Loeser. Five crises in pain management, Pain Clinical Updates. 2012;20 (1):1–4(cited by I. Kissin, Long-term

129.    Discontinuing opioids after more than just a few weeks of therapy will cause most patients to experience withdrawal symptoms. These withdrawal symptoms include: severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long the opioids were used.

130.    When under the continuous influence of opioids over time, patients become tolerant to their analgesic effects.   As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same levels of pain reduction to which he has become accustomed – up to and including doses that are "frighteningly high."[37]   At higher doses, the effects of withdrawal are more substantial, thus leaving a patient at a much higher risk of addiction. A patient can take the opioids at the continuously escalating dosages to match pain tolerance and still overdose at recommended levels.

131.    Opioids vary by duration. Long-acting opioids, such as Purdue's OxyContin and MS Contin, Janssen's Nucynta ER and Duragesic, Endo's Opana ER, and Actavis's Kadian, are designed to be taken once or twice daily and are purported to provide continuous opioid therapy for, in general, 12 hours. Short-

---

opioid treatment of chronic nonmalignant pain: unproven efficacy and neglected safety? 6 J. Pain Research 513, 514 (2013)).

[37] M. Katz, Long-term Opioid Treatment of Nonmalignant Pain: A Believer Loses His Faith, 170(16) Archives of Internal Med. 1422 (2010).

acting opioids, such as Cephalon's Actiq and Fentora, are designed to be taken in addition to long-acting opioids to address "episodic pain" and provide fast-acting, supplemental opioid therapy lasting approximately 4 to 6 hours.

132.    Manufacturer Defendants promoted the idea that pain should be treated by taking long-acting opioids continuously and supplementing them by also taking short-acting, rapid-onset opioids for episodic pain.

133.    In 2013, in response to a petition to require manufacturers to strengthen warnings on the labels of long-acting opioid products, the FDA warned of the "grave risks" of opioids, including "addiction, overdose, and even death." The FDA further warned, "[e]ven proper use of opioids under medical supervision can result in life-threatening respiratory depression, coma, and death." Because of those grave risks, the FDA said that long-acting or extended release opioids "should be used only when alternative treatments are inadequate."[38] The FDA required that – going forward – opioid makers of long-acting formulations clearly communicate these risks in their labels.

134.    In 2016, the FDA expanded its warnings for immediate-release opioid pain medications, requiring similar changes to the labeling of immediate-release opioid pain medications as it had for extended release opioids in 2013. The FDA also required several additional safety-labeling changes across all prescription

---

[38] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. *Physicians for Responsible Opioid Prescribing,* Re Docket No. FDA- 2012-P-0818 (Sept. 10, 2013) (emphasis in original).

opioid products to include additional information on the risk of these medications.[39]

135.    The facts on which the FDA relied in 2013 and 2016 were well known in the 1990s when Manufacturer Defendants began their deceptive marketing campaign to expand the opioid market.

## B. Opioid Therapy Makes Patients Sicker Without Long-Term Benefits

136.    There is no scientific evidence supporting the safety or efficacy of opioids for long-term use. Manufacturer Defendants are well aware of the lack of such scientific evidence. While promoting opioids to treat chronic pain, Manufacturer Defendants failed to disclose the lack of evidence to support their use long-term and have intentionally failed to disclose the substantial scientific evidence demonstrating that chronic opioid therapy actually worsens patients' health.

137.    There are no controlled studies of the use of opioids beyond 16 weeks, and no evidence that opioids improve patients' pain and function on a long-term basis. For example, a 2007 systematic review of opioids for back pain concluded that opioids have limited, if any, efficacy as a treatment for back pain and that evidence did not allow judgments regarding long-term use.

---

[39] FDA announces enhanced warnings for immediate-release opioid pain medications related to risks of misuse, abuse, addiction, overdose and death. Available at http://www.fda.gov/newsevents/newsroom/pressannouncements/ucm491739.htm (accessed September 19, 2017).

138.    Substantial evidence exists that opioid drugs are ineffective to treat chronic pain, and actually worsen patients' health. For example, a 2006 study-of-studies found that opioids as a class did not demonstrate improvement in functional outcomes over other non-addicting treatments.[40]

139.    Increasing duration of opioid use is strongly associated with an increasing prevalence of mental health conditions (including depression, anxiety, post-traumatic stress disorder, or substance abuse), increased psychological distress, and greater health care utilization.

140.    Although opioids may work acceptably well during a limited, short period of time, long-term usage results in marked declines in patient's ability to function, their general health, mental health, and social function. Over time, even high doses of potent opioids often fail to control pain, and patients exposed to such doses are unable to function normally.[41]

141.    The foregoing is true both generally and for specific pain-related conditions. Studies of the long-term use of opioids for chronic lower back pain have failed to demonstrate an improvement in patients' function. Instead, research

---

[40] A. Furlan *et al.*, *Opioids for chronic noncancer pain: a meta-analysis of effectiveness and side effects*, 174(11) Can. Med. Ass'n J. 1589 (2006). This same study revealed that efficacy studies do not typically include data on opioid addiction. In many cases, patients who may be more prone to addiction are pre-screened out of the study pool. This does not reflect how doctors actually prescribe the drugs, because even patients who have past or active substance use disorders tend to receive higher doses of opioids. K. Seal, *Association of Mental Health Disorders With Prescription Opioids and High- Risk Opioids in US Veterans of Iraq and Afghanistan*, 307(9) J. Am. Med. Ass'n 940 (2012).

[41] *See* A. Rubenstein, *Are we making pain patients worse?* Sonoma Medicine (Fall 2009).

consistently shows that long-term opioid therapy for patients who have lower back injuries does not permit patients to return to work or physical activity. This failure is due in part to addiction and other side effects.

142.    For example, as many as 30% of patients who suffer from migraines have been prescribed opioids to treat their headaches. Users of opioids had the highest increase in the number of headache days per month, scored significantly higher on the Migraine Disability Assessment, and had higher rates of depression, compared to non-opioid users. A survey by the National Headache Foundation found that migraine patients who used opioids were more likely to experience sleepiness, confusion, and rebound headaches, and reported a lower quality of life than patients taking other, non-opioid medications.

### C. **Manufacturer Defendant's Scheme To Change Prescriber Habits And Public Perception**

143.    Prior to the Manufacturer Defendants' marketing campaign complained of herein, generally accepted standards of medical practice dictated that opioids should only be used on a short-term, temporary basis in order to treat acute pain, pain relating to recovery from surgery, or for cancer or palliative care. In those limited instances, the risks of addiction are considered low or of little significance.

144.    By its very nature, the market for short-term pain relief is significantly more limited than the market for long-term chronic pain relief. Manufacturer

Defendants recognized that if they could sell their opioid products for both short term pain relief and for the treatment of long-term, chronic pain, they could achieve significantly higher levels of sales while exponentially increasing profits. Further, Manufacturer Defendants recognized that the elevated risk of addiction associated with the long-term use of their highly-addictive, opioid products virtually guarantee that their blockbuster profits would continue indefinitely.

145.   Manufacturer Defendants knew that to increase their profits from the sale of opioids they would need to convince doctors and patients that long-term opioid therapy was safe and effective. In other words, Manufacturer Defendants needed to persuade physicians to abandon the long-held medical consensus about prescribing opioids, and instead to prescribe opioids for durations previously understood to be unsafe.

146.   Manufacturer Defendants knew that their goal of increasing profits by promoting the prescription of opioids for chronic pain would lead directly to an increase in health care costs for patients, health care insurers, and health care payors such as Plaintiffs.

147.   Engaging help from consultants and public relations firms, Manufacturer Defendants developed and executed a common strategy to reverse the long-settled understanding of the relative risks and benefits of chronic opioid therapy. Rather than add to the collective body of medical knowledge concerning

the best ways to treat pain and improve patient quality of life, however, Manufacturer Defendants instead sought to distort and pervert medical and public perception of existing scientific data.

148.    As explained more fully herein, Manufacturer Defendants, collectively and individually, invested vast sums of money into generating articles, continuing medical education courses ("CMEs"), and other "educational" materials, conducting sales visits to individual doctors, and supporting a network of professional societies and advocacy groups, which was intended to, and which did, create a new but patently false "consensus" supporting the long-term use of opioids.

### D. **Manufacturer Defendants Used "Unbranded" Marketing To Evade Regulations and Consumer Protection Laws**

149.    Pharmaceutical companies' promotional activity can be branded or unbranded; unbranded marketing typically focuses on education regarding a particular disease state or treatment rather than promoting a specific drug product. By using unbranded marketing in its communications, drug companies avoid the extensive regulatory framework governing branded communications.

150.    A drug company's branded marketing, which identifies and promotes a specific drug, must: (a) be consistent with its label and supported by substantial scientific evidence; (b) not include false or misleading statements or material

omissions; and (c) fairly balance the drug's benefits and risks.[42] The regulatory framework governing the marketing of specific drugs reflects a public policy designed to ensure that drug companies, which are best suited to understand the properties and effects of their drugs, are responsible for providing prescribers with the information they need to accurately assess the risks and benefits of prescribing those drugs to their patients.

151.    Further, the Federal Food, Drug, and Cosmetic Act ("FDCA") places additional restrictions on branded marketing. It prohibits the sale, in interstate commerce, of drugs that are "misbranded." A drug is "misbranded" if it lacks "adequate directions for use" or if the label is false or misleading "in any particular."[43] "Labeling" includes more than the drug's physical label; it also includes "all . . . other written, printed, or graphic matter . . . accompanying" the drug, including promotional material.[44] The term "accompanying" is interpreted broadly to include promotional materials – posters, websites, brochures, books, and the like – disseminated by or on behalf of the manufacturer of the drug.[45] Thus, Manufacturer Defendants' promotional materials are part of their drugs' labels and are required to be accurate, balanced, and not misleading.

152.    Branded promotional materials for prescription drugs must be

---

[42] 21 U.S.C. 352(a); 21 CFR 202.1(e)(6); 21 CFR 202.1(e)(3); 21 CFR 1.21(a)
[43] 21 U.S.C 352(f); 21 U.S.C. 352(q); *U.S. v. Sullivan*, 68 S.Ct. 331, 335 (1948)
[44] 21 U.S.C.A. § 321(m)
[45] *Kordel v. U.S.*, 69 S. Ct. 106, 110 (1948)

submitted to the FDA when they are first used or disseminated. If, upon review, the FDA determines that a drug's marketing materials are misleading, it can issue either an untitled letter or a warning letter. The FDA uses untitled letters for violations such as overstating the effectiveness of the drug or making claims without context or balanced information. Warning letters address promotions involving safety or health risks and indicate the FDA may take further enforcement action.

153.    Manufacturer Defendants generally avoided using branded advertisements to spread their deceptive messages and claims regarding opioids. Manufacturer Defendants intentionally avoided branded promotional materials for the express purpose of escaping regulatory review of their claims.

154.    Instead, Manufacturer Defendants disseminated much of their false, misleading, imbalanced, and unsupported statements through unregulated and unbranded marketing materials – materials that generally promoted opioid use but did not name a specific opioid while doing so. Through these unbranded materials, Manufacturer Defendants presented information and instructions concerning opioids generally that were false and misleading.

155.    By acting through third parties, Manufacturer Defendants were able to give the false appearance that their messages reflected the views of independent third parties. Later, Manufacturer Defendants would cite to these sources as

"independent" corroboration of their own statements. Further, as one physician adviser to Manufacturer Defendants noted, third-party documents had not only greater credibility, but also broader distribution, as doctors did not "push back" at having materials, for example, from the non-profit American Pain Foundation ("APF") on display in their offices, as they would with drug company pieces.

156.   As part of their marketing scheme, Manufacturer Defendants spread and validated their deceptive messages through the following unbranded vehicles (the "Vehicles"): (i) so-called "key opinion leaders" (*i.e.*, Physicians who influence their peers' medical practice, including but not limited to prescribing behavior) ("KOLs"), who wrote favorable journal articles and delivered supportive CMEs; (ii) a body of biased and unsupported scientific literature, ghostwritten by Manufacturer Defendants and published by KOLs ; (iii) treatment guidelines ghostwritten by Manufacturer Defendants and published as a direct result of KOLs reputation and involvement with the publishing organizations, which were distributed within Plaintiffs' communities causing injury within the Plaintiffs' respective jurisdictions; (iv) CMEs by KOLs, deliberately conducted within Delaware, attended by Dover, Seaford, and Kent County area physicians, causing injury within the Plaintiffs' respective jurisdictions; and (v) unbranded patient education materials disseminated within Plaintiffs' communities through groups purporting to be patient-advocacy and professional organizations ("Front Groups"),

which were deliberately influenced by Manufacturer Defendant-controlled KOLs, exercising their influence both directly and indirectly because they served in leadership roles in these organizations.

157.   Manufacturer Defendants disseminated many of their false, misleading, imbalanced and unsupported messages through the Vehicles because they appeared to uninformed observers to be independent. Through unbranded materials, Defendants presented information and instructions concerning opioids generally that were false and misleading.

158.   Even where such unbranded messages were disseminated through third-party Vehicles, including the KOLs, Manufacturer Defendants adopted these messages as their own when they cited to, edited, approved, and distributed such materials Manufacturer Defendants knew or reasonably should have known were false, misleading, unsubstantiated, unbalanced, and incomplete from the very outset of the message's "creation" by the purportedly independent KOLs. As described herein, Manufacturer Defendants' sales representatives distributed third-party marketing material to Defendants' target audience that was deceptive.

159.   Manufacturer Defendants took an active role in writing, guiding, reviewing, and approving many of the misleading statements issued by third parties, including the KOLs' statements, ensuring that Manufacturer Defendants were consistently in control of their content. By funding, directing, editing, and

distributing these materials, Manufacturer Defendants exercised control over the deceptive messages and acted in concert with these third parties to fraudulently promote the use of opioids for the treatment of chronic pain. The process described in this paragraph is commonly referred to as "Ghostwriting."

160.    The unbranded marketing materials that Manufacturer Defendants assisted in creating and distributing either did not disclose the risks of addiction, abuse, misuse, and overdose, or affirmatively denied or minimized those risks. All of these unbranded marketing materials were promoted by the KOLs falsely from the very outset as independent statements. The KOLs' false promotion of independence provided the unbranded marketing materials utilized by Manufacturer Defendants the credibility required to fraudulently induce physicians in Delaware, including those within Plaintiffs' communities, to prescribe opioids for chronic pain to Plaintiffs' employees and residents, ultimately causing an epidemic that the Plaintiffs must now expend resources to remediate.

### a.    *Manufacturer Defendants' Misuse of KOLs*

161.    The Manufacturer Defendants cultivated a select circle of doctors who were chosen and sponsored by Manufacturer Defendants solely because they promoted the aggressive treatment of chronic pain with opioids in return for the payment of vast sums of money by the Manufacturer Defendants. As set forth herein, the pro-opioid KOLs have been a central feature of the Manufacturer

Defendants' promotional efforts, presenting the appearance of unbiased and reliable medical research supporting the broad use of opioid therapy for chronic pain. These pro-opioid KOLs have written, consulted on, edited, and lent their names to books and articles, and given speeches and CMEs supportive of opioid therapy for chronic pain. They have served on committees that developed treatment guidelines strongly encouraging the use of opioids to treat chronic pain and sat on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs. Manufacturer Defendants were able to exert control of each of these modalities through the KOLs, each of whom accepted money to promote the false marketing claims of Manufacturer Defendants.

162.    In return for their successful pro-opioid advocacy, KOLs received money, prestige, recognition, research funding, and avenues to publish. The more successful the KOLs' deceptive promotion of Opioids for Chronic Pain, the more they were able to receive from the Manufacturer Defendants.

163.    Manufacturer Defendants cited and promoted the KOLs and studies or articles by the KOLs to broaden the chronic opioid therapy market. By contrast, Manufacturer Defendants did not support, acknowledge, or disseminate the publications of independent doctors critical of the use of chronic opioid therapy.

164.    Manufacturer Defendants carefully vetted their KOLs to ensure that they would remain "on-message" and supportive of the agenda to falsely promote

opioids as safe for the treatment of chronic pain.  Manufacturer Defendants also kept close tabs on the content of the materials published by the KOLs, if not authoring, editing, and/or revising them in their entirety prior to publication.

165.    In their promotion of the use of opioids to treat chronic pain, the KOLs knew that their statements were false and misleading, or they recklessly disregarded the truth in doing so, but they continued to publish their misstatements to benefit the Manufacturer Defendants.

### b.    *Manufacturer Defendants' Corruption of Scientific Literature through KOLs*

166.    Rather than actually test the safety and efficacy of opioids for long-term use, Manufacturer Defendants, instrumentally relying on KOLs, misled physicians, patients, and health care payors into believing that such testing had already been performed. As set forth herein, Manufacturer Defendants created a body of false, misleading, and unsupported medical and popular literature about opioids that (a) understated the risks and overstated the benefits of opioids for long-term use; (b) appeared to be the result of independent, objective research; and (c) was likely to shape the perceptions of prescribers, patients, and payors. This literature was, in fact, marketing material intended to persuade doctors and consumers that the benefits of long-term opioid use outweighed the risks.

167.    To accomplish their goal, Manufacturer Defendants – sometimes through third-party consultants and/or front groups – commissioned, edited, and

arranged for the placement of favorable articles in academic journals authored by KOLs.

168.    Manufacturer Defendants' plans for these materials did not originate in the departments within the Manufacturer Defendants' organizations responsible for research, development, or any other area that would have specialized knowledge about the drugs and their effects on patients; rather, they originated in Manufacturer Defendants' marketing departments and with Manufacturer Defendants' marketing and public relations consultants, ultimately being published and promoted by KOLs.

169.    In these materials, Manufacturer Defendants (and their KOL surrogates) often claimed to rely on "data on file" or presented posters, neither of which are subject to peer review. Manufacturer Defendants presented these materials to the medical community as scientific articles or studies, despite the fact that Manufacturer Defendants' materials were not based on reliable data and subject to the scrutiny other experts in the same field.

170.    Manufacturer Defendants also made sure that favorable articles were disseminated and cited widely in the medical literature and by KOLs, even when Manufacturer Defendants knew that the articles distorted the significance or meaning of the underlying study. Most notably, Purdue frequently cited a 1980 item in the well-respected New England Journal of Medicine, J. Porter & H. Jick,

*Addiction Rare in Patients Treated with Narcotics*, 302 (2) New Eng. J. Med. 123 (1980) ("Porter & Jick Letter"), in a manner that makes it appear that the item reported the results of a peer reviewed study. It also cited two CME programs sponsored by Endo where KOLs were presenters.  Manufacturer Defendants and the KOLs acting on their behalf failed to reveal that this "article" was actually a letter-to-the-editor, not a study, much less a peer-reviewed study. The letter, reproduced in full below, states that the authors examined their files of hospitalized patients who had received opioids:

---

### ADDICTION RARE IN PATIENTS TREATED WITH NARCOTICS

*To the Editor:* Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients[1] who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well documented addiction in patients who had no history of addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients,[2] Percodan in one, and hydromorphone in one. We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.

JANE PORTER
HERSHEL JICK, M.D.
Boston Collaborative Drug
Surveillance Program
Waltham, MA 02154        Boston University Medical Center

1. Jick H, Miettinen OS, Shapiro S, Lewis GP, Siskind Y, Slone D. Comprehensive drug surveillance. JAMA. 1970; 213:1455-60.
2. Miller RR, Jick H. Clinical effects of meperidine in hospitalized medical patients. J Clin Pharmacol. 1978; 18:180-8.

---

171.    The patients referred to in the letter were all treated prior to the letter, which was published in 1980. Because of standards of care prior to 1980, the treatment of those patients with opioids would have been limited to acute or end-

of-life situations, not chronic pain, making the data useless for any generalization regarding the safety or efficacy of opioids for treating chronic pain. Even aside from chronic pain treatment, the letter notes that when these patients' records were reviewed, the authors found almost no references to signs of addiction, though there is no indication that caregivers were instructed to look for, assess, or document signs of addiction. Nor is there any indication that the patients were followed after discharge from the hospital or, if they were followed, for how long. None of these serious limitations were disclosed when Manufacturer Defendants and KOLs acting on their behalf cited the letter, typically as the sole scientific support for the proposition that opioids are rarely addictive.

172.    Dr. Jick has complained that his letter has been distorted and misused – as indeed it has.

173.    Manufacturer Defendants not only created and promoted favorable studies in the literature through the paid efforts of KOLs but, in order to discredit or suppress negative information, funded studies and articles that targeted articles contradicting Manufacturer Defendants' claims or raising concerns about chronic opioid therapy. In order to do so, Manufacturer Defendants – often with the help of KOLs – used a broad range of media to disseminate their message, including negative review articles, letters to the editor, commentaries, case-study reports, and newsletters.

174.    Manufacturer Defendants' strategy – to create, fund, plant, and promote supportive literature for citation as pro-opioid evidence in their promotional materials, while failing to disclose evidence that contradicted their claims – was flatly inconsistent with their legal obligations. Manufacturer Defendants' strategy was intended to alter, and did alter, prescribing and consumer patterns, including those within Plaintiffs' communities, by distorting the truth regarding the risks and benefits of opioids for chronic pain relief.

### c. *Manufacturer Defendants' Misuse of Treatment Guides*

175.    Treatment guidelines authored with KOLs' influence but under the direction and control of Manufacturer Defendants have been particularly important in securing acceptance for chronic opioid therapy. The guidelines are relied upon by doctors, especially the general practitioners and family doctors targeted by Manufacturer Defendants, who are generally not experts, and who generally have no special training, in the treatment of chronic pain. Treatment guidelines not only directly inform doctors' prescribing practices, but also are cited throughout scientific literature and relied on by third-party payors in determining whether they should pay for treatments for specific indications.

### i.    FSMB

176.    The Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the United States.

The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline physicians. The FSMB finances opioid and pain-specific programs through grants from Defendants.

177.    Since 1998, the FSMB has been developing treatment guidelines for the use of opioids for the treatment of pain. The 1998 edition of the guidelines, Model Guidelines for the Use of Controlled Substances for the Treatment of Pain ("1998 Guidelines") was produced "in collaboration with pharmaceutical companies" and taught that opioids were "essential" for the treatment of chronic pain, including as a first prescription option, rather than that opioids could be appropriate in limited cases after other treatments had failed. A 2004 iteration of the 1998 Guidelines and the 2007 book, *Responsible Opioid Prescribing*, also made the same claims as the 1998 Guidelines. These guidelines were posted online and were available to and intended to reach physicians nationwide, including those treating employees and residents of Dover, Seaford, and Kent County.

178.    The publication of *Responsible Opioid Prescribing* was backed largely by drug manufacturers. In all, 163,131 copies of *Responsible Opioid Prescribing* were distributed by state medical boards (and through the boards, to practicing doctors). The FSMB website describes the book as the "leading continuing medical education (CME) activity for prescribers of opioid medications."

179.     FSMB's *Responsible Opioid Prescribing* was drafted by a KOL named Dr. Scott Fishman.  Dr. Fishman was frequently hired by a consulting firm, Conrad & Associates LLC, to write pro-opioid marketing pieces disguised as science. Dr. Fishman's work was reviewed and approved by drug company representatives, and Dr. Fishman authored pieces that he admits distorted the risks and benefits of chronic opioid therapy in order to meet the demands of his drug company sponsors.

180.     *Responsible Opioid Prescribing* was a signature piece of Dr. Fishman's work and contained a number of deceptive statements. This publication claimed that, because pain had a negative impact on a patient's ability to function, relieving pain—alone—would "reverse that effect and improve function." The truth, however, is far more complicated; functional improvements made from increased pain relief can be offset by a number of problems, including addiction.

181.     Manufacturer Defendants also relied on 1998 Guidelines to convey the alarming message that "under-treatment of pain" would result in official discipline, but no discipline would result if opioids were prescribed as part of an ongoing patient relationship and prescription decisions were documented. FSMB turned doctors' fear of discipline on its head: doctors, who used to believe that they would be disciplined if their patients became addicted to opioids, were taught

instead that they would be punished if they failed to prescribe opioids to their patients with chronic pain.

    ii.    <u>AAPM/APS GUIDELINES</u>

182.    American Academy of Pain Medicine ("AAPM") and the American Pain Society ("APS") are professional medical societies, each of which received substantial funding from Manufacturer Defendants from 2009 to 2013. In 1997, AAPM issued a "consensus" statement that endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low.[46] The Chair of the committee that issued the statement, Dr. J. David Haddox, was at the time a paid speaker for Purdue. The sole consultant to the committee was a KOL named Dr. Russel Portenoy. The consensus statement, which also formed the foundation of the 1998 Guidelines, was published on the AAPM's website.

183.    AAPM and APS issued their own guidelines in 2009 ("2009 Guidelines") that continued to recommend the use of opioids to treat chronic pain. Fourteen of the 21 panel members who drafted the 2009 Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine, M.D., received support from Manufacturer Defendants Janssen, Cephalon, Endo, and Purdue.

184.    The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain and conclude that the risk of addiction is manageable for

---

[46] Haddox J., et al., The Use of Opioids for the Treatment of Chronic Pain – A Consensus Statement from the American Academy of Pain Medicine and the American Pain Society, 6(1) Pain Forum 77-79 (1997)

patients regardless of past abuse histories. The 2009 Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; they were reprinted in the *Journal of Pain*, have been cited hundreds of times in academic literature, were disseminated within Plaintiffs' communities during the relevant time period, and were and are available online.

185.    Manufacturer Defendants widely cited and promoted the 2009 Guidelines without disclosing the lack of evidence to support its conclusions.

### iii.    GUIDELINES THAT DID NOT RECEIVE DEFENDANTS' SUPPORT

186.    The extent of Manufacturer Defendants' influence on treatment guidelines is demonstrated by the fact that independent guidelines – the authors of which did not accept funding from drug companies – reached very different conclusions.

187.    The 2012 Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain, issued by the American Society of Interventional Pain Physicians ("ASIPP"), warned that "[t]he recent revelation that the pharmaceutical industry was involved in the development of opioid guidelines as well as the bias observed in the development of many of these guidelines illustrate that the model guidelines are not a model for curtailing controlled substance abuse and may, in

fact, be facilitating it." ASIPP's Guidelines further advise that "therapeutic opioid use, specifically in high doses over long periods of time in chronic non-cancer pain starting with acute pain, not only lacks scientific evidence, but is in fact associated with serious health risks including multiple fatalities, and is based on emotional and political propaganda under the guise of improving the treatment of chronic pain." ASIPP recommends long-acting opioids in high doses only "in specific circumstances with severe intractable pain" and only when coupled with "continuous adherence monitoring, in well-selected populations, in conjunction with or after failure of other modalities of treatments with improvements in physical and functional status and minimal adverse effects."[47]

188.     Similarly, the 2011 Guidelines for the Chronic Use of Opioids, issued by the American College of Occupational and Environmental Medicine, recommend against the "routine use of opioids in the management of patients with chronic pain," finding "at least moderate evidence that harms and costs exceed benefits based on limited evidence."[48]

189.     The Clinical Guidelines on Management of Opioid Therapy for Chronic Pain, issued by the U.S. Department of Veterans Affairs ("VA") and Department of Defense ("DOD") in 2010, notes that their review revealed a lack of

---

[47] Laxmaiah Manchikanti, et al., American Society of Interventional Pain Physicians (ASIPP) *Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain: Part 1, Evidence Assessment*, 15 Pain Physician (Special Issue) S1-S66; *Part 2 – Guidance*, 15 Pain Physician (Special Issue) S67-S116 (2012).
[48] *American College of Occupational and Environmental Medicine's Guidelines for the Chronic Use of Opioids* (2011).

solid evidence-based research on the efficacy of long-term opioid therapy.[49]

### d. *Manufacturer Defendants' Misuse of CMEs*

190.   A CME (an acronym for "Continuing Medical Education") is a professional education program provided to doctors. Doctors are required to attend a certain number and, often, type of CME programs each year as a condition of licensure. CME programs are delivered in person, often in connection with professional organizations' conferences, and online, or through written publications. Doctors rely on CMEs not only to satisfy licensing requirements, but also to learn information on new developments in medicine or to deepen their knowledge in specific areas of practice. With the support of Manufacturer Defendants, the KOLs became highly respected in their fields and, as a result, the KOLs typically taught CMEs.

191.   CMEs are thought to be independent, objective reflections of the presenting physicians' medical expertise. As a result, CMEs can be especially influential with doctors.

192.   In fact, the Manufacturer Defendants used KOLs to teach CMEs as way to influence the prescribing habits of doctors within Delaware, ultimately inducing doctors treating the residents and employees of Dover, Seaford, and Kent

---

[49] Management of Opioid Therapy for Chronic Pain Working Group, VA/DoD Clinical Practice Guideline for Management of Opioid Therapy for Chronic Pain (May 2010). Available at https://www.va.gov/painmanagement/docs/cpg_opioidtherapy_fulltext.pdf (accessed September 19, 2017).

County to prescribe opioids to treat chronic pain conditions and causing the epidemic that Plaintiffs must now expend resources to remediate.

193. The countless doctors and other health care professionals who participate in accredited CMEs constitute an enormously important audience for opioid reeducation. As one target, Manufacturer Defendants, through KOLs, aimed to reach general practitioners, whose broad area of practice and lack of expertise and specialized training in pain management made them particularly dependent upon CMEs and, as a result, especially susceptible to Manufacturer Defendants' deceptions.

194. Manufacturer Defendants sponsored CMEs that were delivered thousands of times, promoting chronic opioid therapy and supporting and disseminating the deceptive and biased messages described in this Complaint. These CMEs, while often generically titled to relate to the treatment of chronic pain, focused on opioids to the exclusion of alternative treatments, inflated the benefits of opioids, and frequently omitted or downplayed their risks and adverse effects.

195. As an example, KOL Dr. Fine authored a CME, sponsored by Cephalon, titled *Opioid-Based Management of Persistent and Breakthrough Pain*, with KOLs Dr. Christine A. Miaskowski, M.D., and Michael J. Brennan, M.D. Cephalon paid to have this CME published in a supplement of Pain Medicine

News in 2009.[50] It instructed prescribers that "clinically, broad classification of pain syndromes as either cancer or non-cancer related has limited utility," and recommended dispensing "rapid onset opioids" for "episodes that occur spontaneously" or unpredictably, including "oral transmucosal fentanyl," Actiq, and "fentanyl buccal table," Fentora, including in patients with chronic non-cancer pain. Dr. Miaskoski disclosed in 2009, in connection with the APS/AAPM Opioid Treatment Guidelines, that she served on Cephalon's speaker's bureau.[51] Dr. Fine also received funding from Cephalon for consulting services.

196.   The American Medical Association ("AMA") has recognized that support from drug companies with a financial interest in the content being promoted "creates conditions in which external interests could influence the availability and/or content" of the programs and urges that "[w]hen possible, CME[s] should be provided without such support or the participation of individuals who have financial interests in the education subject matter."[52]

197.   Physicians treating residents within Plaintiffs' communities attended or reviewed Manufacturer Defendants' sponsored CMEs during the relevant time period and were misled by them.

---

[50] Fine, Perry, et al., *Opioid-Based Management of Persistent and Breakthrough Pain*, Pain Medicine News (2009), https://www.yumpu.com/en/document/view/11409251/opioid-based-management-of-persistent-and-breakthrough-pain (accessed December 29, 2017).
[51] 14 of 21 panel members who drafted the AAPM/APS Guidelines received support from Janssen, Cephalon, Endo, and Purdue.
[52] Opinion 9.0115, *Financial Relationships with Industry in CME*, Am. Med. Ass'n (Nov. 2011).

198.     By sponsoring CME programs put on by Front Groups (*i.e.*, groups purporting to be patient-advocacy and professional organizations) like APF, AAPM and others, Manufacturer Defendants could rely upon instructors to deliver messages favorable to them, as these organizations were dependent on the Manufacturer Defendants for funding and other projects. The sponsoring organizations in turn hired pro-opioid KOLs to give presentations that supported and promoted chronic opioid therapy. The Manufacturer Defendants' influence over the content of these CMEs had a direct and immediate effect on prescribers' views on opioids.

199.     Producers of CMEs and the Manufacturer Defendants measure the effects of CMEs on prescribers' views on opioids and their absorption of specific messages, confirming the strategic marketing purpose of CMEs.

## e.     *Defendants' Misuse of Patient Education Materials and Front Groups*

200.     Pharmaceutical industry marketing experts consider patient-focused advertising, including direct-to-consumer marketing, as particularly valuable in "increas[ing] market share . . . by bringing awareness to a particular disease that the drug treats."[53] Physicians are more likely to prescribe a drug if a patient specifically requests it, and physicians' willingness to acquiesce to such patient

---

[53] Kanika Johar, *An Insider's Perspective: Defense of the Pharmaceutical Industry's Marketing Practices*, 76 Albany L. Rev. 299, 308 (2013).

requests holds true for opioids, even as a treatment for conditions for which opioids are not approved.[54]   Recognizing this phenomenon, Manufacturer Defendants used their relationships with Front Groups to engage in largely unbranded patient education about opioid treatment for chronic pain.

201.    Manufacturer Defendants entered into arrangements with numerous Front Groups (*i.e.*, groups purporting to be patient-advocacy and professional organizations) to promote the prescription of opioids for the treatment of chronic pain. Each one of these Front Groups relied or relies largely upon Manufacturer Defendants for significant funding and, in some cases, depend exclusively upon Manufacturer Defendants' funding for their continued survival. In addition to generating Manufacturer Defendants' promotional materials and programs supporting chronic opioid therapy to be provided to doctors and patients, Front Groups also assisted Manufacturer Defendants' marketing efforts by responding to negative articles and advocating against regulatory changes that would constrain opioid prescribing. Front Groups developed and disseminated pro-opioid treatment guidelines; conducted outreach to groups targeted by Manufacturer Defendants, such as veterans and the elderly; and developed and sponsored CMEs that focused exclusively on the use of opioids to treat chronic pain. Manufacturer Defendants

---

[54] In one study, for example, nearly 20% of sciatica patients requesting oxycodone received a prescription for it, compared with 1% of those making no specific request. J.B. McKinlay *et al.*, *Effects of Patient Medication Requests on Physician Prescribing Behavior*, 52(2) Med. Care 294 (2014).

created a symbiotic relationship with the Front Groups whereby Manufacturer Defendants funded them in order to ensure supportive messages from these seemingly neutral and credible third parties, and their funding did, in fact, ensure such supportive messages.  In turn, the supportive messages drove prescriptions and profits for Defendants and ensured continued funding of the Front Groups.

     i.    <u>AMERICAN PAIN FOUNDATION</u>

202.    The most prominent and effective of Manufacturer Defendants' Front Groups was the American Pain Foundation ("APF"), which received more than $10 million in funding from opioid manufacturers from 2007 until it closed in May 2012.

203.    APF issued purported "education guides" for patients, the news media, and policymakers that promoted the benefits of opioids for chronic pain treatment and minimized their risks, specifically the risk of addiction. APF also engaged in a significant multimedia campaign – through radio, television and the internet – to "educate" patients about their "right" to pain treatment with opioids. All of the programs and materials were intended to, and did, reach a national audience, including residents within Plaintiffs' communities.

204.    By 2011, APF was entirely dependent on incoming grants from defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit. APF board member, Dr. Portenoy, explained the lack of funding diversity was one

of the biggest problems at APF.

205.    While APF held itself out as an independent patient advocacy organization, it simultaneously engaged in grassroots lobbying against various legislative initiatives that might regulate the prescription of opioids and protect patients from the risks associated with the unnecessary prescription of highly addictive and ineffective drugs. In stark contrast to its stated purpose, APF functioned principally as an advocate for the interests of Manufacturer Defendants, not patients.

206.    In practice, APF operated in close collaboration with Manufacturer Defendants. APF submitted grant proposals seeking to fund activities and publications suggested by Manufacturer Defendants. APF also assisted in marketing projects for Manufacturer Defendants.

207.    The intimate relationship between APF and Manufacturer Defendants demonstrates APF's clear lack of independence in its finances, management, and mission, and its willingness to allow Manufacturer Defendants to control its activities and messages, strongly indicates that each Defendant that provided APF with funding was able to exercise editorial control over its publications.

208.    In May 2012, the U.S. Senate Finance Committee began looking into APF to determine the links - financial and otherwise - between the organization and the manufacturers of opioid painkillers. Within days of being targeted by the

Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF then "cease[d] to exist, effective immediately,"[55] proving the degree of its dependence upon Manufacturer Defendants' financing as well as their control over it.

ii.   THE AMERICAN ACADEMY OF PAIN MEDICINE

209.   The American Academy of Pain Medicine ("AAPM"), with the assistance, prompting, involvement, and funding of Manufacturer Defendants, issued the treatment guidelines discussed herein, and sponsored and hosted CMEs essential to the Manufacturer Defendants' deceptive marketing scheme.

210.   AAPM received more than $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering CMEs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings.

---

[55] William Heisel, USC Annenberg Center for Health Journalism, Antidote: Investigating Untold Health Stories, *Journalists Bag a Big One: The American Pain Foundation*, https://www.centerforhealthjournalism.org/blogs/2012/05/14/journalists-bag-big-one-american-pain-foundation (accessed September 19, 2017).

Defendants Endo, Purdue, and Cephalon were members of the council and presented deceptive programs to doctors who attended this annual event.

211. The conferences sponsored by AAPM heavily emphasized CME sessions on opioids – 37 out of roughly 40 at one conference alone. AAPM's presidents have included top industry-supported KOLs, Dr. Fine, Dr. Portenoy, and Dr. Webster.  Dr. Webster was elected president of AAPM while under a DEA investigation. Another past AAPM president, KOL Dr. Scott Fishman, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are … small and can be managed."[56]

212. AAPM's staff understood that they and their industry funders were engaged in a common task.  Manufacturer Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

## E.  Defendants Acted Through KOLs and Front Groups to Create, Promote, and Control Unbranded Marketing

213. Manufacturer Defendants worked in concert with each other and with the industry-funded and directed Front Groups and KOLs to carry out a common scheme to deceptively market opioids by misrepresenting the risks, benefits, and superior efficacy of opioids to treat chronic pain.

---

[56] *Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine*, Univ. of Cal., Davis (2005), http://www.medscape.org/viewarticle/500829 (accessed September 19, 2017).

214.   Manufacturer Defendants acted through and with the same network of Front Groups, funded the same KOLs, and often used the very same language and format to disseminate the same deceptive messages regarding the appropriate use of opioids to treat chronic pain. Despite knowing that this information was false and misleading, Manufacturer Defendants, Front Groups, and KOLs disseminated these misrepresentations nationwide, including to prescribers and patients within Plaintiffs' communities.

215.   One Vehicle for Defendants' marketing collaboration was the Pain Care Forum ("PCF"). PCF began in 2004 as an APF project with the stated goals of offering "a setting where multiple organizations can share information" and "promote and support taking collaborative action regarding federal pain policy issues." APF President Will Rowe described the forum as "a deliberate effort to positively merge the capacities of industry, professional associations, and patient organizations."

216.   PCF is comprised of representatives from opioid manufacturers and distributors (including Cephalon, Endo, Janssen, and Purdue); doctors and nurses in the field of pain care; professional organizations (including AAPM, APS, and American Society of Pain Educators); patient advocacy groups (including APF and American Chronic Pain Association ("ACPA")); and other like-minded organizations - almost all of which received substantial funding from Manufacturer

Defendants.

217.   PCF, for example, developed and disseminated "consensus recommendations" for a Risk Evaluation and Mitigation Strategy ("REMS") for long-acting opioids that the FDA mandated in 2009 to communicate the risks of opioids to prescribers and patients.[57] This was critical because a REMS that went too far in narrowing the uses or benefits or in highlighting the risks of chronic opioid therapy would undermine Manufacturer Defendants' marketing efforts and adversely affect profits. The recommendations claimed that opioids were "essential" to the management of pain, and that the REMS "should acknowledge the importance of opioids in the management of pain and should not introduce new barriers." Manufacturer Defendants worked with PCF members to limit the reach and manage the message of the REMS, which enabled them to maintain, rather than undermine, their deceptive marketing of opioids for chronic pain treatment.

### F.   **Manufacturer Defendants' Misrepresentations**

218.   Manufacturer Defendants, through their own marketing efforts and publications and through their sponsorship and control of patient advocacy and medical societies and projects, caused deceptive materials and information to be placed into the marketplace, including to prescribers, patients, and payors within Plaintiffs' communities. These promotional messages were intended to and did

---

[57] The FDA can require a drug maker to develop a REMS—which could entail (as in this case) an education requirement or distribution limitation—to manage serious risks associated with a drug.

encourage patients to request, doctors to prescribe, and payors to pay for chronic opioid therapy.

219.    Recognizing that doctors are the gatekeepers for controlling access to prescription drugs, Manufacturer Defendants not surprisingly focused the bulk of their marketing efforts and multi-million dollar budgets on the professional medical community.  As a controlled substance with significant regulatory barriers limiting access, Manufacturer Defendants knew doctors would not prescribe opioids to patients with common chronic pain complaints unless doctors were convinced that opioids had real benefits and minimal risks.  Accordingly, Manufacturer Defendants concealed from prescribers, patients, and the public that evidence in support of their promotional claims was inconclusive, non-existent or unavailable.  Instead, Manufacturer Defendants disseminated misleading and unsupported messages that caused the target audience to believe those messages were corroborated by scientific evidence. As a result, doctors treating residents and employees of Dover, Seaford, and Kent County began prescribing opioids on a long-term basis to treat chronic pain – a treatment choice that most if not all never would have considered without Manufacturer Defendants' campaign.

220.    Drug company marketing materially impacts doctors' prescribing

behavior.[58] Doctors rely on drug companies to provide them with truthful information about the risks and benefits of their products, and they are influenced by their patients' requests for particular drugs and payors' willingness to pay for those drugs. Evidence shows that doctors who would otherwise not have prescribed opioids were, in fact, induced by Manufacturer Defendants' deceptive marketing to prescribe opioids for chronic pain.

221.    Manufacturer Defendants spent millions of dollars to market opioid drugs to prescribers and patients and meticulously tracked their return on that investment. In one recent survey published by the AMA, 88% of the practitioner respondents said they were confident in their prescribing skills, and nearly half were comfortable using opioids for chronic non-cancer pain, even though nine in ten general practitioners reported prescription drug abuse to be a moderate to large problem in their communities.[59] These results are the direct consequence of Manufacturer Defendants' fraudulent marketing campaign.

222.    As described in detail below, Manufacturer Defendants:

- Misrepresented the truth about how opioids lead to

---

[58] See, e.g., P. Manchanda & P. Chintagunta, *Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis*, 15 (2-3) Mktg. Letters 129 (2004) (detailing has a positive impact on prescriptions written); I. Larkin, *Restrictions on Pharmaceutical Detailing Reduced Off-Label Prescribing of Antidepressants and Antipsychotics in Children*, 33(6) Health Affairs 1014 ( 2014) (finding academic medical centers that restricted direct promotion by pharmaceutical sales representatives resulted in a 34% decline in on-label use of promoted drugs); *see also* A. Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99(2) Am J. Pub. Health 221 (2009) (correlating an increase of OxyContin prescriptions from 670,000 annually in 1997to 6.2 million in 2002 to a doubling of Purdue's sales force and trebling of annual sales calls).

[59] Research Letter, Prescription Drug Abuse: A National Survey of Primary Care Physicians, JAMA Intern. Med. (Dec. 8, 2014), E1-E3.

addiction;
- Misrepresented that opioids improve function;
- Misrepresented that addiction risk of opioids can be managed;
- Misled doctors, patients, and payors through the use of misleading terms like "pseudoaddiction;"
- Falsely claimed that withdrawal is simply managed;
- Misrepresented that increased doses pose no significant additional risks to patients;
- Falsely omitted or minimized the adverse effects of opioids and overstated the risks of alternative forms of pain treatment.

223.    Underlying each of Manufacturer Defendants' misrepresentations and deceptions in promoting the long-term continuous use of opioids to treat chronic pain was a collective effort to hide from the medical community the fact that there are no adequate and well-controlled studies of opioid use longer than 12 weeks.[60]

**a.    *Manufacturer Defendants, Acting Individually and Collectively, Misrepresented the Truth About How Use of Opioids Leads to Addiction.***

224.    Manufacturer Defendants' fraudulent representation that opioids are rarely addictive is central to their scheme. Through their well-funded, comprehensive, and aggressive marketing efforts, Manufacturer Defendants succeeded in changing the perceptions of many physicians, patients, and health care payors and persuaded them that opioid addiction rates are low and that addiction is unlikely to develop when opioids are prescribed for chronic pain. As

---

[60] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. *Physicians for Responsible Opioid Prescribing,* Re Docket No. FDA- 2012-P-0818 (Sept. 10, 2013).

both an intended and foreseeable result, doctors treating the residents and employees of Dover, Seaford, and Kent County prescribed more opioids to more patients – thereby enriching Defendants.

225.   Each of the Manufacturer Defendants claimed that the potential for addiction from its drugs was relatively small or non-existent, despite the complete lack of supporting scientific evidence.

226.   For example, Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which fraudulently claimed that addiction is rare and limited to extreme cases of unauthorized dose escalations, opioid prescription fraud, or theft.

227.   Similarly, Endo sponsored a website, www.painknowledge.com, through APF, which falsely claimed that: "[p]eople who take opioids as prescribed usually do not become addicted." Although the term "usually" is not defined, the overall presentation suggests that the rate is so low as to be immaterial. The language also implies that the long-term use of opioids presents minimal risk of addiction to patients if the opioids are properly prescribed by a physician.

228.   Additionally, Endo distributed a patient education pamphlet edited by KOL Dr. Portenoy entitled *Understanding Your Pain: Taking Oral Opioid Analgesics*. It claimed that "[a]ddicts take opioids for other reasons [than pain relief], such as unbearable emotional problems." This implies that patients

prescribed opioids for *genuine* pain will not become addicted, a claim which is both unsupported and known to be false.

229. Likewise, Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009) in conjunction with the AAPM, ACPA and APF, which, as set forth in the excerpt below, described the fact that opioids are addictive as a "myth" and falsely asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."

Although the term "rarely" is not defined, the overall presentation suggests that the rate is so low as to be immaterial. The language also implies that the long-term use of opioids presents minimal risk of addiction to patients if the opioids are properly prescribed by a physician, which is untrue. The guide states as a "fact" that "Many studies" show that opioids are *rarely* addictive when used for chronic pain. In fact, no such studies exist.

230.    As another example, Purdue sponsored and Janssen provided grants to APF to distribute *Exit Wounds* (2009) to veterans, which taught, "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications," although the term "very unlikely" is not defined, the overall presentation suggests that the rate is so low as to be immaterial.

231.    For another example, Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which inaccurately claimed that less than 1% of children prescribed opioids would become addicted.[61] This publication also falsely asserted that pain is undertreated due to "misconceptions about opioid addiction."

232.    In addition, in the 1990s, Purdue amplified the pro-opioid message with promotional videos and featuring Dr. Portnoy and other doctors in which it

---

[61] In support of this contention, it misleadingly cites a 1996 article by Dr. Kathleen Foley concerning cancer pain.

was claimed, "the likelihood that treatment of pain using an opioid drug which is prescribed by a doctor will lead to addiction is extremely low."[62]

233.   As yet another example from the industry, Actavis's strategy and pattern of deceptive marketing is similarly evident in its internal training materials. A sales education module titled "Kadian Learning System" trained Actavis's sales representatives on the marketing messages described above – including deceptive claims about improved function, the risk of addiction, the false scientific concept of "pseudoaddiction," and opioid withdrawal—that sales representatives were directed and required, in turn, to pass on to prescribers, nationally and within Plaintiffs' communities.

234.   The sales training module, dated July 1, 2010, includes the misrepresentations documented in this Complaint, starting with its promise of improved function. The sales training instructed Actavis sales representatives that "most chronic benign pain patients do have markedly improved ability to function when maintained on chronic opioid therapy," when, in reality, available data demonstrate that patients on chronic opioid therapy are *less likely* to participate in daily activities like work. The sales training also misleadingly implied that the dose of prescription opioids could be escalated without consequence and omitted important facts about the increased risks of high dose opioids. First, Actavis taught

---

[62] Excerpts from one such video, including the statement quoted here, may be viewed at http://www.wsj.com/articles/SB10001424127887324478304578173342657044604 (accessed September 19, 2017).

its sales representatives, who in turn passed the message on to doctors, that pain patients would not develop tolerance to opioids, which would have necessitated increasing doses: "Although tolerance and dependence do occur with long-term use of opioids, many studies have shown that tolerance is limited in most patients with [Chronic pain]." Second, Actavis instructed its sales personnel that opioid "[d]oses are titrated to pain relief, and so no ceiling dose can be given as to the recommended maximal dose." Actavis failed to inform doctors, via its sales representatives, of the greater risks associated with opioids at high doses.

235.    The Kadian Learning System module dates from July 2010, but Actavis sales representatives were passing deceptive messages on to prescribers before that date.  A July 2010 "Dear Doctor" letter issued by the FDA indicated that "[b]etween June 2009 and February 2010, Actavis sales representatives distributed . . . promotional materials that . . . omitted and minimized serious risks associated with [Kadian]."  Certain risks that the FDA noted were misrepresented include the risk of "[m]isuse, [a]buse, and [d]iversion of [o]pioids" and, specifically, the risk that "[o]pioid agonists have the potential for being abused and are sought by drug abusers and people with addiction disorders and are subject to criminal diversion." The FDA also took issue with an advertisement for misrepresenting Kadian's ability to help patients "live with less pain and get adequate rest with less medication," when the supporting study did not represent

"substantial evidence or substantial clinical experience."

236.    Finally, the internal documents of another Manufacturer Defendant, Endo, indicate that pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed the AAPM/APS Guidelines with doctors during detailing visits. These guidelines deceptively concluded that the risk of addiction is manageable for patients, regardless of past abuse histories, amongst other deceptive statements as described above.

237.    Rather than honestly disclose the risk of addiction, Manufacturer Defendants attempted to portray those who were concerned about addiction as callously denying treatment to suffering patients. To increase pressure on doctors to prescribe chronic opioid therapy, Manufacturer Defendants turned the tables: they suggested that doctors who *failed* to treat their patients' chronic pains with opioids were failing their patients and risking professional discipline, while doctors who prescribed long-term opioid therapy were following the compassionate (and professionally less risky) approach. Manufacturer Defendants claimed that "exaggerated" concerns about the risk of addiction resulted in patients' pain being under-treated while opioids were over-regulated and under-prescribed. The Treatment Options guide funded by Purdue and Cephalon claims that "[d]espite the great benefits of opioids, they are often underused." The APF publication funded by Purdue, *A Policymaker's Guide to Understanding Pain & Its Management*,

laments that: "Unfortunately, too many Americans are not getting the pain care they need and deserve. Some common reasons for difficulty in obtaining adequate care include . . . misconceptions about opioid addiction."[63]

238.    *Let's Talk Pain*, sponsored by APF, AAPM and Janssen, likewise warns, "strict regulatory control has made many physicians reluctant to prescribe opioids. The unfortunate casualty in all of this is the patient, who is often undertreated and forced to suffer in silence." The program goes on to say, "[b]ecause of the potential for abusive and/or addictive behavior, many health care professionals have been reluctant to prescribe opioids for their patients…. This prescribing environment is one of many barriers that may contribute to the undertreatment of pain, a serious problem in the United States."

## b.    *Manufacturer Defendants, Acting Individually and Collectively, Misrepresented that Opioids Improve Function*

239.    Manufacturer Defendants produced, sponsored, or controlled materials with the intention and expectation that, by instructing patients and prescribers that opioids would improve patient functioning and quality of life, patients would demand opioids and doctors would prescribe them. These claims also encouraged doctors to continue opioid therapy for patients in the belief that lack of improvement in quality of life could be alleviated by increasing doses or prescribing supplemental short-acting opioids to take on an as-needed basis for

---

[63] This claim also appeared in a 2009 publication by APF, *A Reporter's Guide*.

breakthrough pain.

240.    Although opioids may initially improve patients' function by providing pain relief in the short term, no controlled studies of the use of opioids beyond 12 weeks has ever shown that opioids improve patients' function in the long-term.  On the contrary, research such as a 2008 study in the journal *Spine* has shown that pain sufferers prescribed opioids long-term suffered addiction that made them more likely to be disabled and unable to work.[64]  Despite the lack of evidence of improved function, and the existence of evidence to the contrary, Manufacturer Defendants consistently promoted opioids as capable of improving patients' function and quality of life without disclosing the lack of evidence supporting this claim.

241.    Claims that opioids improve patients' function are misleading because such claims have "not been demonstrated by substantial evidence or substantial clinical experience."[65]

242.    The Federation of State Medical Boards' *Responsible Opioid Prescribing* (2007), sponsored by drug companies including Cephalon, Endo and Purdue, deceptively taught that relief of pain in itself improved patients' function: "While significant pain worsens function, relieving pain should reverse that effect

---

[64] Jeffrey Dersh, et al., Prescription opioid dependence is associated with poorer outcomes in disabling spinal disorders, 33(20) Spine 2219-27 (Sept. 15,2008).
[65] Letter from Thomas W. Abrams, RPh., MBA, Dir., Div. of Marketing, Advertising and Communications to Brian A. Markison, Chairman, *King Pharmaceuticals*, Re: NDA 21-260 (March 24, 2008).

and improve function."

243.     Cephalon and Purdue sponsored the APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids, when used properly "give [pain patients] a quality of life we deserve." The *Treatment Options* guide notes that non-steroidal anti-inflammatory drugs (*e.g.,* Aspirin or Ibuprofen) have greater risks with prolonged duration of use, but there was no similar warning for opioids. The APF distributed 17,200 copies of this guide in one year alone, according to its 2007 annual report, and it is currently still available online.

244.     Through the APF, Endo sponsored a website, painknowledge.com, which claimed in 2009 that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life as well as "improved function" as benefits of opioid therapy.

245.     Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009) in conjunction with the AAPM, ACPA and APF. This guide features a man playing golf on the cover and lists examples of expected functional improvement from opioids like sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs.

246.    As set forth in the excerpt below, the guide states as a "fact" that "opioids may make it *easier* for people to live normally" (emphasis in the original). The myth/fact structure implies authoritative support for the claim that does not exist. The targeting of older adults also ignored heightened opioid risks in this population.



247.    Janssen sponsored a website, *Let's Talk Pain* in 2009, acting in conjunction with the APF, AAPM, and American Society for Pain Management

Nursing, whose participation in *Let's Talk Pain* Janssen financed and orchestrated. This website featured a video interview, which was edited by Janssen personnel, claiming that opioids were what allowed a patient to "continue to function," falsely implying that her experience would be representative despite the lack of statistical support for this implication.

248.    Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management* (2011), which inaccurately claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients," with the implication these studies presented claims of long-term improvement.

> Because of their long history of use, the clinical profile of opioids has been very well characterized. Multiple clinical studies have shown that long-acting opioids, in particular, are effective in improving:
>
> • Daily function
> • Psychological health
> • Overall health-related quality of life for people with chronic pain [12]

The sole reference for the functional improvement claim 1) noted the absence of long-term studies and 2) actually stated, "For functional outcomes, the other analgesics were significantly more effective than were opioids."

249. Purdue also sponsored and Janssen provided grants to APP to distribute *Exit Wounds* to veterans, which taught that opioid medications "increase your level of functioning" (emphasis in the original).

### c. *Manufacturer Defendants, Acting Individually and Collectively, Misrepresented that Addiction Risk can be Effectively Managed*

250. Manufacturer Defendants each continue to maintain to this day that most patients can safely take opioids long-term for chronic pain relief without becoming addicted. Presumably to explain to doctors the high incidence of patient addiction to opioids, Manufacturing Defendants have recently acknowledged that some patients could become addicted, but that doctors can effectively avoid or manage the risk of addiction by using screening tools or questionnaires. These tools, Manufacturing Defendants claim, identify individuals with higher addiction risks (stemming from personal or family histories of substance abuse, mental illness, or abuse) and allow doctors to more closely monitor patients at greater risk of addiction.

251. There are three fundamental flaws in Manufacturer Defendants' representations that doctors can consistently identify and manage the risk of

addiction. First, there is no reliable scientific evidence that the addiction risk screening tools currently available are reliable, effective, capable of being applied correctly and consistently, or invulnerable to patient manipulation. Second, there is no reliable scientific evidence that high-risk or addicted patients identified through the screening tools can take opioids long-term without triggering or worsening addiction, even with enhanced monitoring. Third, there is no reliable scientific evidence that patients identified through such screening tools as "low risk" can take opioids long-term without significant danger of addiction.

252.    Addiction is difficult to predict on a patient-by-patient basis, and there are no reliable, validated tools to do so.  An Evidence Report by the Agency for Healthcare Research and Quality ("AHRQ"), which "systematically review[ed] the current evidence on long-term opioid therapy for chronic pain" identified "[n]o study" that had "evaluated the effectiveness of risk mitigation strategies - such as the use of risk assessment instruments, opioid management plans, patient education, urine drug screening, prescription drug monitoring program data, monitoring instruments, more frequent monitoring intervals, pill counts, or abuse-deterrent formulations - on outcomes related to overdose, addiction, abuse or misuse."[66]  Further, attempts to treat high-risk patients, like those who have a documented predisposition to substance abuse, by resorting to patient contracts,

---

[66] The Effectiveness and Risks of Long-term Opioid Treatment of Chronic Pain, Agency for Healthcare Res. & Quality (Sept. 19, 2014).

more frequent refills, or urine drug screening tests have not proven to be effective, even when the most well-intentioned doctors were misled to employ them.[67]

253.     Manufacturer Defendants' misrepresentations regarding the risk of addiction from chronic opioid therapy were particularly dangerous because they were aimed at general practitioners or family doctors (collectively "GPs"), who treat many chronic conditions but often lack the time and expertise to closely manage patients using opioids by reviewing urine screens, counting pills, or conducting detailed interviews to identify other signs or risks of addiction. One study conducted by Defendant Express Scripts concluded, after analyzing 2011-2012 narcotic prescription data of the type regularly used by Manufacturer Defendants to market their drugs, that only 385 of the more than half million prescribers of opioids during that time period were identified as pain specialists.[68]

254.     In materials they produced, sponsored, or distributed, Manufacturer Defendants instructed patients and prescribers that screening tools can identify patients predisposed to addiction, thus making doctors feel more comfortable prescribing opioids to their patients and patients more comfortable starting on opioid therapy for chronic pain.   Manufacturer Defendants' marketing scheme

---

[67] M. Von Korff, et al., *Long-term opioid therapy reconsidered*, 15595, Annals Internal Med. 325 (Sept. 2011); L. Manchikanti, et al., American Society of Interventional Pain Physicians (ASIPP) *Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain: Part I – Evidence Assessment*, 15 Pain Physician S1 (2012).

[68] Express Scripts Lab, A Nation in Pain: Focusing on U.S. Opioid Trends for Treatment of Short-Term and Longer-Term Pain (December 2014).

contemplated a "heads we win; tails we win" outcome: patients deemed low risk were to receive opioids on a long-term basis without enhanced monitoring, while patients deemed high risk were also to receive opioids on a long-term basis but with more frequent visits, tests and monitoring – with the added visits, tests, and monitoring to be paid for or reimbursed by payors, including Plaintiffs. This, of course, led to a "heads you lose; tails you lose" outcome for patients – all of whom are subjected to an unacceptable risk of addition – and for payors, including Plaintiffs.

255.  Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which falsely reassured patients that "opioid agreements" between doctors and patients can "ensure that you take the opioid as prescribed."

256.  Endo paid for a 2007 supplement available for continuing education credit in the Journal of Family Practice written by a doctor who became a member of Endo's speaker's bureau in 2010. This publication, entitled *Pain Management Dilemmas in Primary Care: Use of Opioids*, (i) recommended screening patients using tools like (a) the *Opioid Risk Tool* created by KOL Dr. Webster and linked to Janssen or (b) the *Screener and Opioid Assessment for Patients with Pain*, and (ii) taught that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and

pill counts. Similarly, Purdue sponsored a 2011 webinar taught by Dr. Webster, entitled *Managing Patient's Opioid Use: Balancing the Need and Risk*. This publication misleadingly taught prescribers that screening tools, urine tests, and patient agreements have the effect of preventing "overuse of prescriptions" and "overdose deaths."

### d.   *Manufactuer Defendants, Acting Individually and Collectively, Misled Physicians, Patients, and Payors Through the Use of the Term "Pseudoaddiction"*

257.   Manufacturer Defendants instructed patients and prescribers that signs of addiction are actually the product of untreated pain, thereby causing doctors to prescribe even more opioids despite signs that the patient was addicted. The word "pseudoaddiction" was concocted by KOL Dr. J. David Haddox, who later went to work for Purdue, and was popularized in opioid therapy for chronic pain by KOL Dr. Portenoy, who consulted for Manufacturer Defendants Cephalon, Endo, Janssen, and Purdue. Much of the same language appears in other Manufacturer Defendants' treatment of this issue, highlighting the contrast between "undertreated pain" and "true addiction" – as if patients could not experience both.

258.   In the materials they produced, sponsored, or controlled, Manufacturer Defendants misrepresented that the concept of "pseudoaddiction" is substantiated by scientific evidence.

259.   Cephalon and Purdue sponsored the Federation of State Medical

Boards' *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, which are in fact signs of genuine addiction, are all really signs of "pseudoaddiction."

260.    Purdue did not mention that the author who concocted both the word and the phenomenon it purported to describe became a Purdue Vice President; nor did Purdue disclose the lack of scientific evidence to support the existence of "pseudoaddiction."[69]

261.    Purdue posted an unbranded pamphlet entitled *Clinical Issues in Opioid Prescribing* on its unbranded website, PartnersAgainstPain.com, in 2005, and, upon information and belief, circulated this pamphlet after 2007.   The pamphlet listed conduct including "illicit drug use and deception" that it claimed was not evidence of true addiction but rather was indicative of "pseudoaddiction" caused by untreated pain.   It also stated, "Pseudoaddiction is a term which has been used to describe patient behaviors that may occur when pain is untreated . . . . Even such behaviors as illicit drug use and deception can occur in the patient's efforts to obtain relief.   Pseudoaddiction can be distinguished from true addiction in that the behaviors resolve when the pain is effectively treated."

    e.    ***Manufacturer Defendants, Acting Individually and Collectively,***

---

[69] J. David Haddox & David E. Weissman, *Opioid pseudoaddiction – an iatrogenic syndrome*, 36(3) Pain 363 (Mar. 1989).

### *Claimed Withdrawal is Simply Managed*

262.   In an effort to underplay the risk and impact of addiction, Manufacturer Defendants claimed that, while patients become physically "dependent" on opioids, physical dependence is not the same as addiction and can be addressed, if and when pain relief is no longer desired, by gradually tapering patients' dosage to avoid the adverse effects of withdrawal.   Manufacturer Defendants failed to disclose the extremely difficult and painful effects that patients can experience when they are removed from opioids – an adverse effect that also makes it less likely that patients will be able to stop using drugs.

263.   In materials Manufacturer Defendants produced, sponsored, and/or controlled, Manufacturer Defendants made misrepresentations to persuade doctors and patients that withdrawal from opioids was not a problem and they should not be hesitant about prescribing or using opioids.  These claims were not supported by scientific evidence.

264.   A CME sponsored by Endo entitled *Persistent Pain in the Older Adult*, taught that withdrawal symptoms can be avoided entirely by tapering a patient's opioid dose by 10% to 20% per day for ten days. This claim was misleading because withdrawal in a patient already physically dependent would take longer than ten days – when it is successful at all.[70]

---

[70] See Jane Ballantyne, *New Addiction Criteria: Diagnostic Challenges Persist in Treating Pain with Opioids*, 21(5)

265.     Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that "Symptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation," but the guide did not disclose the significant hardships that often accompany cessation of use.

### f.     Manufacturer Defendants, Acting Individually and Collectively, Misrepresented that Increased Doses Pose no Significant Additional Risks

266.     Manufacturer Defendants claimed that patients and prescribers could increase doses of opioids indefinitely without added risk, even when pain was not decreasing or when doses had reached levels that were "frighteningly high," suggesting that patients would eventually reach a stable, effective dose.  Each of Manufacturer Defendants' claims was deceptive in that it omitted warnings of increased adverse effects that occur at higher doses.

267.     In materials Manufacturer Defendants produced, sponsored or controlled, Manufacturer Defendants instructed patients and prescribers that patients could remain on the same dose indefinitely, assuaging doctors' concerns about starting patients on opioids or increasing their doses during treatment, or about discontinuing their patients' treatment as doses escalated.  These claims were not supported by scientific evidence.

---

Pain Clinical Updates (Dec. 2013).

268.     Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide taught that opioids differ from NSAIDs in that they have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. The publication attributes 10,000 to 20,000 deaths annually to NSAID overdose when the true figure was closer to 3,200 at the time.[71]

269.     Cephalon sponsored a CME written by KOL Dr. Webster, *Optimizing Opioid Treatment for Breakthrough Pain*, offered by Medscape, LLC from September 28, 2007 through December 15, 2008. The CME taught that non-opioid analgesics and combination opioids containing non-opioids such as aspirin and acetaminophen are less effective at treating breakthrough pain because of dose limitations on the non-opioid component.

270.     Endo sponsored a website, *painknowledge.com*, through APF, which claimed in 2009 that opioids may be increased until "you are on the right dose of medication for your pain," at which point further dose increases would not be required.

271.     Endo distributed a patient education pamphlet edited by KOL Dr.

---

[71] Robert E. Tarone, et al., Nonselective Nonaspirin Nonsteroidal Anti-Inflammatory Drugs and Gastrointestinal Bleeding: Relative and Absolute Risk Estimates from Recent Epidemiologic Studies, 11 Am. J. of Therapeutics 17-25 (2004).

Portenoy entitled *Understanding Your Pain: Taking Oral Opioid Analgesics*, which was published on Endo's website. In Q&A format, it asked, "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased. … You won't 'run out' of pain relief."

272.    Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dose escalations are "sometimes necessary," even indefinite ones, but did not disclose the risks from high-dose opioids. This publication is still available online.

273.    Purdue also sponsored *Overview of Management Options*, a CME issued by the AMA in 2003, 2007, 2010, and 2013. The 2013 version remains available for CME credit. The CME was edited by KOL Dr. Portenoy, among others, and taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses.

**g.    *Manufacturer Defendants, Acting Individually and Collectively, Deceptively Omitted or Minimized the Adverse Effects of Opioids and Overstated the Risks of Alternative Forms of Pain Treatment***

274.    In materials they produced, sponsored or controlled, Manufacturer Defendants omitted known risks of chronic opioid therapy and emphasized or exaggerated risks of competing products so that prescribers and patients would be more likely to choose opioids and would favor opioids over other therapies such as over-the-counter acetaminophen or over-the-counter or prescription NSAIDs.

None of these claims was supported by scientific evidence.

275.     In addition to failing to disclose in promotional materials the risks of addiction, abuse, overdose, and respiratory depression, Manufacturer Defendants routinely ignored the risks of hyperalgesia, a "known serious risk associated with chronic opioid analgesic therapy in which the patient becomes more sensitive to certain painful stimuli over time;"[72] hormonal dysfunction;[73] decline in immune function; mental clouding, confusion, and dizziness; increased falls and fractures in the elderly;[74] neonatal abstinence syndrome (when an infant exposed to opioids prenatally suffers withdrawal after birth), and potentially fatal interactions with alcohol or benzodiazepines, which are used to treat post-traumatic stress disorder and anxiety. Post-traumatic stress disorder and anxiety also often accompany chronic pain symptoms.[75]

276.     Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids differ from NSAIDs in that they have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. As indicated above, the publication attributes 10,000 to

---

[72] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. *Physicians for Responsible Opioid Prescribing,* Re Docket No. FDA- 2012-P-0818 (Sept. 10, 2013).

[73] H.W. Daniell, Hypogonadism in men consuming sustained-action oral opioids, 3(5) J. Pain 377-84 (2001).

[74] Bernhard M. Kuschel, The risk of fall injury in relation to commonly prescribed medications among older people – a Swedish case-control study, Eur. J. Pub. H. (July 31, 2014).

[75] Karen H. Seal, Association of Mental Health Disorders with Prescription Opioids and High-Risk Opioids in US Veterans of Iraq and Afghanistan, 307(9) J. Am. Med. Ass'n 940- 47 (2012).

20,000 deaths annually to NSAID overdose when the figure is closer to 3,200.[76]

*Treatment Options* also warned that risks of NSAIDS increase if "taken for more than a period of months," with no corresponding warning about opioids.

277.    Endo sponsored a website, painknowledge.com, through APF, which contained a flyer called "Pain: Opioid Therapy." This publication included a list of adverse effects that omitted significant adverse effects including hyperalgesia, immune and hormone dysfunction, cognitive impairment, tolerance, dependence, addiction, and death.

278.    Janssen and Purdue sponsored and Endo provided grants to APF to distribute *Exit Wounds (*2009) to veterans, which omits warnings of the risk of potentially fatal interactions between opioids and certain anti-anxiety medicines such as benzodiazepines, commonly prescribed to veterans with post-traumatic stress disorder.

279.    As a result of Manufacturer deceptive marketing campaign promoting opioids over safer and more effective drugs, opioid prescriptions increased even as the percentage of patients visiting a doctor for pain remained constant. A study of 7.8 million doctor visits between 2000 and 2010 found that opioid prescriptions increased from 11.3% to 19.6% of visits, as NSAID and acetaminophen prescriptions fell from 38% to 29%, driven primarily by the decline in NSAID

---

[76] Robert E. Tarone, et al., Nonselective Nonaspirin Nonsteroidal Anti-Inflammatory Drugs and Gastrointestinal Bleeding: Relative and Absolute Risk Estimates from Recent Epidemiologic Studies, 11 Am. J. of Therapeutics 17-25 (2004).

prescribing.[77]

## G.    **Manufacturer Defendants' Promotion of Their Branded Drugs Was Also Deceptive**

280.    While Manufacturer Defendants worked in concert to expand the market for opioids, they also worked to maximize their individual shares of that market. Each Manufacturer Defendant promoted opioids for chronic pain through sales representatives (which Manufacturer Defendants called "detailers" to deemphasize their primary sales role) and small group speaker programs to reach out to individual prescribers nationwide and within Plaintiffs' communities. By establishing close relationships with doctors, Manufacturer Defendants were able to disseminate their misrepresentations in targeted, one-on-one settings that allowed them to differentiate their opioids and to allay individual prescribers' concerns about prescribing opioids for chronic pain.

281.    Manufacturer Defendants developed sophisticated methods for selecting doctors for sales visits based on the doctors' prescribing habits. In accordance with common industry practice, Manufacturer Defendants purchase and closely analyze prescription sales data from IMS Health, a healthcare data collection, management and analytics corporation.  This data allows Manufacturer

---

[77] M. Daubresse, *et al.*, *Ambulatory Diagnosis and Treatment of Nonmalignant Pain in the United States, 2000-2010,* 51(*10*) Med. Care, 870-878 (2013). For back pain alone, the percentage of patients prescribed opioids increased from 19% to 29% between 1999 and 2010, even as the use of NSAIDs or acetaminophen declined from 39.9% to 24.5% of these visits; and referrals to physical therapy remained steady. *See also* J. Mafi, *et al.*, *Worsening Trends in the Management and Treatment of Back Pain*, 173(17) J. of the Am Med. Ass'n Internal Med. 1573, 1573 (2013).

Defendants to track precisely the rates of initial and renewal prescribing by individual doctors, which allows them to target and tailor their appeals. Sales representatives visited hundreds of thousands of doctors and disseminated the misinformation and materials described above throughout the United States, including to doctors treating residents and employees of Dover, Seaford, and Kent County.

### H.    Manufacturer Defendants Knew That Their Marketing of Chronic Opioid Therapy was False, Unfounded, and Dangerous and Would Harm Plaintiffs and Their Residents

282.    Manufacturer Defendants made, promoted, and profited from their misrepresentations – individually and collectively – knowing that their statements regarding the risks, benefits, and superiority of opioids for chronic pain were false and misleading.  Cephalon and Purdue entered into settlements in the hundreds of millions of dollars to resolve criminal and federal charges involving nearly identical conduct.  Manufacturer Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the significant adverse outcomes from opioids and that patients were suffering from addiction, overdoses, and death in alarming numbers.

283.    Manufacturer Defendants expected and intended that their misrepresentations would induce doctors to prescribe, patients to use, and payors to

pay for opioids for chronic pain.

284.    When they began their deceptive marketing practices, Manufacturer Defendants recklessly disregarded the harm that their practices were likely to cause. As their scheme was implemented, and as reasonably foreseeable harm began to occur, Manufacturer Defendants were well aware that it was occurring. Manufacturer Defendants closely monitored their own sales and the habits of prescribing doctors, which allowed them to see sales balloon – overall, in individual practices, and for specific indications. Their sales representatives, who visited doctors and attended CME programs, knew what types of doctors were receiving their messages and how they were responding. Moreover, Manufacturer Defendants had access to, and carefully monitored government and other data that tracked the explosive rise in opioid use, addiction, injury, and death.

## I.    **Manufacturer Defendants Fraudulently Concealed Their Misrepresentations**

285.    Manufacturer Defendants took steps to avoid detection of, and to fraudulently conceal, their deceptive marketing and conspiratorial behavior.

286.    Manufacturer Defendants disguised their own roles in the deceptive marketing by funding and working through Front Groups purporting to be patient advocacy and professional organizations and through paid KOLs. Manufacturer Defendants purposefully hid behind the assumed credibility of the Front Groups and KOLs and relied on them to vouch for the accuracy and integrity of

Defendants' false and misleading statements about opioid use for chronic pain. While Defendants were listed as sponsors of many of the publications described in this Complaint, they never disclosed their role in shaping, editing, and approving their content.  Manufacturer Defendants exerted considerable influence on these purportedly "educational" or "scientific" materials in emails, correspondence, and meetings with KOLs, Front Groups, and public relations companies that were not public.

287.    In addition to hiding their own role in generating the deceptive content, Manufacturer Defendants manipulated their promotional materials and the scientific literature to make it appear these items were accurate, truthful, and supported by substantial scientific evidence.  Manufacturer Defendants distorted the meaning or import of materials they cited and offered them as evidence for propositions the materials did not support. The true lack of support for Manufacturer Defendants' deceptive messages was not apparent to the medical professionals who relied upon them in making treatment decisions. The false and misleading nature of Manufacturer Defendants' marketing was not known to, nor could it reasonably have been discovered by, Plaintiffs or their residents.

288.    Manufacturer Defendants also concealed their participation by extensively using the public relations companies they hired to work with Front Groups to produce and disseminate deceptive materials.

289.     Manufacturer Defendants concealed from the medical community, patients, and health care payors facts sufficient to arouse suspicion of the existence of claims that Plaintiffs now asserts. Plaintiffs did not discover the existence and scope of Manufacturer Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence. Through public statements, marketing, and advertising, Manufacturer Defendants' deceptions deprived Plaintiffs of actual or implied knowledge of facts sufficient to put them on notice of potential claims.

## J.     **Manufacturer Defendants Entered Into and Engaged in a Civil Conspiracy**

290.    Manufacturer Defendants entered into a conspiracy to engage in the wrongful conduct complained of herein, and intended to benefit both independently and jointly from their conspiratorial enterprise.

291.    Manufacturer Defendants reached an agreement between themselves to set up, develop, and fund an unbranded promotion and marketing network to promote the use of opioids for the management of pain in order to mislead physicians, patients, health care providers, and health care payors through misrepresentations or omissions regarding the appropriate uses, risks and safety of opioids.

292.    This network is interconnected and interrelated and relied upon Manufacturer Defendants' collective use of and reliance upon unbranded

marketing materials, such as KOLs, scientific literature, CMEs, patient education materials, and Front Groups. These materials were developed and funded collectively by Manufacturer Defendants, and Manufacturer Defendants relied upon the materials to intentionally mislead consumers and medical providers of the appropriate uses, risks and safety of opioids.

293.    By knowingly misrepresenting the appropriate uses, risks, and safety of opioids, Manufacturer Defendants committed overt acts in furtherance of their conspiracy.

### K.    Distributor Defendants Intentionally Failed to Take Any Action to Stop the Misuse of Opioids, in Violation of State Laws and Regulations

294.    Distributor Defendants purchased opioids from manufacturers, such as the Manufacturer Defendants herein, and sold them to other pharmacies within Plaintiffs' communities.

295.    Distributor Defendants play an integral role in the chain of opioids being distributed within Plaintiffs' communities.

296.    Legal requirements for distributors of controlled substances are set forth Chapter 47, Title 16 of the Delaware Code and Title 24, §2500 of the Delaware Administrative Code, which incorporate federal regulatory requirements.

297.    Federal regulations, incorporated as stated above, similarly impose a non-delegable duty upon wholesale drug distributors, which includes a duty to

"design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant [distributor] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

298.   "Suspicious orders" include orders of an unusual size, orders of unusual frequency or orders deviating substantially from a normal pattern. *See* 21 CFR 1301.74(b). These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a wholesale distributor need not wait for a normal pattern to develop over time before determining whether an order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the wholesale distributor's responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the wholesale distributor's customer base and the patterns throughout the relevant segment of the wholesale distributor industry.

299.   In addition to reporting all suspicious orders, distributors must also

stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels. *See Southwood Pharm., Inc.*, 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007); *Masters Pharmaceutical, Inc. v. Drug Enforcement Administration*, No. 15-11355 (D.C. Cir. June 30, 2017). Regardless, all flagged orders must be reported. *Id.*

300. Prescription drugs are regulated for the purpose of providing a "closed" system intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.[78]

301. Different entities supervise the discrete links in the chain that separate a consumer from a controlled substance. Statutes and regulations define each participant's role and responsibilities.[79]

---

[78] *See* 1970 U.S.C.C.A.N. 4566, 4571-72.

[79] Brief for Healthcare Distribution Management Association and National Association of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharm., Inc. v. U.S. Drug Enf't Admin.* (No. 15-1335) (D.C. Cir. Apr. 4, 2016), 2016 WL 1321983, at *22 [hereinafter Brief for HDMA and NACDS]. The Healthcare Distribution Management Association (HDMA or HMA)—now known as the Healthcare Distribution Alliance (HDA)—is a national, not-for-profit trade association that represents the nation's primary, full-service healthcare distributors whose membership includes, among others: AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation. *See generally* HDA, *About*, https://www.healthcaredistribution.org/about (last visited Aug. 21, 2017). The National Association of Chain Drug Stores (NACDS) is a national, not-for-profit trade association that represents traditional drug stores and supermarkets and mass merchants with pharmacies whose membership includes, among others: Walgreen Company, CVS Health, Rite Aid Corporation and Walmart. *See generally* NACDS, *Mission*, https://www.nacds.org/ about/mission/ (last visited Aug. 21, 2017).

302.    As the DEA advised the Distributor Defendants in a letter to them dated September 27, 2006, wholesale distributors are "one of the key components of the distribution chain. If the closed system is to function properly . . . distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.  This responsibility is critical, as . . . the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people."[80]

303.    Distributor Defendants have acknowledged that they are responsible for reporting suspicious orders.[81]

304.    The DEA sent a letter to each of the Distributor Defendants on September 27, 2006, warning that it would use its authority to revoke and suspend registrations when appropriate. The letter expressly states that a distributor, ***in addition*** to reporting suspicious orders, has a "statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."[82] The letter also instructs that "distributors must be vigilant in deciding whether a prospective

---

[80] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006) [hereinafter Rannazzisi Letter] ("This letter is being sent to every commercial entity in the United States registered with the Drug Enforcement Agency (DEA) to distribute controlled substances. The purpose of this letter is to reiterate the responsibilities of controlled substance distributors in view of the prescription drug abuse problem our nation currently faces."), *filed in Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-51.

[81] *See* Brief for HDMA and NACDS, *supra*, 2016 WL 1321983, at *4 ("[R]egulations . . . in place for more than 40 years require distributors to report suspicious orders of controlled substances to DEA based on information readily available to them (e.g., a pharmacy's placement of unusually frequent or large orders).").

[82] Rannazzisi Letter, *supra*, at 2.

customer can be trusted to deliver controlled substances only for lawful purposes."[83] The DEA warns that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."[84]

305.   The DEA sent a second letter to each of the Distributor Defendants on December 27, 2007.[85] This letter reminds the Defendants of their statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[86]  The letter further explains:

> The regulation also requires that the registrant inform the local DEA Division Office of suspicious orders <u>when discovered</u> by the registrant. Filing a monthly report of completed transactions (e.g., "excessive purchase report" or "high unity purchases") does not meet the regulatory requirement to report suspicious orders. Registrants are reminded that their responsibility does not end merely with the filing of a suspicious order report. Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels. Reporting an order as suspicious will not absolve the registrant of responsibility if the registrant knew, or should have known, that the controlled substances were being diverted.

> The regulation specifically states that suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of an

---

[83] *Id.* at 1.
[84] *Id.* at 2.
[85] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-8.
[86] *Id.*

unusual frequency. These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a registrant need not wait for a "normal pattern" to develop over time before determining whether a particular order is suspicious. The size of an order alone, whether or not it deviates from a normal pattern, is enough to trigger the registrant's responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer, but also on the patterns of the registrant's customer base and the patterns throughout the segment of the regulated industry.

Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders. For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient. This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributor. Also, this system would not identify orders as suspicious if the order were solely for one highly abused controlled substance if the orders never grew substantially. Nevertheless, ordering one highly abused controlled substance and little or nothing else deviates from the normal pattern of what pharmacies generally order.

When reporting an order as suspicious, registrants must be clear in their communication with DEA that the registrant is actually characterizing an order as suspicious. Daily, weekly, or monthly reports submitted by registrant indicating "excessive purchases" do not comply with the requirement to report suspicious orders, even if the registrant calls such reports "suspicious order reports."

> Lastly, registrants that routinely report suspicious orders, yet fill these orders without first determining that order is not being diverted into other than legitimate medical, scientific, and industrial channels, may be failing to maintain effective controls against diversion. Failure to maintain effective controls against diversion is inconsistent with the public interest as that term is used in 21 USC 823 and 824, and may result in the revocation of the registrant's DEA Certificate of Registration.[87]

Finally, the DEA letter references the Revocation of Registration issued in *Southwood Pharmaceuticals, Inc.*, 72 Fed. Reg. 36,487-01 (July 3, 2007), which discusses the obligation to report suspicious orders and "some criteria to use when determining whether an order is suspicious."[88]

306.    Distributor Defendants admit that they "have not only statutory and regulatory responsibilities to detect and prevent diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."[89]

307.    Distributor Defendants knew they were required to monitor, detect, and halt suspicious orders. Industry compliance guidelines established by the Healthcare Distribution Management Association, the trade association of pharmaceutical distributors, explain that distributors are "[a]t the center of a sophisticated supply chain" and therefore "are uniquely situated to perform due

---

[87] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), *Supra.*
[88] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), *Supra.*
[89] *See* Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal Health, Inc., *Cardinal Health, Inc. v. United States Dept. Justice*, No. 12-5061 (D.C. Cir. May 9, 2012), 2012 WL 1637016, at *2 [hereinafter Brief of HDMA].

diligence in order to help support the security of the controlled substances they deliver to their customers." The guidelines set forth recommended steps in the "due diligence" process, and note in particular: If an order meets or exceeds a distributor's threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not ship to the customer, in fulfillment of that order, any units of the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest.[90]

308.     Each of the Distributor Defendants sold and delivered prescription opioids, including hydrocodone and/or oxycodone, to retailers in Plaintiffs' communities and/or to retailers from which Distributor Defendants knew or should reasonably have known prescription opioids were likely to be diverted to Plaintiffs' communities.

309.     Because distributors handle such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, it is incumbent on distributors to maintain effective controls to prevent diversion of controlled substances. Should a distributor deviate from these checks

---

[90] Healthcare Distribution Management Association (HDMA) *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances, filed in Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App'x B).

and balances, the closed system collapses.[91]

310.    The sheer volume of prescription opioids distributed to pharmacies in the Plaintiffs' communities, and/or to pharmacies from which the Distributor Defendants knew the opioids were likely to be diverted into Plaintiffs' communities, is excessive for the medical need of Plaintiffs' communities and facially suspicious - some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.[92]

311.    Additionally, Distributor Defendants' grossly negligent distribution to pharmacies outside the state also caused an influx of illicit diversion of opioids within Plaintiffs' communities, ultimately causing an epidemic that the Plaintiffs must now expend resources to remediate.

312.    Distributor Defendants failed to report "suspicious orders" originating from Plaintiffs' communities, or which Distributor Defendants knew were likely to be diverted to Plaintiffs' communities, to federal and state authorities, including the DEA and/or the Delaware Board of Pharmacy.

313.    Distributor Defendants unlawfully filled suspicious orders of unusual size, orders that deviated substantially from a normal pattern and/or orders of

---

[91] *See* Rannazzisi Decl. ¶ 10, filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-2.
[92] *Masters Pharmaceuticals, Inc.*, 80 Fed. Reg. 55,418-01, 55,482 (Sept. 15, 2015) (citing *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*, 77 Fed. Reg. 62,316, 62,322 (2012)).

unusual frequency in Plaintiffs' communities, and/or in areas from which the Distributor Defendants could foreseeably anticipate that opioids were likely to be diverted to Plaintiffs' communities.

314.    Distributor Defendants breached their duty to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates originating from Plaintiffs' communities, and/or in areas from which the Distributor Defendants knew or reasonably should have known opioids were likely to be diverted to Plaintiffs' communities.

315.    Distributor Defendants breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels.

316.    Distributor Defendants breached their duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and failed to inform the authorities including the Delaware Department of Health and Social Services of suspicious orders when discovered, in violation of their duties under federal and state laws.

317.    Distributor Defendants breached their duty to exercise due diligence to avoid filling suspicious orders that might be diverted into channels other than legitimate medical, scientific and industrial channels.[93]

---

[93] *See Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 206 (D.D.C. 2012).

318.     The federal and state laws at issue here are public safety laws.

319.     The unlawful conduct by the Distributor Defendants is purposeful and intentional.

320.     Distributor Defendants failed to adhere to duties imposed by federal and state law which are required to legally acquire and maintain a license to distribute prescription opiates.

321.     Distributor Defendants acted with actual malice in breaching their duties, *i.e.*, they have acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

322.     Distributor Defendants' repeated shipments of suspicious orders, over an extended period, in violation of public safety statutes, and without reporting the suspicious orders to the relevant authorities demonstrates wanton, willful, or reckless conduct or criminal indifference to obligations affecting the rights of others and justifies an award of punitive damages.

323.     Distributor Defendants have repeatedly misrepresented their compliance with their legal duties under state and federal law and have wrongfully and repeatedly disavowed those duties to mislead regulators and the public regarding the Distributor Defendants' compliance with their legal duties.

324.     Distributor Defendants have refused to recognize any duty beyond

*reporting* suspicious orders. In *Masters Pharmaceuticals*, the HDMA, a trade association run by Distributor Defendants, and the NACDS submitted amicus briefs regarding the legal duty of wholesale distributors.  Inaccurately denying the legal duties that the wholesale drug industry has been tragically recalcitrant in performing, they argued as follows:

i.   The Associations complained that the "DEA has required distributors not only to report suspicious orders, but to *investigate* orders (e.g., by interrogating pharmacies and physicians) and take action to *halt* suspicious orders before they are filled."[94]

ii.   The Associations argued that, "DEA now appears to have changed its position to require that distributors not only *report* suspicious orders, but *investigate* and *halt* suspicious orders. Such a change in agency position must be accompanied by an acknowledgment of the change and a reasoned explanation for it. In other words, an agency must display awareness that it *is* changing position and show that there are good reasons for the new policy. This is especially important here, because imposing intrusive obligation on distributors threatens to disrupt patient access to needed prescription medications."[95]

iii.   The Associations alleged (inaccurately) that nothing "requires distributors to investigate the legitimacy of orders, or to halt shipment of any orders deemed to be suspicious."[96]

iv.   The Association complained that the purported "practical infeasibility of requiring distributors to investigate and halt suspicious orders (as well as report them) underscores the importance of ensuring that DEA has

---

[94] Brief for HDMA and NACDS, *supra*, 2016 WL 1321983, at *4–5.
[95] Brief for HDMA and NACDS, *supra*, 2016 WL 1321983 at *8.
[96] *Id*. at *14

complied with the APA before attempting to impose such duties."[97]

    v.    The Associations alleged (inaccurately) that "DEA's regulations [sensibly impose] a duty on distributors simply to *report* suspicious orders, but left it to DEA and its agents to investigate and halt suspicious orders."[98]

    vi.    Also inaccurately, the Associations argued that, "[i]mposing a duty on distributors – which lack the patient information and the necessary medical expertise – to investigate and halt orders may force distributors to take a shot-in-the-dark approach to complying with DEA's demands."[99]

325.    The positions taken by the trade groups are emblematic of the position taken by Distributor Defendants in an attempt to deny or avoid their legal obligations to prevent diversion of the dangerous drugs.[100]

326.    The Court of Appeals for the District of Columbia recently issued an opinion affirming that a wholesale drug distributor does, in fact, have duties beyond reporting. *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017). The D.C. Circuit Court upheld the revocation of Master Pharmaceutical's license and determined that DEA regulations require that in addition to reporting suspicious orders, distributors must "decline to ship the order, or conduct some 'due diligence' and—if it is able to determine that the order is not

---

[97] *Id*. at *22

[98] *Id*. at *24-25

[99] *Id*. at *26

[100] *See* Brief of HDMA, *supra*, 2012 WL 1637016, at *3 (arguing the wholesale distributor industry "does not know the rules of the road because" they claim (inaccurately) that the "DEA has not adequately explained them").

likely to be diverted into illegal channels—ship the order." *Id*. at 212. Master Pharmaceutical was in violation of legal requirements because it failed to conduct necessary investigations and filled suspicious orders. *Id.* at 218-219, 226. A distributor's investigation must dispel all the red flags giving rise to suspicious circumstances prior to shipping a suspicious order. *Id.* at 226. The Circuit Court also rejected the argument made by the HDMA and NACDS (quoted above), that, allegedly, the DEA had created or imposed new duties. *Id.* at 220.

327.   Distributor Defendant McKesson was recently forced to specifically admit to having breached its duties to monitor, report, and prevent suspicious orders. Pursuant to an Administrative Memorandum of Agreement ("2017 Agreement") entered into between McKesson and the DEA in January 2017, McKesson admitted that, at various times during the period from January 1, 2009 through the effective date of the Agreement (January 17, 2017) it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters."[101]

328.   Further, the 2017 Agreement specifically finds that McKesson "distributed controlled substances to pharmacies even though those McKesson Distribution Centers should have known that the pharmacists practicing within

---

[101]   Department of Justice, *Administrative Memorandum of Agreement*, January 17, 2017, https://www.justice.gov/opa/press-release/file/928476/download, (accessed October 27, 2017).

those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R § 1306.04(a)."[102] McKesson admitted that, during this time period, it "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations, 21 C.F.R. Part 1300 *et seq*., at the McKesson Distribution Centers" including the McKesson Distribution Centers located in 12 different  locations, any of which could have foreseeably caused the diversion of opioids into Plaintiffs' communities.[103]  Due to these violations, McKesson agreed that its authority to distribute controlled substances from these 12 facilities would be partially suspended.[104]

329.    As punishment for its wrongdoing, McKesson agreed to pay a $150 million fine and suspend the sale of controlled substances from distribution centers in several states.[105]

330.    The 2017 Memorandum of Agreement followed a 2008 Settlement Agreement in which McKesson also admitted failure to report suspicious orders of

---

[102] *Id.* at 4
[103] *Id.*
[104] *Id.* at 6.
[105] *Id.* at 8.

controlled substances to the DEA.[106]   In the 2008 Settlement Agreement, McKesson "recognized that it had a duty to monitor its sales of all controlled substances and report suspicious orders to DEA," but had failed in its obligations.[107]   The 2017 Memorandum of Agreement documents that McKesson continued to breach its admitted duties by "fail[ing] to properly monitor its sales of controlled substances and/or report suspicious orders to DEA, in accordance with McKesson's obligations."[108]

331.   Even though McKesson had been sanctioned in 2008 for failure to comply with its legal obligations regarding controlling diversion and reporting suspicious orders, and even though McKesson had specifically agreed in 2008 that it would no longer violate those obligations, McKesson continued to violate its legal obligations despite its written agreement not to do so.

332.   Because of Distributor Defendants' refusal to abide by their legal obligations, the DEA has repeatedly taken administrative action to attempt to force compliance. For example, in May 2014, the United States Department of Justice, Office of the Inspector General, Evaluation and Inspections Divisions, reported that the DEA issued final decisions in 178 registrant actions between 2008 and 2012.[109]   The Office of Administrative Law Judges issued a recommended decision

---

[106] *Id.* at 4.
[107] *Id.*
[108] *Id.*
[109] U.S. Dep't of Justice, Evaluation and Inspections Div., Office of the Inspector Gen., *The Drug Enforcement*

in a total of 117 registrant actions before the DEA issued its final decision, including 76 actions involving orders to show cause and 41 actions involving immediate suspension orders.[110]   These actions include the following:

    a. On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

    b. On November 28, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

    c. On December 5, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

    d. On December 7, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

    e. On January 30, 2008, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution

---

*Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf, (accessed October 27, 2017).
[110] *Id.*

Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

f. On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

g. On September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreement* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

h. On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

i. On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against facilities it owned in Maryland, Florida, New York, and Washington.

j. On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150 million civil

> penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO, Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL, Landover MD, La Vista NE, Livonia MI, Methuen MA, Sante Fe Springs CA, Washington Courthouse OH and West Sacramento CA.

333.     Title 16, §4733 of the Delaware Code incorporates federal requirements for pharmacies dispensing controlled substances. The Defendant Pharmacies' violations of these legal requirements demonstrate how the Defendant Pharmacies were negligent under common law; Defendant Pharmacies had a duty to prevent diversion of opioids to protect public health, failed to take measures to prevent diversion, and as a result, proximately causing the diversion of opioids within Plaintiffs' communities, and across the State of Delaware, causing opioid abuse, addiction and deaths in Plaintiffs' communities.

334.     Distributors include pharmacies who are defined by 21 C.F.R. § 802 (46) as a regulated seller, a term that includes retail distributors.

335.     Defendants neglected their duty to prevent the diversion of opioids and protect public health by negligently: filling prescriptions with no legitimate medical purpose; filling forged prescriptions; failing to monitor opioid use of "high risk" Medicaid users; and failing to report any suspicious orders of prescription opiates originating from within Plaintiffs' communities.

336.     Defendant Rite Aid agreed that it failed to comply by State and Federal requirements after a pattern of failing to meet its duty was discovered by the Department of Justice.[111]   In January 2009, Rite Aid Corporation and Subsidiaries agree to pay $5 million in civil penalties to resolve violations in eight states of the Controlled Substances Act.

337.     Defendant CVS has paid over $40 million in fines as the result of opioid prescription investigations by the DEA and the United States Department of Justice. Yet CVS continues to dispense opioids in quantities significantly higher than medically necessary, including to residents and/or employees of Dover, Seaford, and Kent County.   In February 2016, CVS paid $8 million to settle allegations made by the DEA and the Department of Justice that its stores and pharmacists had been violating their duties under the Federal Controlled Substances Act, by filling prescriptions with no legitimate medical purpose.[112] CVS has settled similar cases with Florida, Oklahoma, Massachusetts, New Hampshire, and Rhode Island, for filling forged prescriptions for addictive painkillers and filling prescriptions with no legitimate medical purpose.

338.     Walgreens paid $80 million to settle claims that it committed record keeping and dispensing violations of the FCSA, causing the diversion of

---

[111] Department of Justice, *Rite Aid Corporation and Subsidiaries Agree to Pay $5 Million in Civil Penalties to Resolve Violations in Eight States of the Controlled Substances Act*, https://www.justice.gov/opa/pr/rite-aid-corporation-and-subsidiaries-agree-pay-5-million-civil-penalties-resolve-violations (Published January 12, 2009).

[112] Press Release, Drug Enf't Admin., DEA Reaches $8 million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances (Feb. 12, 2016.) https://www.justice.gov/usao-md/pr/united-states-reaches-8-million-settlement-agreement-cvs-unlawful-distribution-controlled (Accessed February 20, 2018).

prescription pain killers across several states.[113] As part of the settlement agreement, Walgreens agreed to no longer provide pharmacists with incentives based on the volume of prescriptions filled at the pharmacy. Walgreens has also settled with several state attorneys general, including $200,000 with Massachusetts, for failing to monitor the opioid use of some Medicaid (MassHealth) patients who were considered high-risk. Due to their high-risk nature, patients were supposed to use only one pharmacy which would track the patterns and use of a patient's prescriptions. However, 160 Walgreens Pharmacies in Massachusetts had accepted cash for controlled substances from patients in the state's MassHealth agency, instead of seeking approval from the agency and failed to track prescriptions.[114]

339.    Rite Aid and/or CVS and/or Walgreens breached its duty when it failed to report any "suspicious orders" of prescription opiates originating from Dover, Seaford, or Kent County to the DEA and/or the Delaware Board of Pharmacy between 2006 to present. Rite Aid and/or CVS and/or Walgreens's failure contributed to the excessive non-medical opioid prescriptions filled in Dover, Seaford, and Kent County from 2006 until present.  Rite Aid and/or CVS

---

[113] Press Release, U.S. Attorney's Office S. Dist. of Fla., Walgreens Agrees to Pay a Record Settlement of $80 Million for Civil Penalties Under the Controlled Substances Act (June 11, 2013), https://www.justice.gov/usao-sdfl/pr/walgreens-agrees-pay-record-settlement-80-million-civil-penalties-under-controlled (accessed February 21, 2018).
[114] Felice J. Freyer, *Wagreens to Pay $200,000 Settlement for Lapses with Opioids,* The Boston Globe (Jan. 19, 2017) https://www.bostonglobe.com/metro/2017/01/18/walgreens-agrees-better-monitor-opioid-dispensing/q0B3FbMo2k3wPt4hvmTQrM/story.html (accessed February 21, 2018).

and/or Walgreens's failures are a direct and proximate cause of the diversion of prescription opiates for nonmedical purposes in Plaintiffs' communities, and across the State of Delaware, causing opioid abuse, addiction and deaths in Plaintiffs' communities.

340.    Distributing opioids within Plaintiffs' communities, Distributor Defendants neglected their legal duties, leading to distribution rates that well exceeded legitimate medical usage.

341.    Distributor Defendants failed to detect and report actions by "Pill Mill" physicians, and others similarly situated, which also fueled the opioid epidemic plaguing Dover, Seaford, and Kent County. The data which reveals and/or confirms the identity of each wrongful opioid distributor is hidden from public view in the DEA's confidential ARCOS database. *See Madel v. USDOJ*, 784 F.3d 448 (8th Cir. 2015).   Distributor Defendants conceal and prevent the discovery of necessary information to confirm the identities of pill mill physicians. Neither the DEA[115] nor the wholesale distributors[116] will voluntarily disclose the data necessary to identify with specificity the transactions which will form the

---

[115] *See* Declaration of Katherine L. Myrick, Chief, Freedom of Information (FOI)/Privacy Act Unit ("SARF"), FOI, Records Management Section ("SAR"), Drug Enforcement Administration (DEA), United States Department of Justice (DOJ), *Madel v. USDOJ*, Case 0:13-cv-02832-PAM-FLN, (Document 23) (filed 02/06/14) (noting that ARCOS data is "kept confidential by the DEA").

[116] *See* Declaration of Tina Lantz, Cardinal Health VP of Sales Operation, *Madel v. USDOJ*, Case 0:13-cv-02832-PAM-FLN, (Document 93) (filed 11/02/16) ("Cardinal Health does not customarily release any of the information identified by the DEA notice letter to the public, nor is the information publicly available. Cardinal Health relies on DEA to protect its confidential business information reported to the Agency.").

evidentiary basis for identifying the pill mill doctors practicing in Dover, Seaford, and Kent County.

342.     Rather than abide by their non-delegable duties under public safety laws, Distributor Defendants, individually and collectively through trade groups in the industry, pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug Enforcement Act" which, raised the burden for the DEA to revoke a distributor's license from "imminent harm" to "immediate harm" and provided the industry the right to "cure" any violations of law before a suspension order can be issued.[117]

343.     In addition to taking actions to limit regulatory prosecutions and suspensions, Distributor Defendants undertook to fraudulently convince the public that they were complying with their legal obligations, including those imposed by licensing regulations. Through such statements, Distributor Defendants attempted to assure the public they were working to curb the opioid epidemic.

---

[117] Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html?utm_term=.61697ec67e05; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html?utm_term=.014176059151; Eric Eyre, *DEA Agent: "We Had No Leadership" in WV Amid Flood of Pain Pills*, http://www.100daysinappalachia.com/2017/02/22/dea-agent-no-leadership-west-virginia-amid-flood-pain-pills/, Charleston Gazette-Mail, Feb. 18, 2017, (all accessed October 27, 2017).

344.    For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain, and represented that it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[118]   Given the sales volumes and the company's history of violations, this executive was either not telling the truth, or, if Cardinal Health had such a system, it ignored the results in favor of profits.

345.    Similarly, Defendant McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."[119]   Again, given McKesson's historical conduct, this statement is either false, or the company ignored outputs of the monitoring program.

346.    By misleading the public about the effectiveness of their controlled substance monitoring programs, Distributor Defendants successfully concealed the facts sufficient to arouse suspicion of the claims that Plaintiffs now assert. The Plaintiff did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

---

[118] Lenny Bernstein et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: "No One Was Doing Their Job,"* Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html?utm_term=.6d9936e87c93, (accessed October 27, 2017).

[119] Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, Wash. Post, Dec. 22, 2016, https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html?utm_term=.0b845f727e2c, (accessed October 27, 2017).

347.    Meanwhile, the opioid epidemic continues unabated across the United States, including within Plaintiffs' communities.

348.    The opioid epidemic has continued and is continuing because the regulatory fines and suspensions imposed by the DEA have not changed the conduct of the industry.  Opioid distributors, including the Distributor Defendants, pay fines as a cost of doing business in an industry that generates billions of dollars in annual revenue. Distributors hold multiple DEA registration numbers and when one facility is suspended, they simply ship from another facility.  Despite administrative enforcement actions, fines, and penalties brought against the Distributor Defendants in the past, they continued to fail to report suspicious orders or prevent the flow of prescription opioids into Plaintiffs' communities, and elsewhere.

349.    Between the years in question, including 2007 through 2016, Distributor Defendants shipped millions of doses of highly addictive opioids into Delaware, causing the misuse and unlawful diversion of opioids within Plaintiffs' communities, and ultimately causing an epidemic that the Plaintiffs must now expend resources to remediate.

350.    Many of the aforesaid orders should have been stopped, or at the very least, investigated as potentially suspicious orders.

351.    The sheer volume of the increase in opioid pain medications,

including OxyCodone, being distributed to pharmacies and retailers, should have put the Distributor Defendants on notice to investigate and report such orders.

352.    Distributor Defendants delivered an excessive and unreasonable amount of opioid pain medications to pharmacies and retailers within Plaintiffs' communities, and elsewhere in and around Delaware.

353.    Upon information and belief, Distributor Defendants did not refuse to ship or supply any opioid medications to any pharmacy in Dover, Seaford, or Kent County from 2007 to the present.

354.    Distributor Defendants knew or should have known that they were distributing levels of opioid medications that far exceeded the legitimate medical needs of the Dover, Seaford, and Kent County communities.

355.    Distributor Defendants also paid their sales force bonuses and commissions on the sale of most or all of the highly addictive opioid pain medications distributed within Plaintiffs' communities.

356.    Distributor Defendants made substantial profits from the opioids sold in Dover, Seaford, Kent County, and elsewhere.

357.    By the actions and inactions described above, Distributor Defendants showed a reckless disregard for the safety of the residents and employees of Dover, Seaford, and Kent County.

358.    By the actions and inactions described above, Distributor Defendants

caused great harm to Dover, Seaford, and Kent County.

359.    Distributor Defendants have abandoned their duties imposed under federal and state law; taken advantage of a lack of DEA law enforcement; and abused the privilege of distributing controlled substances within Plaintiffs' communities.

### L.    Wrongdoing By Defendants Increased Demand for "Pill Mill" Doctors, Including Patrick Titus, Who Recklessly Prescribed Opioids to Individuals Throughout Plaintiffs' Communities

360.    Defendants negligent, deceptive, reckless, and/or willful and wanton actions, as described in detail throughout this complaint, caused and created the market for the illegal diversion of opioids.

361.    Demand for "Pill Mill" doctors increased due to the Defendants' negligent, deceptive, reckless, and/or willful and wanton actions.

362.    Patrick Titus ("Titus") was a Delaware licensed doctor operating Lighthouse Internal Medicine in Milford, Delaware.

363.    In June, 2018, Titus was indicted in the United States District Court for the District of Delaware for running a "Pill Mill" where between July 2012 and December 2014 he wrote more than "25,000 prescriptions for over 2,000,000 dosage units of Oxycodone products . . . ."[120]

---

[120] Indictment, *United States v. Titus*, Case 1:18-cr-00045-UNA, filed 6/14/18 (D. Del.), available online through the following URL: https://www.justice.gov/file/1078456/download.

364.   The negligent, deceptive, reckless, and/or willful and wanton actions of Defendants led directly to increased demand for opioids in Plaintiffs' communities and the unlawful prescriptions for opioids Titus issued with no legitimate medical purpose.

### L. The Sackler Family is Liable for the Wrongdoing of Purdue Under Delaware's Personal Participation Doctrine

365.   The members of the Sackler Family named as Defendants are personally liable for the actions of Purdue under Delaware's Personal Participation Doctrine.

366.   This court has jurisdiction over Sacklers pursuant to 6 *Del. C.* §17-109 and 10 *Del. C.* §3104.

367.   Under Delaware's Personal Participation Doctrine, corporate officers may be liable for torts that they commit, participate in, or inspire, even though the acts are performed in the name of the business. *See Yavar Rzayev, LLC v. Marvin B. Roffman*, 2015 Del. Super. LEXIS 433, 2015 WL 5167930 quoting *Heronemus v. Ulrick,* 1997 Del. Super. LEXIS 266, 1997 WL 524127.

368.   Individual liability attaches where the officer "directed, ordered, ratified, approved, consented to" the wrongful act. *Id.*, quoting *Brasby v. Morris,* 2007 Del. Super. LEXIS 73, 2007 WL 949485.

369.   Delaware courts have found corporate officers liable for statutory violations despite the fact that their actions were taken in official corporate

capacity. *See State ex rel. Brady v. Preferred Florist Network, Inc.,* 791 A.2d 8, 2001 Del. Ch. LEXIS 74.  A corporate officer who is shown to have been "actively involved in the allegedly violative" conduct, may be held liable. *Id.* at 22.

370.   Richard Sackler served as President of Purdue Pharma L.P. ("PPL", Formerly, Purdue Frederick) from 1999 until 2003.   The other members of the Sackler Family named as Defendants served on Purdue's Board of Directors at times relevant to the Complaint.   During this relevant time, the Sackler Family owned Purdue and always controlled a majority of seats on its Board of Directors.

371.   Through their control of Purdue, the Sackler Family actively participated in, controlled, and authority to stop Purdue's fraudulent marketing scheme to expand sales of its opioids.

372.   The Sackler Family directed, ordered, ratified, approved, and consented to Purdue's marketing activities for OxyContin,  including:

    i.    Promoting OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal than other pain medication.

    ii.    Misrepresenting the risks of addiction to market and promote OxyContin.

    iii.    Training Purdue sales representatives to tell health care providers that "it was more difficult to extract the oxycodone from an OxyContin tablet for the purpose of intravenous abuse, although Purdue's own study showed that a drug abuser could extract approximately 68% of the oxycodone from a single 10 mg OxyContin tablet merely by crushing the tablet, stirring it in water, and

drawing the solution through cotton into a syringe."[121]

    iv.    Allowing Purdue's sales representatives to tell healthcare providers that OxyContin potentially creates fewer chances for addiction than immediate-release opioids.

    v.    Allowing Purdue's sales staff to continue promoting and marketing OxyContin even after receiving reports of OxyContin abuse and diversion by March 2000.

373.    Richard Sackler, in his capacity as President of Purdue, and the Sackler Family as Board members, also directed, ordered, ratified, approved, and consented to Purdue's marketing publications which caused deceptive materials and information to be placed into the marketplace, and reached prescribers, patients, and payors in Dover, Seaford, and Kent County.

374.    The Sackler Family directed, ordered, ratified, approved, and consented to and intended promotional messages to encourage patients to request, doctors to prescribe, and payors to pay for chronic opioid therapy.

375.    Sackler Family directed, ordered, ratified, approved, and consented to Purdue's marketing efforts to reverse the medical community's long-settled understanding of risks and benefits of chronic opioid therapy.

376.    The Sackler Family directed, ordered, ratified, approved, and consented to Purdue to focusing its marketing efforts and multi-million-dollar marketing budget on concealing from the professional medical community the

---

[121] U.S. Department of Justice, U.S. Attorney, Western District of Virginia, "Statement of United States Attorney John Brownlee on the Guilty Plea of the Purdeue Frederick Company and its Executives for Illegally Misbranding OxyContin," May 9, 2007. http://www.ctnewsjunkie.com/upload/2016/02/usdoj-purdue-guilty-plea-5-10-2007.pdf (accessed February 21, 2018)

truth that evidence in support of their promotional claims was inconclusive, non-existent or unavailable.

377.    The Sackler Family directed, ordered, ratified, approved, and consented to Purdue's expenditures for consultants and public relations firms, professional societies and advocacy groups, to generate articles, continuing medical education courses and other "educational" materials, meant to create a new and false "consensus" championing the long-term use of opioids.

378.    The Sackler Family directed, ordered, ratified, approved, and consented to marketing and advertising department's decision to use unregulated, unbranded marketing materials and advertisements to promote opioid use, and present information and instructions concerning opioids that were false and misleading.

379.    The Sackler Family directed, ordered, ratified, approved, and consented to Purdue's use of unbranded "Vehicles" used to spread and validate their deceptive messages.

380.    The Sackler Family directed, ordered, ratified, approved, and consented to Purdue's active role in writing, guiding, reviewing and approving many of the misleading statements issued by third parties.

381.    The Sackler Family Sackler directed, ordered, ratified, approved, and consented to expenditures to compensate Dr. J. David Haddox to speak for Purdue.

Dr. Haddox was the Chair of the committee that issued the consensus statement from the American Academy of Pain Medicine and the American Pain Society. Dr. Haddox endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low.

382.   The Sackler Family directed, ordered, ratified, approved, and consented to Purdue's sponsorship of CMEs that promoted opioid therapy and supported and disseminated deceptive and biased messages.

383.   The Sackler Family directed, ordered, ratified, approved, and consented to Purdue's involvement with numerous Front Groups, including funding to ensure supportive messages, targeted marketing and advocacy for pro-opioid regulations and treatment.

384.   The Sackler Family directed, ordered, ratified, approved, and consented to Purdue's expenditures to fund the American Pain Foundation from 2007 to 2009.

385.   On October 4, 2007, the state of Kentucky and co-plaintiff Pike County on behalf of itself and a putative class of all Kentucky counties, filed an action in Pike Circuit Court against Purdue, Abbott Laboratories, and Abbott Laboratories, Inc., for deceptive marketing. In August 2015, Richard Sackler was deposed for his role in the development and marketing of OxyContin.  One day later, Purdue settled for $24 million, admitted no liability, and sealed from public

view Sackler's deposition and internal documents obtained through discovery.[122]

386.    The Medical news website, STAT, has sued to unseal Sackler's deposition. The state judge ruled in its favor, but Purdue has appealed to prevent the copy of the deposition and discovery documents from being released to the public. The appeal is pending and deposition testimony remains under a protective order.  The President of the Kentucky Senate, Robert Stivers, has said that keeping the records from public view was "inappropriate," particularly considering the impact of the abuse of OxyContin on the public.[123]

387.    Further, on May 10, 2007, Purdue and three of its top executives pleaded guilty in the U.S. District Court for the Western District of Virginia, Abingdon Division, to "a felony charge of illegally misbranding OxyContin in an effort to mislead and defraud physicians and consumers in violation of the FDCA." *Id.* "[Purdue] agreed to pay $634.5 million in criminal and civil penalties, fines and forfeitures, acknowledging that it illegally marketed and promoted OxyContin by falsely claiming that OxyContin was less addictive, less subject to abuse and diversion, and less likely to cause withdrawal symptoms than other pain medications – all in an effort to maximize profits." *Id.*

388.    The Sackler Family directed, ordered, ratified, approved, and

---

[122] Patrick Radden Keefe, "The Family that Built an Empire of Pain," *The New Yorker*, October 30, 2017. https://www.newyorker.com/magazine/2017/10/30/the-family-that-bulit-an-empire-of-pain (accessed February 21, 2018).

[123] David Armstrong, "Kentucky Senate President Urges Release of Secret OxyContin Records," STAT, June 28, 2017. www.statnews.com/2017/06/28/purdue-kentucky-stat/ (accessed February 21, 2018).

consented to Purdue's entry of the guilty plea and payment of civil and criminal penalties, fines and forfeitures.

389.    As a direct and proximate of the actions of the Sackler Family through their ownership and control of Purdue, the Sackler Family has personally caused Plaintiffs to suffer damages by (and among other things) incurring excessive costs related to diagnosis, treatment, and cure of addiction or risk of addiction to opioids.

## V.    CAUSE OF ACTION

### FIRST CAUSE OF ACTION
### DELAWARE CONSUMER FRAUD ACT
### (AGAINST ALL DEFENDANTS)

390.    Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

391.    At all times relevant to this Complaint, all Defendants were engaged in the trade or commerce of manufacturing, marketing, selling, and distributing prescription opioid pain medications. For 20 years Defendants have been the leading force in the prescription opioid market, both nationally and in Delaware.

392.    By engaging in the acts and practices alleged herein, Defendants made or caused to be made to Delaware consumers, directly or indirectly, explicitly or by implication, misrepresentations that, reasonably interpreted, are material, false, and likely to mislead.

393.    In overstating the benefits of opioids and understating their very

serious risks, including the risk of addition; in falsely promoting abuse-deterrent formulations as reducing abuse; in falsely claiming that OxyContin provides 12 hours of relief; and in falsely portraying its efforts or commitment to rein in the diversion and abuse of opioids, including in Delaware and Plaintiffs' communities, Defendants have engaged in misrepresentations and knowing omission of material fact.

394.    Defendants violated the Delaware Consumer Fraud Act (DE Code §2511; §2513(a),*et seq.)* because they engaged in deceptive acts or practices in the conduct of business, trade or commerce within Delaware, Dover, Seaford, and Kent County, in violation of the Delaware Consumer Fraud Act. Defendants misrepresented material facts, or suppressed, concealed or omitted material facts, including:

- Marketing opioid drugs as safe and effective for the long term treatment of chronic pain conditions when they were not, for the purpose of deceiving physicians into using addictive opioids;
- Creating, sponsoring, and assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;
- Disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of "pseudoaddiction" through Defendants' own unbranded publications and on internet sites Defendants operated that were marketed to and accessible by consumers;
- Distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid

abuse; indicating that screening tools effectively prevent addiction; and that abuse-deterrent opioids reduce tampering and abuse;

- Sponsoring, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid KOL doctors and Front Groups so they would make deceptive statements concerning the use of opioids to treat chronic pain while maintaining a more credible, "independent third party" appearance and allowing them to side-step labeling regulations in violation of Delaware and Federal law;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Developing and disseminating misleading scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- Assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

- Exclusively disseminating misleading statements in education materials to hospital doctors and staff while purportedly educating them on new pain standards;

- Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;

136

- Holding themselves out as law-abiding distributors but instead withholding from law enforcement the names of prescribers they knew to be facilitating the diversion and over-prescribing of their products, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and advertisements and CMEs Defendants knew would reach these same prescribers, violating Delaware and Federal law by not reporting these doctors instead; and,
- Falsely representing to patients that they needed prescription opioids for treatment when that practice of prescribing was dishonest and fell well outside the standard of care and done for the sole purpose of making profit.

395.    Defendants knew at the time that they made their misrepresentations and omissions that 1.) they were false and 2.) had the tendency to influence the consumer choices of Plaintiffs and their residents.

396.    Defendants designed their misrepresentations and omissions for the purpose of influencing Plaintiffs and residents into relying upon them, including area physicians treating residents of Dover, Seaford, and Kent County.

397.    Defendants' acts and practices as alleged in this Complaint had a capacity or tendency to deceive. When considered from the perspective of a reasonable consumer, these acts or practices were likely to mislead Delaware consumers in Dover, Seaford, and Kent County.

398.    Defendants' consistent, repeated, deceptive representations that their opioids had properties unsupported by medical literature did in fact deceive

Plaintiffs and their residents and area physicians, causing them to both prescribe and consume opioids for the treatment of chronic pain conditions and suffer addiction when they otherwise would not.

399.   Given the incredible resources Defendants put into crafting their misrepresentations to pervade nearly every source of trusted medical information, Plaintiffs and their residents, as well as physicians treating residents of Dover, Seaford, and Kent County, reasonably relied upon Defendants' misrepresentations and omissions, as stated above.

400.   Given the infinitely better-resourced and highly sophisticated nature of the Distributor Defendants' practices, and their intimate knowledge of state and federal legal requirements, Plaintiffs and their residents reasonably relied on the Distributor Defendants to uphold their legal requirements and not commit intentional, material omissions to law enforcement for the sake of its own profits.

401.   In addition to the misrepresentations in the preceding paragraphs, Distributor Defendants have misrepresented or concealed material facts, including that they:

- Failed to report suspicious orders of controlled substances;
- Failed to maintain necessary records of opioid transactions;
- Deliberately ignored questionable and obviously illegal prescriptions and filled them anyway;
- Failed to implement effective business practices to guard against diversion of highly-addictive opioid

products;

- Ignored the sale of prescription opioids to the citizens of Plaintiffs' communities in quantities that far exceeded the number of prescriptions that could reasonably have been used for medical purposes, despite information provided by prescribing records, pharmacy orders, and field reports from sales representatives; and

- Violated the Delaware and Federal laws and regulations by habitually filling suspicious or invalid orders for prescription opioids at the wholesale and retail levels; failing to maintain effective controls against opioid diversion; and failing to operate a system to disclose suspicious orders of controlled substances.

402.   Distributor Defendants have misrepresented material facts, or used concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale, distribution, or dispensing of prescription opioids, whether or not any person has been misled, deceived or damaged thereby, in violation of §2513(a) of the Delaware Consumer Fraud Act, by suppressing, concealing, or omitting the material facts stated in the preceding paragraphs.

403.   Each instance where Defendants have sold, distributed, or dispensed prescription opioids and suppressed, concealed, or omitted any of the material facts set forth herein with the intent that a consumer would rely thereon, constitutes a violation of §2513(a) of the Delaware Consumer Fraud Act.

404.   Plaintiffs and their residents have been injured by reason of Defendants' violation of the Delaware Consumer Fraud Act, directly caused by

Defendants' deceptive behavior resulting in increased expenditures on public healthcare services, law enforcement, the justice system, emergency response, child and family services, as well as lost productivity and lost tax revenue. The health and wellbeing of the citizens of Dover, Seaford, and Kent County, including those who have abused or will abuse prescription opioids is a legitimate crisis for Plaintiffs.

405.   Defendants' acts or practices alleged herein constitute unfair or deceptive acts or practices in violation of 6 *Del. C.* §2513 and have proximately caused and continue to cause an ascertainable loss of money and property to Plaintiff.

406.   Every deceptive, unfair, and/or misrepresentative act by Defendants constitutes a separate and distinct violation of 6 *Del. C.* §2513, capable of repetition and affecting and impacting the public's interest.

407.   Plaintiffs hereby demand an award of their actual damages in an amount determined by the jury, and for an award of reasonable attorney fees.

## SECOND CAUSE OF ACTION
## FRAUD
## (AGAINST ALL DEFENDANTS)

408.   Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

409.   Defendants, individually and acting through their employees and

agents, and in concert with each other, made misrepresentations and omissions of facts material to Plaintiffs and their residents, including physicians treating residents and employees Dover, Seaford, and Kent County, to induce them to purchase, administer, and consume opioids as set forth in detail above, including:

- Marketing opioid drugs as safe and effective for the long term treatment of chronic pain conditions when they were not, for the purpose of deceiving physicians into using addictive opioids;
- Creating, sponsoring, and assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;
- Disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through Defendants' own unbranded publications and on internet sites Defendants operated that were marketed to and accessible by consumers;
- Distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse;
- Sponsoring, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;
- Providing significant financial support to pro-opioid KOL doctors and Front Groups so they would make deceptive statements concerning the use of opioids to treat chronic pain while maintaining a more credible, "independent third party" appearance and allowing them to side-step labeling regulations in violation of Delaware and Federal law;
- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Developing and disseminating misleading scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- Assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

- Exclusively disseminating misleading statements in education materials to hospital doctors and staff while purportedly educating them on new pain standards;

- Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;

- Holding themselves out as law-abiding distributors but instead withholding from law enforcement the names of prescribers they knew to be facilitating the diversion and over-prescribing of their products, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and advertisements and CMEs Defendants knew would reach these same prescribers, violating Delaware and Federal law by not reporting these doctors instead; and,

- Falsely representing to patients that they needed prescription opioids for treatment when that practice of prescribing was dishonest and fell well outside the standard of care and done for the sole purpose of making profit.

410.   Defendants knew at the time that they made their misrepresentations

and omissions that they were false.

411. Defendants intended that the Plaintiffs and their residents, as well as the physicians treating residents and employees of Dover, Seaford, and Kent County, would rely on their misrepresentations and omissions.

412. Given the incredible resources Defendants put into crafting their misrepresentations to pervade nearly every source of trusted medical information, Plaintiffs and their residents, as well as the physicians treating residents of Dover, Seaford, and Kent County, reasonably relied upon (and were right to rely upon) Defendants' misrepresentations and omissions, as stated above.

413. Given the infinitely better-resourced and highly sophisticated nature of the Distributor Defendants' practices, and their intimate knowledge of state and federal legal requirements, Plaintiffs and their residents, as well as physicians treating residents of Dover, Seaford, and Kent County, reasonably relied upon (and were right to rely upon) the Distributor Defendants to uphold their legal requirements and not commit intentional, material omissions to law enforcement for the sake of their own profits.

414. By reason of reliance on Defendants' misrepresentations and omissions of material fact, Plaintiffs had no knowledge of the Defendants' falsehoods and Plaintiffs and their residents suffered actual pecuniary damage directly caused by Defendants' deceptive behavior resulting in increased

expenditures on public healthcare services, law enforcement, the justice system, emergency response, child and family services, as well as lost productivity and lost tax revenue.

415.     Defendants' conduct was willful, wanton, and malicious and was directed at the public generally.

## FOURTH CAUSE OF ACTION
## NEGLIGENCE AND NEGLIGENCE PER SE
## (AGAINST ALL DEFENDANTS)

416.     Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

417.     The Federal Food, Drug, and Cosmetic Act ("FDCA") places restrictions on branded marketing. It prohibits the sale, in interstate commerce, of drugs that are "misbranded." A drug is "misbranded" if the label is false or misleading "in any particular."[124] "Labeling" includes more than the drug's physical label; it also includes "all . . . other written, printed, or graphic matter... accompanying" the drug, including promotional material.[125] Furthermore, the FDCA specifies that drug advertisements must include a true statement of information and an advertisement fails to satisfy this requirement if it is:

> i."false or misleading with respect to side effects, contraindications, or effectiveness"[126]; or,
> ii."Contains a representation or suggestion that a drug is

---

[124] 21 U.S.C 352(a)
[125] 21 U.S.C.A. § 321(m)
[126] 21 CFR 202.1(e)(5)(i)

safer than it has been demonstrated to be by substantial evidence or substantial experience, by selective presentation of information from published articles or other references that report no side effects or minimal side effects with the drug or otherwise selects information from any source in a way that makes a drug appear to be safer than has been demonstrated."[127]

418.   Manufacturer Defendants breached their duties as specified by the FDCA when:

- marketing opioid drugs as safe and effective for the long-term treatment of chronic pain conditions when they were not, for the purpose of deceiving physicians into using addictive opioids;
- creating, sponsoring, and assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;
- disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of "pseudoaddiction" through Defendants' own unbranded publications and on internet sites Defendants operated that were marketed to and accessible by consumers;
- distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse; indicating that screening tools effectively prevent addiction; and that abuse-deterrent opioids reduce tampering and abuse;
- sponsoring, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;
- providing significant financial support to pro-opioid KOL doctors and Front Groups so they would make deceptive statements concerning the use of opioids to

---

[127] 21 CFR 202.1(e)(6)(iv)

treat chronic pain while maintaining a more credible, "independent third party" appearance and allowing them to side-step labeling regulations in violation of Delaware and Federal law;

- endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- developing and disseminating misleading scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

- exclusively disseminating misleading statements in education materials to hospital doctors and staff while purportedly educating them on new pain standards; and,

- making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

419.    Delaware (16 *Del. C.* §4761) and Federal Law (21 CFR § 1301.74(b)) impose a non-delegable duty upon the Distributor Defendants, including the Pharmacy Defendants - "Retail Distributors" - to "design and operate a system to disclose . . . suspicious orders of controlled substances. The [Distributor] shall inform the Field Division Office of the Administration in his area of suspicious

orders when discovered by the [Distributor]. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."[128] The stated purpose of the statutory scheme is to reduce the widespread diversion of controlled substances, like opioids, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.[129]

420.    The Distributor Defendants breached their aforesaid legal duties within Plaintiffs' communities, by:

- Failing to design and operate a system to disclose suspicious orders of opioids;
- Once compelled to design and operate a system to disclose suspicious orders of opioids, failing to report suspicious orders as required; and,
- Failing to avoid filling suspicious orders that were ultimately diverted.

421.    All of the aforementioned statutory provisions are designed to protect both individuals, and communities like Dover, Seaford and Kent County at-large, from the addictive properties of opioids and the damages caused by opioid addiction, which includes the current opioid epidemic caused by Defendants that Plaintiffs must now cope with and ameliorate by use of public funds.

422.    As a direct and a proximate result of Defendants' acts and omissions that violated statutory requirements, Defendants and their agents have caused

---

[128] 21 CFR § 1301.74(b)
[129] 1970 U.S.C.C.A.N. 4566, 4571-72

Plaintiffs to suffer damages by (among other things) incurring excessive costs related to diagnosis, treatment, and cure of addiction or risk of addiction to opioids, and the costs of having to provide necessary resources for care, treatment facilities, law enforcement services, first responder services, and child and family services for the residents of Dover, Seaford, and Kent County. Additionally, Plaintiffs have suffered lost tax revenue and a loss productivity of its workforce.

423.     The Defendants' acts are willful and wanton.  In addition to actual damages, Plaintiffs are entitled to punitive damages in an amount to be determined by the jury at the trial of the matter.

## SIXTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
## (AGAINST ALL DEFENDANTS)

424.     Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

425.     Defendants, individually and acting through their employees and agents, and in concert with each other, made misrepresentations and omissions of facts material to Plaintiffs and their residents, as well as physicians treating residents and employees within Plaintiffs' communities, to induce them to purchase, administer, and consume opioids as set forth in detail above, including:

- Marketing opioid drugs as safe and effective for the long term treatment of chronic pain conditions when they were not, for the purpose of deceiving physicians into using addictive opioids;

- Creating, sponsoring, and assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;
- Disseminating misleading statements regarding the true risk of addiction and promoting the concept of "pseudoaddiction" through Defendants' own unbranded publications and on internet sites Defendants operated that were marketed to and accessible by consumers;
- Distributing brochures to doctors, patients, and law enforcement officials that included statements concerning the indicators of possible opioid abuse;
- Sponsoring, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;
- Providing significant financial support to pro-opioid KOL doctors and Front Groups so they would make statements concerning the use of opioids to treat chronic pain while maintaining a more credible, "independent third party" appearance and allowing them to side-step labeling regulations in violation of Delaware and Federal law;
- Endorsing and assisting in the distribution of CMEs containing statements concerning the use of opioids to treat chronic non-cancer pain;
- Developing and disseminating misleading scientific studies that concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, based upon inadequate data while concealing contrary data;
- Assisting in the dissemination of literature written by pro-opioid KOLs that contained statements concerning the use of opioids to treat chronic non-cancer pain;
- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-

term efficacy;

- Exclusively disseminating statements in education materials to hospital doctors and staff not supported by valid, balanced data while purportedly educating them on new pain standards;

- Making statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;

- Withholding from law enforcement the names of prescribers they believed to be facilitating the diversion and over-prescribing of their products, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and advertisements and CMEs Defendants knew would reach these same prescribers, violating Delaware and Federal law by not reporting these doctors instead; and,

- Falsely representing to patients that they needed prescription opioids for treatment when that practice of prescribing was dishonest and fell well outside the standard of care and done for the sole purpose of making profit.

426.    Defendants should have known at the time that they made their misrepresentations and omissions that they were false.

427.    Defendants should have, at the least, investigated the truth or falsity of their representations to Plaintiffs, their residents, and area physicians treating the residents and employees of Plaintiffs' communities.

428.    Defendants intended that Plaintiffs and their residents would rely on their misrepresentations and omissions.

429.    Given the incredible resources Defendants put into crafting their misrepresentations to pervade nearly every source of trusted medical information,

Plaintiffs and their residents, as well as physicians treating the residents and employees of Plaintiffs' communities, reasonably relied upon Defendants' misrepresentations and omissions, as stated above.

430.  Given the infinitely better-resourced and highly sophisticated nature of the Distributor Defendants' practices, and their intimate knowledge of state and federal legal requirements, Plaintiffs and their residents, as well as the physicians treating residents and employees of Plaintiffs' communities, reasonably relied on the Distributor Defendants to uphold their legal requirements and not commit intentional, material omissions to law enforcement for the sake of their own profits.

431.  By reason of their reliance on Defendants' misrepresentations and omissions of material fact, Plaintiffs and their residents have suffered actual pecuniary damage directly caused by Defendants' deceptive behavior resulting in increased expenditures on public healthcare services, law enforcement, the justice system, emergency response, child and family services, as well as lost productivity and lost tax revenue.

432.  Defendants' conduct was willful, wanton, and malicious and was directed at the public generally.  In addition to actual damages, Plaintiffs are entitled to punitive damages in an amount to be determined by the jury at the trial of the matter.

## SEVENTH CAUSE OF ACTION
## PUBLIC NUISANCE
## (AGAINST ALL DEFENDANTS)

433.     Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

434.     Under Delaware common law, Defendants, through the actions described in this Complaint, have created, or were a substantial factor in creating, a public nuisance by unreasonably interfering with a right common to the general public, such as interference with the public health, public safety, public peace, and public comfort and convenience.

435.     Dover, Seaford, and Kent County, and the citizens of these communities, have a public right to be free from the substantial injury to public health, safety, peace, comfort, and convenience. The interference of this right resulted from Defendants' illegal and deceptive marketing and distribution of opioids.

436.     Defendants, individually and acting through their employees and agents, and in concert with each other, made unreasonable and/or unlawful use of their financial resources in an improper, indecent, and unwarranted fashion to wage a massive campaign of misrepresentations and omissions of facts, negligence, and violation of state laws material to Plaintiffs and their residents, as well as physicians treating residents and employees of Plaintiffs' communities, in order to

induce them to purchase, administer, dispense, and consume opioids as set forth in

detail above, including:

- Marketing opioid drugs as safe and effective for the long term treatment of chronic pain conditions when they were not, for the purpose of deceiving physicians into using addictive opioids;
- Creating, sponsoring, and assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;
- Disseminating misleading statements regarding the true risk of addiction and promoting the concept of "pseudoaddiction" through Defendants' own unbranded publications and on internet sites Defendants operated that were marketed to and accessible by consumers;
- Distributing brochures to doctors, patients, and law enforcement officials that included statements concerning the indicators of possible opioid abuse;
- Sponsoring, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;
- Providing significant financial support to pro-opioid KOL doctors and Front Groups so they would make statements concerning the use of opioids to treat chronic pain while maintaining a more credible, "independent third party" appearance and allowing them to side-step labeling regulations in violation of Delaware and Federal law;
- Endorsing and assisting in the distribution of CMEs containing statements concerning the use of opioids to treat chronic non-cancer pain;
- Developing and disseminating misleading scientific studies that concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, based upon inadequate data while concealing contrary data;

- Assisting in the dissemination of literature written by pro-opioid KOLs that contained statements concerning the use of opioids to treat chronic non-cancer pain;
- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;
- Exclusively disseminating statements in education materials to hospital doctors and staff not supported by valid, balanced data while purportedly educating them on new pain standards;
- Making statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;
- Falsely representing to patients that they needed prescription opioids for treatment when that practice of prescribing was dishonest and fell well outside the standard of care and done for the sole purpose of making profit.
- Withholding from law enforcement the names of prescribers they believed to be facilitating the diversion and over-prescribing of their products, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and advertisements and CMEs Defendants knew would reach these same prescribers, violating Delaware and Federal law by not reporting these doctors instead; and,

437.   The activities of Defendants that created a public nuisance worked as

an obstruction or injury to Dover, Seaford, and Kent County and their residents,

producing a material annoyance, inconvenience, discomfort, and/or harm to the

Plaintiffs' and their residents, and causing them to suffer actual damages directly

caused by Defendants' deceptive, negligent, and/or unlawful behavior resulting in increased expenditures on public healthcare services, law enforcement, the justice system, emergency response, child and family services, as well as lost productivity and lost tax revenue.

438.    Defendants' conduct was willful, wanton, and malicious and was directed at the public generally.

439.    At all times relevant to the Complaint, Defendants exercised control over the instrumentalities constituting the nuisance, Defendants' actions were a substantial factor creating the public nuisance, and the public nuisance was foreseeable to Defendants.  Without Defendants' actions, opioid use would not have become so widespread in Dover and Kent County, and the opioid epidemic that now exists would have been averted or would be much less severe.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs hereby demand judgment against Defendants, jointly and severally, awarding the Plaintiffs:

      i.  Compensatory damages in an amount sufficient to fairly and completely compensate Plaintiffs for all damages;

     ii.  Damages, costs, and reasonable attorney's fees;

   iii. Under equitable principles and due to its unjust enrichment, disgorgement of any profits, plus interest, obtained as a result of Defendants' misrepresentations.

iv. A reasonable amount of punitive damages to be determined by the jury at the trial of the matter;

v. Interest, costs, and disbursements;

vi. An injunction forcing Defendants to abate the opioid epidemic devastating Delaware, the City of Dover, the City of Seaford, and Kent County, and enjoining the distributors from marketing opioids as a) safe for use in chronic pain patients; b) carrying a low risk of addiction in long term use; and c) needed in patients exhibiting signs of "pseudoaddiction."

vii.      Such other and further relief as this Court deems just and proper.


PARKOWSKI, GUERKE & SWAYZE, P.A.


/S/ James D. Nutter, Esquire
JAMES D. NUTTER, ESQUIRE
Del. Bar I.D. No. 3654
19354C Miller Road
Rehoboth Beach, DE 199711
(302) 226-8702
(302) 678-1396 {Fax}
jnutter@pgslegal.com

-and-

OF COUNSEL:

MARC J. BERN & PARTNERS LLP


/s/ Marc J. Bern, Esquire
(Pro Hac Vice Pending)
/s/ Joseph Cappelli, Esquire

*(Pro Hac Vice* Pending)
*/s/ Carmen De Gisi, Esquire*
*(Pro Hac Vice* Pending)
/s/ Margaret E. Cordner, Esquire
*(Pro Hac Vice* Pending)

60 E. 42nd Street, Suite 950
New York, NY 10165
(212) 702-5000
opioidlitigation@bernllp.com

Attorneys for Plaintiffs: City of Dover,
                         City of Seaford and Kent County

Dated:  June 14, 2019

EFiled:  Jun 14 2019 05:31PM EDT
Transaction ID 63366543
Case No. K19C-06-022 JJC

**SUPERIOR COURT**
**CIVIL CASE INFORMATION STATEMENT (CIS)**

COUNTY:    N    **K**    S          CIVIL ACTION NUMBER:  _____

| | |
|---|---|
| CAPTION:<br><br>City of Dover,  a municipal corporation of the State of Delaware, City of Seaford, a municipal corporation of the State of Delaware, and Kent County, a political subdivision of the State of Delaware, Plaintiffs,<br><br>v.<br><br>Purdue Pharma, L.P., et. al.,<br><br>Defendants. | Civil Case Code:  CMIS<br><br>Civil Case Type:  Civil Miscellaneous<br>        (SEE REVERSE SIDE FOR CODE AND TYPE)<br><br>MANDATORY NON-BINDING ARBITRATION (MNA) _____<br><br>Name and Status of Party filing document:<br><br>City of Dover, City of Seaford, and Kent County, Plaintiffs<br><br>Document Type: (E.G., COMPLAINT; ANSWER WITH COUNTERCLAIM)<br><br>Complaint and related pleadings<br><br>          JURY DEMAND: YES __X__  NO ____ |
| ATTORNEY NAME(S):<br><br>JAMES D. NUTTER, ESQUIRE<br><br>ATTORNEY ID(S):<br>  3654<br>FIRM NAME:<br><br>  PARKOWSKI, GUERKE & SWAYZE, P.A.<br>ADDRESS:<br><br>  19354C MILLER ROAD<br><br>  REHOBOTH BEACH, DE  19971<br><br><br>TELEPHONE NUMBER:<br><br>  (302) 226-8702<br>FAX NUMBER:<br><br>  (302) 678-1396<br>E-MAIL ADDRESS:<br><br>  jnutter@pgslegal.com | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS<br>_____<br>_____<br>_____<br>EXPLAIN THE RELATIONSHIP(S):  _____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:____  MORE  THAN  40  NAMED DEFENDANTS _____<br>_____<br>_____<br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGES) |

**THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED.  THE FAILURE TO FILE THE CIS AND TO HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.**

Revised 12/17

EFiled:  Jun 14 2019 05:31PM EDT
Transaction ID 63366543
Case No. K19C-06-022 JJC

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| **CITY OF DOVER, a municipal corporation of the State of Delaware, CITY OF SEAFORD, a municipal corporation of the State of Delaware, and KENT COUNTY, a political subdivision of the State of Delaware,** | |
| **Plaintiffs,** | **C.A. No. _____** |
| **vs.** | |
| **PURDUE PHARMA L.P.; PURDUE PHARMA INC.; THE PURDUE FREDERICK COMPANY, INC.; RHODES PHARMACEUTICALS, L.P.; ABBOTT LABORATORIES; ABBOTT LABORATORIES, INC.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC N/K/A JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. N/K/A JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC F/K/A ACTAVIS PLC; ACTAVIS, INC. F/K/A WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.;** | **TRIAL BY JURY OF TWELVE DEMANDED** |

| | |
|---|---|
| **ACTAVIS LLC; ACTAVIS PHARMA, INC. F/K/A WATSON PHARMA, INC.; MALLINCKRODT PLC; MALLINCKRODT LLC; INSYS THERAPEUTICS, INC.; MYLAN PHARMACEUTICALS, INC.; ASSERTIO THERAPEUTICS, INC., F/K/A DEPOMED, INC.; MCKESSON CORPORATION; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN CORPORATION;  ANDA PHARMACEUTICALS, INC.; H.D. SMITH, LLC; CVS HEALTH CORPORATION; RITE AID CORPORATION; WALGREENS BOOTS ALLIANCE, INC.; RICHARD SACKLER; THERESA SACKLER; KATHE SACKLER; JONATHAN SACKLER; MORTIMER D.A. SACKLER; BEVERLY SACKLER; DAVID SACKLER; ILENE SACKLER LEFCOURT;** | |
| **Defendants.** | |

## <u>PRAECIPE</u>

TO:   Prothonotary
        Kent County Superior Court
        Kent County Courthouse
        38 The Green
        **PLEASE ISSUE SUMMONS** and a copy of the complaint and related

pleadings to the below-listed Plaintiffs' counsel, commanding Plaintiffs' counsel to

summon and direct the below named defendants to answer the Complaint by serving the below-listed defendants with the Summons and a copy of the Complaint and related pleadings at the defendants' addresses listed below in accordance with the long arm statute, 10 *Del. C.* §3104:

1.     Upon Defendant, Purdue Pharma, Inc., at its principal place of business at One Stamford Forum, 201 Tressler Boulevard, Stamford, Connecticut, 06901.

2.     Upon Defendant, The Purdue Frederick Company, at its principal place of business at One Stamford Forum, 201 Tressler Boulevard, Stamford, Connecticut, 06901.

3.     Upon, Defendant, Abbott Laboratories, at its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064-3500.

4.     Upon Defendant, Abbott Laboratories, Inc., at its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064-3500.

5.     Upon Defendant, Teva Pharmaceutical Industries, Ltd. at its principal place of business in the United States at 1090 Horsham Road, North Wales, Pennsylvania 19454.

6.     Upon Defendant, Johnson & Johnson ("J&J"), at its principal place of business at 1 Johnson & Johnson Plaza, New Brunswick, New Jersey, 08933.

7. Upon Defendant, Janssen Pharmaceuticals, Inc. ("Janssen Pharmaceuticals"), at its principal place of business at 1125 Bear Harbor Road, Titusville, New Jersey, 08560.

8. Upon Defendant, Ortho-McNeil-Janssen Pharmaceuticals, Inc. ("OMP"), n/k/a Janssen Pharmaceuticals, Inc., at its principal place of business at 1125 Bear Harbor Road, Titusville, New Jersey, 08560.

9. Upon Defendant, Janssen Pharmaceutica, Inc. ("Janssen Pharmaceutica"), n/k/a Janssen Pharmaceuticals, Inc., at its principal place of business at 1125 Bear Harbor Road, Titusville, New Jersey, 08560.

10. Upon Defendant, Allergan PLC f/k/a Activis PLC, at its principal place of business at Clonshaugh Business & Technology Park, Coolock, Dublin 17. Actavis PLC acquired Allergan PLC in March, 2015, and name of the combined company became Allergan PLC.

11. Upon Defendant, Actavis, Inc., at its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054.

12. Upon Defendant, Watson Laboratories, Inc., at its headquarters at 132 Business Center Drive, Corona, California, 92880.

13.    Upon Defendant, Mallinckrodt PLC, at its headquarters at 3 Lotus Park, The Causeway, Staines-Upon-Thames, Surrey, TW18 3 AG, United Kingdom.

14.    Upon Defendant, Mylan Pharmaceuticals, Inc. at its principal place of 1000 Mylan Blvd., Canonsburg, PA 15317.

15.    Upon Defendant, Cardinal Health Inc., its headquarters at 7000 Cardinal Place, Dublin, Ohio, 43017.

16.    Upon Defendant, Anda Pharmaceuticals, Inc. ("Anda"), at its principal place of business at 2915 Weston Road, Weston, FL 33331.

17.    Upon Defendant, Richard Sackler, at 14 Cicero Lane Austin, TX 78746.

18.    Upon Defendant, Theresa Sackler, at 980 5th Avenue, Apt. 24A New York, NY 10075.

19.    Upon Defendant, Kathe Sackler, at 136 Wells Hill Road Easton, CT 06612.

20.    Upon Defendant, Jonathan Sackler, at 201 Tresser Blvd. Stamford, CT 06901.

21.    Upon Defendant, Mortimer D.A. Sackler, at 15 E. 62nd Street New York, NY 10021.

22.    Upon Defendant, Beverly Sackler, at 60 Field Point Circle Greenwich, CT 06830.

23.    Upon Defendant, David Sackler, at 200 E. 66th Street New York, NY 10065.

24.    Upon Defendant, Ilene Sackler Lefcourt, at 146 Central Park W., Apt. 12, New York, NY 10023.

**ALSO PLEASE ISSUE SUMMONS** for service of the within Complaint and related pleadings for service on the below-listed Delaware-based defendants by Sheriff of Kent County as follows:

25.    Upon Defendant, Purdue Pharma, L.P., by serving its registered agent, The Prentice-Hall Corporation System, 251 Little Falls Drive, Wilmington, DE 19808.

26.    Upon Defendant, Rhodes Pharmaceuticals, L.P., by serving its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

27.    Upon Defendant, Teva Pharmaceuticals USA, Inc., by serving its registered agent, Corporate Creations Network, Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, DE 19810.

28.     Upon Defendant, Cephalon, Inc., by serving its registered agent, Corporate Creations Network, Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, DE 19810.

29.     Upon Defendant, Endo Health Solutions, by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

30.     Upon Defendant, Endo Pharmaceuticals, Inc., by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

31.     Upon Defendant, Actavis, LLC, by serving its registered agent, Corporate Creations Network, Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, DE 19810.

32.     Upon Defendant, Actavis Pharma, Inc., f/k/a Actavis Inc., by serving its registered agent, Corporate Creations Network, Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, DE 19810.

33.     Upon Defendant, Mallinckrodt LLC, by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

34.     Upon Defendant, Insys Therapeutics, Inc., by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

35.     Upon Defendant, Assertio Therapeutics, Inc., by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

36.     Upon Defendant, McKesson Corporation, by serving its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

37.     Upon Defendant, AmerisourceBergen Drug Corporation, by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE  19801.

38.     Upon Defendant, H.D. Smith, LLC, by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE  19801.

39.     Upon CVS Health Corporation, by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE  19801.

40.     Upon Defendant, Rite Aid Corporation, by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

41.     Upon Defendant, Walgreens Boots Alliance, Inc., f/k/a Walgreen Co., by serving its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE  19808.

Our checks payable to Sheriff of Kent County for Service of Process will be hand delivered upon acceptance of this Complaint.

*/S/ JAMES D. NUTTER, ESQUIRE*
JAMES D. NUTTER, ESQUIRE
Parkowski, Guerke & Swayze, P.A.
Del. Bar I.D. No. 3654
19354C Miller Road
Rehoboth Beach, DE 19971
(302) 226-8702
jnutter@pgslegal.com
Attorney for Plaintiffs

DATED:  June 14, 2019

EFiled:  Jun 14 2019 05:31PM EDT
Transaction ID 63366543
Case No. K19C-06-022 JJC

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| **CITY OF DOVER, a municipal corporation of the State of Delaware, CITY OF SEAFORD, a municipal corporation of the State of Delaware, and KENT COUNTY, a political subdivision of the State of Delaware,**<br><br>   **Plaintiffs,**<br><br>   **vs.**<br><br>**PURDUE PHARMA L.P.; PURDUE PHARMA INC.; THE PURDUE FREDERICK COMPANY, INC.; RHODES PHARMACEUTICALS, L.P.; ABBOTT LABORATORIES; ABBOTT LABORATORIES, INC.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC N/K/A JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. N/K/A JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC F/K/A ACTAVIS PLC; ACTAVIS, INC. F/K/A WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.;** | **C.A. No. _____**<br><br><br>**TRIAL BY JURY OF TWELVE DEMANDED** |

**\*     This Summons is for Service By Counsel**
**DO NOT SEND TO SHERIFF'S OFFICE**

| | |
|---|---|
| **ACTAVIS LLC; ACTAVIS PHARMA, INC. F/K/A WATSON PHARMA, INC.; MALLINCKRODT PLC; MALLINCKRODT LLC; INSYS THERAPEUTICS, INC.; MYLAN PHARMACEUTICALS, INC.; ASSERTIO THERAPEUTICS, INC., F/K/A DEPOMED, INC.; MCKESSON CORPORATION; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN CORPORATION;  ANDA PHARMACEUTICALS, INC.; H.D. SMITH, LLC; CVS HEALTH CORPORATION; RITE AID CORPORATION; WALGREENS BOOTS ALLIANCE, INC.; RICHARD SACKLER; THERESA SACKLER; KATHE SACKLER; JONATHAN SACKLER; MORTIMER D.A. SACKLER; BEVERLY SACKLER; DAVID SACKLER; ILENE SACKLER LEFCOURT;** | |
|     **Defendants.** | |

## SUMMONS FOR SERVICE BY COUNSEL

**TO PLAINTIFF'S COUNSEL:**[*]

James D. Nutter, Esquire
Parkowski, Guerke & Swayze, P.A.
19354C Miller Road
Rehoboth Beach, DE  19971

    [*]    **This Summons is for Service By Counsel
DO NOT SEND TO SHERIFF'S OFFICE**

**YOU ARE COMMANDED:**

To summon the above named Defendant(s), so that, within 20 days after service hereof upon Defendant(s), exclusive of the day of service, Defendant(s) shall serve upon Plaintiffs' attorney, James D. Nutter, Esquire, of **PARKOWSKI, GUERKE & SWAYZE, P.A., 19354C Miller Road, Rehoboth Beach, Delaware  19971** an Answer to the Complaint (and, if an affidavit of demand has been filed, an affidavit of defense).

To serve upon a copy hereof and of the Complaint (and of the affidavit of the demand if any has been filed by Plaintiffs) pursuant to 10 <u>Del. C.</u> §3104.

DATE:                                          _____,

                                                        Prothonotary


                                                        _____

                                                        Per Deputy


**TO THE ABOVE NAMED DEFENDANT(S):**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on Plaintiffs' attorneys named above an Answer to the Complaint (and, if an affidavit of demand has been filed, an affidavit of defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the affidavit of demand, if any).

DATE:                                          _____,

                                                        Prothonotary


                                                        _____

                                                        Per Deputy


\*       **This Summons is for Service By Counsel**
        **DO NOT SEND TO SHERIFF'S OFFICE**

EFiled: Jun 18 2019 09:57AM EDT
Transaction ID 63372968
Case No. K19C-06-022 JJC

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| **CITY OF DOVER, a municipal corporation of the State of Delaware, CITY OF SEAFORD, a municipal corporation of the State of Delaware, and KENT COUNTY, a political subdivision of the State of Delaware,** | |
| **Plaintiffs,** | **C.A. No. _____** |
| **vs.** | |
| **PURDUE PHARMA L.P.; PURDUE PHARMA INC.; THE PURDUE FREDERICK COMPANY, INC.; RHODES PHARMACEUTICALS, L.P.; ABBOTT LABORATORIES; ABBOTT LABORATORIES, INC.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC N/K/A JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. N/K/A JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC F/K/A ACTAVIS PLC; ACTAVIS, INC. F/K/A WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.;** | **TRIAL BY JURY OF TWELVE DEMANDED** |

**ACTAVIS LLC; ACTAVIS PHARMA, INC. F/K/A WATSON PHARMA, INC.; MALLINCKRODT PLC; MALLINCKRODT LLC; INSYS THERAPEUTICS, INC.; MYLAN PHARMACEUTICALS, INC.; ASSERTIO THERAPEUTICS, INC., F/K/A DEPOMED, INC.; MCKESSON CORPORATION; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN CORPORATION;  ANDA PHARMACEUTICALS, INC.; H.D. SMITH, LLC; CVS HEALTH CORPORATION; RITE AID CORPORATION; WALGREENS BOOTS ALLIANCE, INC.; RICHARD SACKLER; THERESA SACKLER; KATHE SACKLER; JONATHAN SACKLER; MORTIMER D.A. SACKLER; BEVERLY SACKLER; DAVID SACKLER; ILENE SACKLER LEFCOURT;**

  **Defendants.**

## AMENDED PRAECIPE

TO:   Prothonotary
      Kent County Superior Court
      Kent County Courthouse
      38 The Green
      **PLEASE ISSUE SUMMONS** and a copy of the complaint and related

pleadings to the below-listed Plaintiffs' counsel, commanding Plaintiffs' counsel to

summon and direct the below named defendants to answer the Complaint by serving the below-listed defendants with the Summons and a copy of the Complaint and related pleadings at the defendants' addresses listed below in accordance with the long arm statute, 10 *Del. C.* §3104:

1.      Upon Defendant, Purdue Pharma, Inc., at its principal place of business at One Stamford Forum, 201 Tressler Boulevard, Stamford, Connecticut, 06901.

2.      Upon Defendant, The Purdue Frederick Company, at its principal place of business at One Stamford Forum, 201 Tressler Boulevard, Stamford, Connecticut, 06901.

3.      Upon, Defendant, Abbott Laboratories, at its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064-3500.

4.      Upon Defendant, Abbott Laboratories, Inc., at its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064-3500.

5.      Upon Defendant, Teva Pharmaceutical Industries, Ltd. at its principal place of business in the United States at 1090 Horsham Road, North Wales, Pennsylvania 19454.

6.      Upon Defendant, Johnson & Johnson ("J&J"), at its principal place of business at 1 Johnson & Johnson Plaza, New Brunswick, New Jersey, 08933.

7.     Upon  Defendant,  Janssen  Pharmaceuticals,  Inc.  ("Janssen Pharmaceuticals"), at its principal place of business at 1125 Bear Harbor Road, Titusville, New Jersey, 08560.

8.     Upon  Defendant,  Ortho-McNeil-Janssen  Pharmaceuticals,  Inc. ("OMP"), n/k/a Janssen Pharmaceuticals, Inc., at its principal place of business at 1125 Bear Harbor Road, Titusville, New Jersey, 08560.

9.     Upon  Defendant,  Janssen  Pharmaceutica,  Inc.  ("Janssen Pharmaceutica"), n/k/a Janssen Pharmaceuticals, Inc., at its principal place of business at 1125 Bear Harbor Road, Titusville, New Jersey, 08560.

10.    Upon Defendant, Allergan PLC f/k/a Activis PLC, at its principal place of business at Clonshaugh Business & Technology Park, Coolock, Dublin 17. Actavis PLC acquired Allergan PLC in March, 2015, and name of the combined company became Allergan PLC.

11.    Upon Defendant, Actavis, Inc., at its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054.

12.    Upon Defendant, Watson Laboratories, Inc., at its headquarters at 132 Business Center Drive, Corona, California, 92880.

13.   Upon Defendant, Mallinckrodt PLC, at its headquarters at 3 Lotus Park, The Causeway, Staines-Upon-Thames, Surrey, TW18 3 AG, United Kingdom.

14.   Upon Defendant, Mylan Pharmaceuticals, Inc. at its principal place of 1000 Mylan Blvd., Canonsburg, PA 15317.

15.   Upon Defendant, Cardinal Health Inc., its headquarters at 7000 Cardinal Place, Dublin, Ohio, 43017.

16.   Upon Defendant, Anda Pharmaceuticals, Inc. ("Anda"), at its principal place of business at 2915 Weston Road, Weston, FL 33331.

17.   Upon Defendant, Richard Sackler, at 14 Cicero Lane Austin, TX 78746.

18.   Upon Defendant, Theresa Sackler, at 980 5th Avenue, Apt. 24A New York, NY 10075.

19.   Upon Defendant, Kathe Sackler, at 136 Wells Hill Road Easton, CT 06612.

20.   Upon Defendant, Jonathan Sackler, at 201 Tresser Blvd. Stamford, CT 06901.

21.   Upon Defendant, Mortimer D.A. Sackler, at 15 E. 62nd Street New York, NY 10021.

22.     Upon Defendant, Beverly Sackler, at 60 Field Point Circle Greenwich, CT 06830.

23.     Upon Defendant, David Sackler, at 200 E. 66th Street New York, NY 10065.

24.     Upon Defendant, Ilene Sackler Lefcourt, at 146 Central Park W., Apt. 12, New York, NY 10023.

**ALSO PLEASE ISSUE SUMMONS** for service of the within Complaint and related pleadings for service on the below-listed Delaware-based defendants by the Sheriff of New Castle County as follows:

25.     Upon Defendant, Purdue Pharma, L.P., by serving its registered agent, The Prentice-Hall Corporation System, 251 Little Falls Drive, Wilmington, DE 19808.

26.     Upon Defendant, Rhodes Pharmaceuticals, L.P., by serving its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

27.     Upon Defendant, Teva Pharmaceuticals USA, Inc., by serving its registered agent, Corporate Creations Network, Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, DE 19810.

28.    Upon Defendant, Cephalon, Inc., by serving its registered agent, Corporate Creations Network, Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, DE 19810.

29.    Upon Defendant, Endo Health Solutions, by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

30.    Upon Defendant, Endo Pharmaceuticals, Inc., by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

31.    Upon Defendant, Actavis, LLC, by serving its registered agent, Corporate Creations Network, Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, DE 19810.

32.    Upon Defendant, Actavis Pharma, Inc., f/k/a Actavis Inc., by serving its registered agent, Corporate Creations Network, Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, DE 19810.

33.    Upon Defendant, Mallinckrodt LLC, by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

34.    Upon Defendant, Insys Therapeutics, Inc., by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

35.     Upon Defendant, Assertio Therapeutics, Inc., by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

36.     Upon Defendant, McKesson Corporation, by serving its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

37.     Upon Defendant, AmerisourceBergen Drug Corporation, by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

38.     Upon Defendant, H.D. Smith, LLC, by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

39.     Upon CVS Health Corporation, by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

40.     Upon Defendant, Rite Aid Corporation, by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

41.     Upon Defendant, Walgreens Boots Alliance, Inc., f/k/a Walgreen Co., by serving its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

Our checks payable to Sheriff of Kent County for Service of Process will be hand delivered upon acceptance of this Complaint.

/S/ JAMES D. NUTTER, ESQUIRE
_____
JAMES D. NUTTER, ESQUIRE
Parkowski, Guerke & Swayze, P.A.
Del. Bar I.D. No. 3654
19354C Miller Road
Rehoboth Beach, DE 19971
(302) 226-8702
jnutter@pgslegal.com
Attorney for Plaintiffs

DATED:  June 18, 2019

**EFiled:  Jun 18 2019 09:57AM EDT**
**Transaction ID 63372968**
**Case No. K19C-06-022 JJC**

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| **CITY OF DOVER, a municipal corporation of the State of Delaware, CITY OF SEAFORD, a municipal corporation of the State of Delaware, and KENT COUNTY, a political subdivision of the State of Delaware,** | |
| **Plaintiffs,** | **C.A. No. _____** |
| **vs.** | |
| **PURDUE PHARMA L.P.; PURDUE PHARMA INC.; THE PURDUE FREDERICK COMPANY, INC.; RHODES PHARMACEUTICALS, L.P.; ABBOTT LABORATORIES; ABBOTT LABORATORIES, INC.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC N/K/A JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. N/K/A JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC F/K/A ACTAVIS PLC; ACTAVIS, INC. F/K/A WATSON PHARMACEUTICALS, INC.;** | **TRIAL BY JURY OF TWELVE DEMANDED** |

| | |
|---|---|
| **WATSON LABORATORIES, INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC. F/K/A WATSON PHARMA, INC.; MALLINCKRODT PLC; MALLINCKRODT LLC; INSYS THERAPEUTICS, INC.; MYLAN PHARMACEUTICALS, INC.; ASSERTIO THERAPEUTICS, INC., F/K/A DEPOMED, INC.; MCKESSON CORPORATION; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN CORPORATION;  ANDA PHARMACEUTICALS, INC.; H.D. SMITH, LLC; CVS HEALTH CORPORATION; RITE AID CORPORATION; WALGREENS BOOTS ALLIANCE, INC.; RICHARD SACKLER; THERESA SACKLER; KATHE SACKLER; JONATHAN SACKLER; MORTIMER D.A. SACKLER; BEVERLY SACKLER; DAVID SACKLER; ILENE SACKLER LEFCOURT;**<br><br>    **Defendants.** | |

## SUMMONS FOR SERVICE BY SHERIFF

**THE STATE OF DELAWARE,
TO THE SHERIFF OF NEW CASTLE COUNTY:
YOU ARE COMMANDED:**

To summon the above named Defendant(s), so that, within 20 days after service hereof upon Defendant(s), exclusive of the day of service, Defendants shall serve upon Plaintiffs' attorney, James D. Nutter, Esquire, of **PARKOWSKI, GUERKE & SWAYZE, P.A., 19354C Miller Road, Rehoboth Beach, Delaware  19971** an Answer to the Complaint (and, if an affidavit of demand has been filed, an affidavit of defense).


DATE: _____

_____,
Prothonotary


_____
Per Deputy

**TO THE ABOVE NAMED DEFENDANT(S):**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on Plaintiffs' attorneys named above an Answer to the Complaint (and, if an affidavit of demand has been filed, an affidavit of defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the affidavit of demand, if any).

DATE: _____

_____,
Prothonotary


_____
Per Deputy

**EFiled:  Sep 05 2019 11:40AM EDT**
**Transaction ID 64162287**
**Case No. K19C-06-022 JJC**



**Sheriff's Office**                          State of Delawa
800 N. French Street, 5th Floor              New Castle County
Wilmington, Delaware 19801                   **Scott T. Phillips**
302-395-8450, Fax: 302-395-8460              Sheriff

9/5/2019

**Court Case # K19C-06-022 JJC**
Sheriff # 19-007489

Summons and Complaint

### CITY OF DOVER, CITY OF SEAFORD AND KENT COUNTY
vs
### PURDUE PHARMA, L.P.; PURDUE PHARMA INC.; ET AL

Entity - RHODES PHARMACEUTICALS, L.P.

On 9/3/2019 at 10:00 AM a copy of the within writ together with a copy of the Summons and Complaint were served upon Litigation Management Representative, a representative for the registered agent CORPORATION SERVICE COMPANY 251 LITTLE FALLS DRIVE WILMINGTON, DE 19808 .

Fees Paid:  $185.00

Per:  Deputy Sheriff, Jeffrey Maddocks

SO ANS;

SHERIFF

PER   Tracy Lopez

**EFiled:  Sep 05 2019 11:40AM EDT**
**Transaction ID 64162286**
**Case No. K19C-06-022 JJC**



**Sheriff's Office**

800 N. French Street, 5th Floor
Wilmington, Delaware 19801
302-395-8450, Fax: 302-395-8460

State of Delawa
New Castle County
**Scott T. Phillips**
Sheriff

9/5/2019

**Court Case # K19C-06-022 JJC**
Sheriff # 19-007489

Summons and Complaint

### CITY OF DOVER, CITY OF SEAFORD AND KENT COUNTY
### vs
### PURDUE PHARMA, L.P.; PURDUE PHARMA INC.; ET AL

Entity - PURDUE PHARMA, L.P.

On 9/3/2019 at 10:00 AM a copy of the within writ together with a copy of the Summons and Complaint were served upon Litigation Management Representative, a representative for the registered agent PRENTICE HALL CORPORATION SYSTEMS, INC 251 LITTLE FALLS DRIVE WILMINGTON, DE 19808 .

Fees Paid:  $185.00

Per:  Deputy Sheriff, Jeffrey Maddocks

SO ANS;

SHERIFF

PER   Tracy Lopez

**EFiled: Sep 05 2019 11:40AM EDT**
**Transaction ID 64162293**
**Case No. K19C-06-022 JJC**



**Sheriff's Office**
800 N. French Street, 5th Floor
Wilmington, Delaware 19801
302-395-8450, Fax: 302-395-8460

State of Delawa
New Castle County
**Scott T. Phillips**
Sheriff

9/5/2019

**Court Case # K19C-06-022 JJC**
Sheriff # 19-007489

Summons and Complaint

### CITY OF DOVER, CITY OF SEAFORD AND KENT COUNTY
#### vs
### PURDUE PHARMA, L.P.; PURDUE PHARMA INC.; ET AL

Entity - TEVA PHARMACEUTICALS USA, INC

On 9/3/2019 at 2:53 PM a copy of the within writ together with a copy of the Summons and Complaint were served upon JOELLE AGINA - AGENT, a representative for the registered agent CORPORATE CREATIONS NETWORK INC 3411 SILVERSIDE ROAD TATNALL BUILDING SUITE 104 WILMINGTON, DE 19810 .

Fees Paid:  $185.00

Per:  Deputy Sheriff, Jeffrey Maddocks

SO ANS;

SHERIFF

PER   Tracy Lopez

EFiled:  Sep 05 2019 11:40AM EDT
Transaction ID 64162290
Case No. K19C-06-022 JJC



**Sheriff's Office**

800 N. French Street, 5th Floor
Wilmington, Delaware 19801
302-395-8450, Fax: 302-395-8460

State of Delawa
New Castle County
**Scott T. Phillips**
Sheriff

9/5/2019

**Court Case # K19C-06-022 JJC**
Sheriff # 19-007489

Summons and Complaint

### CITY OF DOVER, CITY OF SEAFORD AND KENT COUNTY
### vs
### PURDUE PHARMA, L.P.; PURDUE PHARMA INC.; ET AL

Entity - MCKESSON CORPORATION

On 9/3/2019 at 10:00 AM a copy of the within writ together with a copy of the Summons and Complaint were served upon Litigation Management Representative, a representative for the registered agent CORPORATION SERVICE COMPANY 251 LITTLE FALLS DRIVE WILMINGTON, DE 19808 .

Fees Paid:  $185.00

Per:  Deputy Sheriff, Jeffrey Maddocks

SO ANS;

SHERIFF

PER   Tracy Lopez

**EFiled:  Sep 05 2019 11:40AM EDT**
**Transaction ID 64162295**
**Case No. K19C-06-022 JJC**



**Sheriff's Office**

800 N. French Street, 5th Floor

Wilmington, Delaware 19801

302-395-8450, Fax: 302-395-8460

State of Delawa

New Castle County

**Scott T. Phillips**

Sheriff

9/5/2019

**Court Case # K19C-06-022 JJC**

Sheriff # 19-007489

Summons and Complaint

**CITY OF DOVER, CITY OF SEAFORD AND KENT COUNTY**

**vs**

**PURDUE PHARMA, L.P.; PURDUE PHARMA INC.; ET AL**

Entity - CEPHALON, INC

On 9/3/2019 at 2:53 PM a copy of the within writ together with a copy of the Summons and Complaint were served upon JOELLE AGINA - AGENT, a representative for the registered agent CORPORATE CREATIONS NETWORK INC 3411 SILVERSIDE ROAD TATNALL BUILDING  SUITE 104 WILMINGTON, DE 19810 .

Fees Paid:  $185.00

Per:  Deputy Sheriff, Jeffrey Maddocks

SO ANS;

SHERIFF

PER   Tracy Lopez

**EFiled: Sep 05 2019 11:40AM EDT**
**Transaction ID 64162292**
**Case No. K19C-06-022 JJC**



**Sheriff's Office**                                 State of Delawa
800 N. French Street, 5th Floor                New Castle County
Wilmington, Delaware 19801                     **Scott T. Phillips**
302-395-8450, Fax: 302-395-8460                    Sheriff

9/5/2019

**Court Case # K19C-06-022 JJC**
Sheriff # 19-007489

Summons and Complaint

### CITY OF DOVER, CITY OF SEAFORD AND KENT COUNTY
### vs
### PURDUE PHARMA, L.P.; PURDUE PHARMA INC.; ET AL

Entity - WALGREENS BOOTS ALLIANCE INC

On 9/3/2019 at 10:00 AM a copy of the within writ together with a copy of the Summons and Complaint were served upon Litigation Management Representative, a representative for the registered agent CORPORATION SERVICE COMPANY 251 LITTLE FALLS DRIVE WILMINGTON, DE 19808 .

Fees Paid:  $185.00

Per:  Deputy Sheriff, Jeffrey Maddocks

SO ANS;

SHERIFF

PER   Tracy Lopez

**EFiled:  Sep 05 2019 11:40AM EDT**
**Transaction ID 64162296**
**Case No. K19C-06-022 JJC**



**Sheriff's Office**

800 N. French Street, 5th Floor
Wilmington, Delaware 19801
302-395-8450, Fax: 302-395-8460

State of Delawa
New Castle County
**Scott T. Phillips**
Sheriff

9/5/2019

**Court Case # K19C-06-022 JJC**
Sheriff # 19-007489

Summons and Complaint

### CITY OF DOVER, CITY OF SEAFORD AND KENT COUNTY
### vs
### PURDUE PHARMA, L.P.; PURDUE PHARMA INC.; ET AL

Entity - ACTAVIS, LLC

On 9/3/2019 at 2:53 PM a copy of the within writ together with a copy of the Summons and Complaint were served upon JOELLE AGINA - AGENT, a representative for the registered agent CORPORATE CREATIONS NETWORK INC 3411 SILVERSIDE ROAD TATNALL BUILDING  SUITE 104 WILMINGTON, DE 19810 .

Fees Paid:  $185.00

Per:  Deputy Sheriff, Jeffrey Maddocks

SO ANS;

SHERIFF

PER   Tracy Lopez

**EFiled:  Sep 05 2019 11:40AM EDT**
**Transaction ID 64162299**
**Case No. K19C-06-022 JJC**



**Sheriff's Office**

800 N. French Street, 5th Floor
Wilmington, Delaware 19801
302-395-8450, Fax: 302-395-8460

State of Delawa
New Castle County
**Scott T. Phillips**
Sheriff

9/5/2019

**Court Case # K19C-06-022 JJC**
Sheriff # 19-007489

Summons and Complaint

**CITY OF DOVER, CITY OF SEAFORD AND KENT COUNTY**
**vs**
**PURDUE PHARMA, L.P.; PURDUE PHARMA INC.; ET AL**

Entity - ACTAVIS PHARMA, INC

On 9/3/2019 at 2:53 PM a copy of the within writ together with a copy of the Summons and Complaint were served upon JOELLE AGINA - AGENT, a representative for the registered agent CORPORATE CREATIONS NETWORK INC 3411 SILVERSIDE ROAD TATNALL BUILDING  SUITE 104 WILMINGTON, DE 19810 .

Fees Paid:  $185.00

Per:  Deputy Sheriff, Jeffrey Maddocks

SO ANS;

SHERIFF

PER   Tracy Lopez

**EFiled:  Sep 05 2019 11:40AM EDT
Transaction ID 64162303
Case No. K19C-06-022 JJC**



**Sheriff's Office**
800 N. French Street, 5th Floor
Wilmington, Delaware 19801
302-395-8450, Fax: 302-395-8460

State of Delawa
New Castle County
**Scott T. Phillips**
Sheriff

9/5/2019

**Court Case # K19C-06-022 JJC**
Sheriff # 19-007489

Summons and Complaint

### CITY OF DOVER, CITY OF SEAFORD AND KENT COUNTY
### vs
### PURDUE PHARMA, L.P.; PURDUE PHARMA INC.; ET AL

Entity - ENDO HEALTH SOLUTIONS, INC

On 9/4/2019 at 9:50 AM a copy of the within writ together with a copy of the Summons and Complaint were served upon Amy McLaren, a representative for the registered agent CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE 19801 .

Fees Paid:  $185.00

Per:  Deputy Sheriff, Joseph Meriggi

SO ANS;

SHERIFF

PER   Tracy Lopez

**EFiled:  Sep 05 2019 11:40AM EDT**
**Transaction ID 64162306**
**Case No. K19C-06-022 JJC**



**Sheriff's Office**

800 N. French Street, 5th Floor
Wilmington, Delaware 19801
302-395-8450, Fax: 302-395-8460

State of Delawa
New Castle County
**Scott T. Phillips**
Sheriff

9/5/2019

**Court Case # K19C-06-022 JJC**
Sheriff # 19-007489

Summons and Complaint

### CITY OF DOVER, CITY OF SEAFORD AND KENT COUNTY
### vs
### PURDUE PHARMA, L.P.; PURDUE PHARMA INC.; ET AL

Entity - ENDO PHARMACEUTICALS, INC

On 9/4/2019 at 9:50 AM a copy of the within writ together with a copy of the Summons and Complaint were served upon Amy McLaren, a representative for the registered agent CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE 19801 .

Fees Paid:  $185.00

Per:  Deputy Sheriff, Joseph Meriggi

SO ANS;

SHERIFF

PER   Tracy Lopez

**EFiled:  Sep 05 2019 11:40AM EDT**
**Transaction ID 64162308**
**Case No. K19C-06-022 JJC**



**Sheriff's Office**                                State of Delawa
800 N. French Street, 5th Floor                    New Castle County
Wilmington, Delaware 19801                         **Scott T. Phillips**
302-395-8450, Fax: 302-395-8460                    Sheriff

9/5/2019

**Court Case # K19C-06-022 JJC**
Sheriff # 19-007489

Summons and Complaint

### CITY OF DOVER, CITY OF SEAFORD AND KENT COUNTY
### vs
### PURDUE PHARMA, L.P.; PURDUE PHARMA INC.; ET AL

Entity - MALLINCKRODT LLC

On 9/4/2019 at 9:50 AM a copy of the within writ together with a copy of the Summons and
Complaint were served upon Amy McLaren, a representative for the registered agent
CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE 19801 .

Fees Paid:  $185.00

Per:  Deputy Sheriff, Joseph Meriggi

SO ANS;

*Scott R Phillips*

SHERIFF

PER   Tracy Lopez

**EFiled:  Sep 05 2019 11:40AM EDT**
**Transaction ID 64162310**
**Case No. K19C-06-022 JJC**



**Sheriff's Office**

800 N. French Street, 5th Floor
Wilmington, Delaware 19801
302-395-8450, Fax: 302-395-8460

State of Delawa
New Castle County
**Scott T. Phillips**
Sheriff

9/5/2019

**Court Case # K19C-06-022 JJC**
Sheriff # 19-007489

Summons and Complaint

**CITY OF DOVER, CITY OF SEAFORD AND KENT COUNTY**
**vs**
**PURDUE PHARMA, L.P.; PURDUE PHARMA INC.; ET AL**

Entity - ASSERTIO THERAPEUTICS, INC

On 9/4/2019 at 9:50 AM a copy of the within writ together with a copy of the Summons and Complaint were served upon Amy McLaren, a representative for the registered agent CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE 19801 .

Fees Paid:  $185.00

Per:  Deputy Sheriff, Joseph Meriggi

SO ANS;

SHERIFF

PER   Tracy Lopez

**EFiled: Sep 05 2019 11:40AM EDT**
**Transaction ID 64162309**
**Case No. K19C-06-022 JJC**



**Sheriff's Office**                                    State of Delawa

800 N. French Street, 5th Floor                    New Castle County

Wilmington, Delaware 19801                    **Scott T. Phillips**

302-395-8450, Fax: 302-395-8460                    Sheriff

9/5/2019

**Court Case # K19C-06-022 JJC**

Sheriff # 19-007489

Summons and Complaint

### CITY OF DOVER, CITY OF SEAFORD AND KENT COUNTY
### vs
### PURDUE PHARMA, L.P.; PURDUE PHARMA INC.; ET AL

Entity - INSYS THERAPEUTICS, INC

On 9/4/2019 at 9:50 AM a copy of the within writ together with a copy of the Summons and Complaint were served upon Amy McLaren, a representative for the registered agent CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE 19801 .

Fees Paid:  $185.00

Per:  Deputy Sheriff, Joseph Meriggi

SO ANS;

*Scott T. Phillips*

SHERIFF

PER   Tracy Lopez

**EFiled: Sep 05 2019 11:40AM EDT**
**Transaction ID 64162311**
**Case No. K19C-06-022 JJC**



**Sheriff's Office**

800 N. French Street, 5th Floor
Wilmington, Delaware 19801
302-395-8450, Fax: 302-395-8460

State of Delawa
New Castle County
**Scott T. Phillips**
Sheriff

9/5/2019

**Court Case # K19C-06-022 JJC**
Sheriff # 19-007489

Summons and Complaint

### CITY OF DOVER, CITY OF SEAFORD AND KENT COUNTY
### vs
### PURDUE PHARMA, L.P.; PURDUE PHARMA INC.; ET AL

Entity - AMERISOURCEBERGEN DRUG CORPORATION

On 9/4/2019 at 9:50 AM a copy of the within writ together with a copy of the Summons and Complaint were served upon Amy McLaren, a representative for the registered agent CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE 19801 .

Fees Paid:  $185.00

Per:  Deputy Sheriff, Joseph Meriggi

SO ANS;

SHERIFF

PER   Tracy Lopez

**EFiled:  Sep 05 2019 11:40AM EDT**
**Transaction ID 64162314**
**Case No. K19C-06-022 JJC**



**Sheriff's Office**                                         State of Delawa

800 N. French Street, 5th Floor                 New Castle County

Wilmington, Delaware 19801                   **Scott T. Phillips**

302-395-8450, Fax: 302-395-8460            Sheriff


                                                                    9/5/2019

**Court Case # K19C-06-022 JJC**

Sheriff # 19-007489


Summons and Complaint


### CITY OF DOVER, CITY OF SEAFORD AND KENT COUNTY
### vs
### PURDUE PHARMA, L.P.; PURDUE PHARMA INC.; ET AL


Entity - CVS HEALTH CORPORATION


On 9/4/2019 at 9:50 AM a copy of the within writ together with a copy of the Summons and
Complaint were served upon Amy McLaren, a representative for the registered agent
CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE 19801 .


Fees Paid:  $185.00


Per:  Deputy Sheriff, Joseph Meriggi


SO ANS;


                SHERIFF


PER   Tracy Lopez

**EFiled:  Sep 05 2019 11:40AM EDT**
**Transaction ID 64162313**
**Case No. K19C-06-022 JJC**



**Sheriff's Office**

800 N. French Street, 5th Floor
Wilmington, Delaware 19801
302-395-8450, Fax: 302-395-8460

State of Delawa
New Castle County
**Scott T. Phillips**
Sheriff

9/5/2019

**Court Case # K19C-06-022 JJC**
Sheriff # 19-007489

Summons and Complaint

### CITY OF DOVER, CITY OF SEAFORD AND KENT COUNTY
### vs
### PURDUE PHARMA, L.P.; PURDUE PHARMA INC.; ET AL

Entity - H D SMITH LLC

On 9/4/2019 at 9:50 AM a copy of the within writ together with a copy of the Summons and Complaint were served upon Amy McLaren, a representative for the registered agent CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE 19801 .

Fees Paid:  $185.00

Per:  Deputy Sheriff, Joseph Meriggi

SO ANS;

*Scott R Phillips*

SHERIFF

PER   Tracy Lopez

**EFiled: Sep 05 2019 11:40AM EDT**
**Transaction ID 64162316**
**Case No. K19C-06-022 JJC**



**Sheriff's Office**

800 N. French Street, 5th Floor
Wilmington, Delaware 19801
302-395-8450, Fax: 302-395-8460

State of Delawa
New Castle County
**Scott T. Phillips**
Sheriff

9/5/2019

**Court Case # K19C-06-022 JJC**
Sheriff # 19-007489

Summons and Complaint

## CITY OF DOVER, CITY OF SEAFORD AND KENT COUNTY
### vs
### PURDUE PHARMA, L.P.; PURDUE PHARMA INC.; ET AL

Entity - RITE AID CORPORATION

On 9/4/2019 at 9:50 AM a copy of the within writ together with a copy of the Summons and Complaint were served upon Amy McLaren, a representative for the registered agent CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON, DE 19801 .

Fees Paid: $185.00

Per: Deputy Sheriff, Joseph Meriggi

SO ANS;

*Scott R Phillips*

        SHERIFF

PER   Tracy Lopez

EFiled:  Sep 13 2019 04:52PM EDT
Transaction ID 64204732
Case No. K19C-06-022 JJC

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| CITY OF DOVER, a municipal corporation of the State of Delaware, CITY OF SEAFORD, a municipal corporation of the State of Delaware, and KENT COUNTY, a political subdivision of the State of Delaware, | |
| Plaintiffs, | C.A. No. K19C-06-022 (JJC) |
| vs. | |
| PURDUE PHARMA L.P.; PURDUE PHARMA INC.; THE PURDUE FREDERICK COMPANY, INC.; RHODES PHARMACEUTICALS, L.P.; ABBOTT LABORATORIES; ABBOTT LABORATORIES, INC.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC N/K/A JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. N/K/A JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC F/K/A ACTAVIS PLC; ACTAVIS, INC. F/K/A WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; | TRIAL BY JURY OF TWELVE DEMANDED |

1

| | |
|---|---|
| **ACTAVIS LLC; ACTAVIS PHARMA, INC. F/K/A WATSON PHARMA, INC.; MALLINCKRODT PLC; MALLINCKRODT LLC; INSYS THERAPEUTICS, INC.; MYLAN PHARMACEUTICALS, INC.; ASSERTIO THERAPEUTICS, INC., F/K/A DEPOMED, INC.; MCKESSON CORPORATION; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN CORPORATION;  ANDA PHARMACEUTICALS, INC.; H.D. SMITH, LLC; CVS HEALTH CORPORATION; RITE AID CORPORATION; WALGREENS BOOTS ALLIANCE, INC.; RICHARD SACKLER; THERESA SACKLER; KATHE SACKLER; JONATHAN SACKLER; MORTIMER D.A. SACKLER; BEVERLY SACKLER; DAVID SACKLER; ILENE SACKLER LEFCOURT;** | |
| **Defendants.** | |

## AMENDMENT TO COMPLAINT PURSUANT TO RULE 4(h)

**COMES NOW**, the above-captioned Plaintiffs, by and through their undersigned counsel, who hereby submit this amendment to the complaint and affidavit of non-resident service pursuant to Superior Court Civil Rule 4(h):

STATE OF DELAWARE    )
                      )   SS:
COUNTY OF SUSSEX    )

BE IT REMEMBERED, that on this 13TH day of September, 2019, personally came before me, the Subscriber, a Notary Public in and for the State and County aforesaid, James D. Nutter, Esquire, attorney for the Plaintiffs, who being sworn according to law, did depose and say as follows:

1.    That I am co-counsel of record for Plaintiffs and the statements made herein are true and correct to the best of my knowledge, information and belief.

2.    That the named Defendants listed below are entities or individuals that are either organized under the laws of another jurisdiction or residents of a State other than Delaware, with addresses for their residences or places of business at:

| | |
|---|---|
| Purdue Pharma, Inc.<br>201 Tresser Blvd.<br>Stamford, CT 06901 | The Purdue Frederick Co.<br>201 Tresser Blvd.<br>Stamford, CT 06901 |
| Abbott Laboratories<br>100 Abbott Park Road<br>Abbott Park, IL 60064-3500 | Abbott Laboratories, Inc.<br>100 Abbott Park Road<br>Abbott Park, IL 60064-3500 |
| Teva Pharmaceutical Industries, Ltd.<br>1090 Horsham Road<br>North Wales, PA 19454 | Johnson & Johnson<br>1 Johnson & Johnson Plaza<br>New Brunswick, NJ 08933 |
| Janssen Pharmaceuticals, Inc.<br>1125 Bear Harbor Road<br>Titusville, NJ 08560 | Ortho-McNeil-Janssen Pharmaceuticals<br>1125 Bear Harbor Road<br>Titusville, NJ 08560 |
| Janssen Pharmaceutica, Inc.<br>1125 Bear Harbor Road | Mylan Pharmaceuticals, Inc.<br>1000 Mylan Blvd. |

Titusville, NJ  08560

Cardinal Health, Inc.
7000 Cardinal Place
Dublin, OH  43017

Jonathan Sackler
201 Tresser Blvd.
Stamford, CT  06901

Ilene Sackler Lefcourt
146 Central Park West, Apt. 12
New York, NY  10023

Canonsburg, PA  15317

Theresa Sackler
980 5th Avenue, Apt. 24A
New York, NY  10075

Beverly Sackler
60 Field Point Circle
Greenwich, CT  06830

3.     That pursuant to 10 *Del. C.* §3104(d), on or about August 29, 2019, I sent by certified mail through the United States Postal Service ("USPS"), with return receipt requested, a copy of the Case Information Statement, Summons, Praecipe, and Complaint to the above-listed Defendants at the addresses listed in Paragraph 2, with USPS certified mail tracking numbers listed as follows:

| Defendant | USPS Certified Tracking Number |
| --- | --- |
| Purdue Pharma, Inc. | 7012 1640 0001 0892 5215 |
| The Purdue Frederick Company | 7012 1640 0001 0892 5208 |
| Abbott Laboratories | 7012 1640 0001 0892 5413 |
| Abbott Laboratories, Inc. | 7012 1640 0001 0892 5420 |
| Teva Pharmaceutical Industries, Ltd | 7012 1640 0001 0892 5437 |
| Johnson & Johnson | 7012 1640 0001 0892 5444 |
| Janssen Pharmaceuticals, Inc. | 7012 1640 0001 0892 5451 |

4

| | |
|---|---|
| Ortho-McNeil-Janssen, Inc. | 7012 1640 0001 0892 5468 |
| Janssen Pharmaceutica, Inc. | 7012 1640 0001 0892 5475 |
| Mylan Pharmaceuticals, Inc. | 7012 1640 0001 0892 5024 |
| Cardinal Health, Inc. | 7012 1640 0001 0892 5147 |
| Theresa Sackler | 7012 1640 0001 0892 5055 |
| Jonathan Sackler | 7006 0100 0001 7214 1640 |
| Bevery Sackler | 7006 0100 0001 7214 1688 |
| Ilene Sackler Lefcourt | 7006 0100 0001 7375 5808 |

4.      That between September 5, 2019, and September 12, 2019, certified mailing receipts were returned to my office indicating that service of the Case Information Statement, Summons, Praecipe, and Complaint was delivered to the Defendants on the dates set forth below and signed for by the applicable Defendant or an agent thereof.

| Defendant | Service Date |
|---|---|
| Purdue Pharma, Inc. | September 4, 2019 |
| The Purdue Frederick Company | September 5, 2019 |
| Abbott Laboratories | September 3, 2019 |
| Abbott Laboratories | September 3, 2019 |
| Teva Pharmaceutical Industries, Ltd. | September 3, 2019 |
| Johnson & Johnson | September 4, 2019 |

| | |
|---|---|
| Janssen Pharmaceuticals, Inc. | September 3, 2019 |
| Ortho-McNeil-Janssen, Inc. | September 3, 2019 |
| Janssen Pharmaceutica, Inc. | September 3, 2019 |
| Mylan Pharmaceuticals, Inc. | September 4, 2019 |
| Cardinal Health, Inc. | September 3, 2019 |
| Theresa Sackler | September 3, 2019 |
| Jonathan Sackler | September 5, 2019 |
| Beverly Sackler | September 3, 2019 |
| Ilene Sackler Lefcourt | September 4, 2019 |

5.     That copies the certified mailing receipts indicating delivery confirmation are attached hereto as Ex. A.

_____
JAMES D. NUTTER, ESQUIRE
Del. Bar I.D. No. 3654
19354C Miller Road
Rehoboth Beach, DE 19971
(302) 226-8702
jnutter@pgslegal.com

SWORN TO AND SUBSCRIBED before me the day and year aforesaid.

_____
NOTARY PUBLIC

DATED:  September 13, 2019

CORTNEY LEE MOORE
Notary Public
State of Delaware
My Commission Expires 9/20/2021

6

# EXHIBIT A

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Purdue Pharma, Inc.
201 Tresser Blvd.
Stanford, CT 06901

9590 9402 4016 8079 2150 25

2. Article Number *(Transfer from service label)*

7012 1640 0001 0892 5215

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                        ☐ Addressee

B. Received by *(Printed Name)*        C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

The Purdue Frederick Co.
201 Tresser Blvd.
Stamford, CT 06901

9590 9402 2915 7094 8968 73

2. Article Number (Transfer from service label)

7012 1640 0001 0892 5208

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053      Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Abott Laboratories
100 Abott Park Road
Abott Park, IL 60064 - 3500

9590 9402 2915 7094 8965 83

2. Article Number (Transfer from service label)

7012 1640 0001 0892 5413

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X  M Candela ☐ Agent
☐ Addressee

B. Received by (Printed Name)
M. Candela

C. Date of Delivery
9-3-1

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

ABSolt Laboratories, Inc.
100 ABSolt Park Road
ABSolt Park, IL 60064-3500

9590 9402 2915 7094 8965 76

2. Article Number (Transfer from service label)

7012 1640 0001 0892 5420

PS Form **3811**, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X  M. Marshal
☐ Agent
☐ Addressee

B. Received by (Printed Name)
M. Marshal
C. Date of Delivery
9.3.19

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

Missing Cert. Tracking#

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Teva Pharmaceutical LTD.
1090 Horsham Road
North Wales, PA 19454

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
9590 9402 2915 7094 8965 69

2. Article Number (Transfer from service label)

7012 1640 0001 0892 5437

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____ ☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053           Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse
   so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
   or on the front if space permits.

1. Article Addressed to:

Johnson & Johnson
1 Johnson & Johnson Plaza
New Brunswick, NJ 08733

9590 9402 2915 7094 8965 52

2. Article Number (Transfer from service label)

7012 1640 0001 0892 5444

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                     ☐ Agent
                                      ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

08899

SEP 04 2019

USPS

3. Service Type
   ☐ Adult Signature
   ☐ Adult Signature Restricted Delivery
   ☐ Certified Mail®
   ☐ Certified Mail Restricted Delivery
   ☐ Collect on Delivery
   ☐ Collect on Delivery Restricted Delivery
   ☐ Insured Mail
   ☐ Insured Mail Restricted Delivery
      (over $500)

   ☐ Priority Mail Express®
   ☐ Registered Mail™
   ☐ Registered Mail Restricted
      Delivery
   ☐ Return Receipt for
      Merchandise
   ☐ Signature Confirmation™
   ☐ Signature Confirmation
      Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053                    Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Janssen Pharmaceutical
1125 Bear Tavern Road
Titusville, NJ 08560

9590 9402 2915 7094 8965 45

2. Article Number (Transfer from service label)

7012 1640 0001 0892 5451

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                         ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
                                 9/3/19

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below:       ☑ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Ortho-Mc Neil-Janssen
1125 Bear Tavern Road
Titusville, NJ 08560

9590 9402 2915 7094 8965 38

2. Article Number (Transfer from service label)

7012 1640 0001 0892 5468

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ☐ Agent
☐ Addressee

B. Received by (Printed Name)  C. Date of Delivery
9/9/11

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☒ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Janssen Pharmaceutica
1125 Bear Tavern Road
Titusville, NJ 08360

9590 9402 2915 7094 8965 21

2. Article Number (Transfer from service label)

7012 1640 0001 0892 5475

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                      ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
                                9/5/19

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☑ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Cardinal Health, Inc.
7000 Cardinal Place
Dublin, OH 43017

9590 9402 2915 7094 8969 65

2. Article Number (Transfer from service label)

7J12 1640 0001 0892 5147

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

SEP 3 2019

43016-USPS

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mylan Pharmaceuticals
1000 Mylan Blvd.
Canonsburg, PA 15317

9590 9402 2915 7094 8969 58

2. Article Number *(Transfer from service label)*

7012 1640 0001 0892 5024

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
☐ Addressee

B. Received by *(Printed Name)* | C. Date of Delivery

RECD SEP 0 4 2019

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   ($500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☑ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Theresa Sackler
980 5th Avenue Apt 9HA
New York, NY 10075-

9590 9402 2915 7094 8969 03

2. Article Number (Transfer from service label)

7012 1640 0001 0892 5055

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X [signature]   □ Agent   □ Addressee

B. Received by (Printed Name)
A. GARABEDIAN   C. Date of Delivery 9/3/19

D. Is delivery address different from item 1?   □ Yes
   If YES, enter delivery address below:   □ No

3. Service Type
□ Adult Signature
□ Adult Signature Restricted Delivery
□ Certified Mail®
□ Certified Mail Restricted Delivery
□ Collect on Delivery
□ Collect on Delivery Restricted Delivery
□ Insured Mail
□ Insured Mail Restricted Delivery
    (over $500)

□ Priority Mail Express®
□ Registered Mail™
□ Registered Mail Restricted Delivery
□ Return Receipt for Merchandise
□ Signature Confirmation™
□ Signature Confirmation Restricted Delivery

Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Jonathan Sackler
201 Tresser Blvd.
Stanford, CT 06901

9590 9402 2915 7094 8968 80

2. Article Number (Transfer from service label)

7006 0100 0001 7214 1640

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X
☐ Agent
☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053     Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse
   so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
   or on the front if space permits.

1. Article Addressed to:

Beverly Sackler
60 Field Point Circle
Greenwich, CT 06830

9590 9402 4016 8079 2070 68

2. Article Number (Transfer from service label)

7006 0100 0001 7214 1668

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                         ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:      ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted
   Delivery
☐ Return Receipt for
   Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation
   Restricted Delivery

Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Ilene Sackler Lefcourt
146 Central Park West Apt 10
New York, NY 10023

9590 9402 4016 8079 2150 32

2. Article Number (Transfer from service label)

7006 0100 0001 7375 5808

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____ ☐ Agent
☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053     Domestic Return Receipt